# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ARTHUR BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 18 CV 7064 |
| v. | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| CITY OF CHICAGO, former Chicago | ) | |
| Police Officers JOSEPH CAMPBELL, | ) | |
| Special Representative for DAVID | ) | |
| KUTZ, and Special Representative for | ) | JURY TRIAL DEMANDED |
| JOSEPH FINE, Former Assistant State's | ) | |
| Attorney JOEL WHITEHOUSE, and | ) | |
| other as-yet unidentified employees of | ) | |
| the City of Chicago, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiff Arthur Brown, by and through his attorneys, Riley Safer Holmes and Cancila LLP, for his Complaint against Defendants City of Chicago, former Chicago Police Officers Joseph Campbell, David Kutz, and Joseph Fine, Former Assistant State's Attorney Joel Whitehouse, and as-yet unidentified City of Chicago Employees, alleges as follows:

## INTRODUCTION

1.     Plaintiff Arthur Brown spent 29 years, 5 months, and 17 days incarcerated for a crime that he did not commit. Arrested in the prime of his life, Mr. Brown was wrongfully convicted of arson and murder and sentenced to life in prison without the possibility of parole.

2.     There was no physical evidence connecting Mr. Brown to the crime. There was no forensic evidence connecting Mr. Brown to the crime.  There was no circumstantial evidence connecting Mr. Brown to the crime.  No eyewitness placed Mr. Brown at the scene of the crime.

3. Mr. Brown was convicted solely based on a coerced confession, corroborated only by fabricated evidence and false testimony that Defendants manufactured, manipulated, and coerced. This miscarriage of justice was the direct result and natural consequence of the *de facto* policies and practices of the Chicago Police Department.

4. Now exonerated and declared innocent, Mr. Brown brings this lawsuit to redress the injustice that Defendants inflicted upon him.

## JURISDICTION AND VENUE

5. This action is brought under 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution, and under various state law causes of action.

6. The Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

7. Venue in this District is proper under 28 U.S.C. § 1391(b) because Defendant City of Chicago is a municipal corporation that resides within this District, and because the events giving rise to the claims asserted in this Complaint occurred within this District.

## THE PARTIES

8. Plaintiff Arthur Brown ("Plaintiff" or "Mr. Brown") is a United States citizen who resides within the territorial limits of the United States District Court for the Northern District of Illinois. At the time of the events leading to the wrongful conviction described in this Complaint, Mr. Brown was 37 years old and was self-employed as a contractor.

9. At all times relevant to this Complaint, Defendants David Kutz (Star #9289), Joseph Fine (Star #14925), and Joseph Campbell (Star #11805) were Area One detectives with the Chicago Police Department, employed by Defendant City of Chicago and acting within the scope

of their employment. These Defendants, along with other as-yet unidentified employees of the City of Chicago, are referred to as the "Officer Defendants."

10.     At all times relevant to this Complaint, Defendant Joel Whitehouse was an Assistant State's Attorney in the Cook County State's Attorney's Office, and was working in an investigatory, not a prosecutorial, capacity.

11.     Defendant City of Chicago (the "City") is a municipal corporation under the laws of the State of Illinois. The City operates the Chicago Police Department ("CPD") and is responsible for the policies, practices, and customs of the City and the CPD.

## FACTUAL BACKGROUND

12.     In the early morning hours of May 28, 1988, the Saturday of Memorial Day Weekend, Mr. Brown was at his mother's home, where he lived at the time, making breakfast and talking to his niece as he prepared for his workday.

13.     At approximately 6:00 a.m., a friend picked Mr. Brown up and drove him to a construction site at Vincennes Avenue and 44th Street in Chicago, Illinois, where Mr. Brown was completing the last day of a roof installation project. Mr. Brown owned and operated a general contracting business that performed construction, remodeling, and roofing at residential and commercial buildings throughout the Chicagoland area.

14.     Unbeknownst to Mr. Brown, less than an hour earlier, a fire consumed Magic Video Store on 63rd Street between South Vernon Avenue and King Drive in Chicago, where Mr. Brown had previously done minor repair work. Tragically, the fire killed Keirt Phophairat and Pismai Panichkarn, who were sleeping in an adjacent Thai restaurant called King Chef and died of smoke inhalation.

15.     In the hours following this incident, Defendants began building a murder case with fabricated evidence that they would pin on Mr. Brown by torturing him into giving a false confession.

### **Defendants' Investigation of the Fire**

16.     Upon information and belief, the Magic Video fire started at approximately 5:05 a.m. on May 28, 1988.  Two CPD officers, David Brown and Hester Scott, observed smoke coming from Magic Video and King Chef while on routine patrol.  They arrived on the scene within minutes of the fire starting.  They did not see Mr. Brown, because Mr. Brown was not at the scene.

17.     While at the scene, Officers Brown and Scott interviewed an eyewitness, Sid Malone, who described seeing two black males walk into Magic Video with a gasoline can shortly before the fire started, while two other black males were already inside Magic Video.  Mr. Malone did *not* identify Mr. Brown, and did not describe anyone who resembled Mr. Brown, either as one of the two men who walked into Magic Video or as one of the two men who were already inside.

18.     Mr. Malone also identified a white Ford Bronco with license plate number GAS403 parked near Magic Video.  This vehicle had no connection to Mr. Brown.  It was registered to Michael Harper, who co-owned Magic Video with his mother.

19.     Officers Brown and Scott then interviewed Michael Harper, who approached them at the scene minutes after the fire started.  Again, Mr. Brown was nowhere to be seen, because he was not there.

20.     Defendants Fine, Kutz, and Campbell thereafter took over as the lead detectives investigating the Magic Video fire.  Defendants Fine and Kutz interviewed Officers Brown and Scott about their earlier conversations with Mr. Malone and Michael Harper.  Meanwhile, Defendant Campbell concluded that the Magic Video fire was an arson, set by spreading gasoline over a mattress inside Magic Video.

21.     During these same morning hours, the Officer Defendants and other CPD officers also collected physical evidence allegedly related to the fire: a gasoline can found under a towel and a green woman's vest; the license plates GAS403 from the white Ford Bronco; x-rated video tapes recovered from the white Ford Bronco; and charred remnants from inside Magic Video. None of this evidence was in any way connected to Mr. Brown.

22.     By mid-morning, within only a few hours of the Magic Video fire, the Officer Defendants had constructed their theory of the crime: Arthur Brown, Michael Harper, Geronia Ford (Michael Harper's cousin), and Albert Harper[1] (Michael Harper's uncle) set the fire together. Officer Defendants theorized that Mr. Brown and Michael Harper prepared the store to be burned, while Mr. Ford and Albert Harper drove Michael Harper's white Ford Bronco to purchase a can of gas to start the fire. Because there was no actual evidence to support that theory, Officer Defendants devised a plan to *make* the evidence fit their theory of the crime.

23.     As the first step in this plan, Defendant Kutz (with another yet-to-be-identified CPD officer) set out to find a witness to testify that he sold gas in a gas can to Mr. Ford and Albert Harper.  This brought him to a Citgo gas station at 67th Street and Eberhardt Street, just blocks from Magic Video.  However, the night-shift gas station attendant, Cecil Hingston, told Defendant Kutz that he did not sell a can of gas to anyone that night.  Frustrated, Defendant Kutz left, but later returned to the Citgo, where Mr. Hingston again protested that he did not sell a can of gas to anyone that night.

24.     Unsatisfied with that answer, Defendant Kutz threatened Mr. Hingston: if he did not acknowledge selling gas in a gas can to two black males driving a white Ford truck, then

---

[1] To avoid confusion between Michael Harper and Albert Harper, the Complaint refers to these individuals by their full names.

Defendant Kutz would (falsely) report Mr. Hingston for not documenting a sale of gas. Despite Mr. Hingston's emphatic objections, Defendant Kutz ultimately succeeded in coercing Mr. Hingston to claim that he sold a can of gas to two black males driving a white Ford truck in the early morning hours of May 28, 1988. Armed with Mr. Hingston's fabricated story – which in no way implicated Mr. Brown – the Officer Defendants then proceeded to plug Mr. Brown into their theory of the crime.

### Defendants' Early Efforts to Force Mr. Brown to Confess and His Repeated Proclamations of Innocence

25. Despite the lack of any physical, forensic, circumstantial, or eyewitness evidence connecting Mr. Brown to the Magic Video fire, the Officer Defendants set out to connect him to the crime. Defendants Fine and Campbell, following information provided by Mr. Brown's mother, visited Mr. Brown's worksite at 44th and Vincennes and left their business card while Mr. Brown was offsite at lunch. When Mr. Brown returned from lunch, he called Defendant Fine and invited Defendants Fine and Campbell to come to his worksite. When they arrived, Mr. Brown voluntarily came down from the roof where he was working and identified himself. Defendants Fine and Campbell then arrested Mr. Brown, triggering 10,762 days of captivity.

26. Mr. Brown did not know that there had been a fire at Magic Video and did not know why he had been arrested. When Defendants Fine and Campbell brought Mr. Brown to Area One headquarters, they placed him in a small, windowless room on the second floor and used his handcuffs to chain him to a ring on the wall in a standing position. The holding room was so hot that the detectives interrogating Mr. Brown could not remain there for a significant amount of time. For over seven hours, Mr. Brown was left in this small, hot, windowless room, chained to the wall, without anything to eat or drink.

27. Occasionally, Defendants Fine and Campbell returned to the holding room individually and asked Mr. Brown if he was ready to confess his involvement in the fire. Mr. Brown repeatedly and steadfastly maintained his innocence, telling Defendants Fine and Campbell that he was not involved in, and did not know anything about, a fire at Magic Video. Mr. Brown repeatedly requested a lawyer. Defendants Fine and Campbell ignored his requests and instead continued to interrogate him.

28. At one point, Mr. Brown was allowed to leave the room to make a phone call to his mother, but Defendants Whitehouse and Campbell eavesdropped on his conversation from another phone down the hall.

29. Throughout this entire ordeal, Mr. Brown never wavered in his proclamations of innocence. He refused to confess, because there was nothing to confess.

### Defendants' Coercion of Mr. Brown's False Confession

30. No witness, including Mr. Malone – who was directly across the street from Magic Video just before the start of the fire – identified Mr. Brown or anyone resembling Mr. Brown as being inside or near Magic Video when the fire started. Further, Mr. Brown had no connection to any of the physical evidence recovered from the scene of the fire: no connection to the white Ford Bronco with license plates GAS403; no connection to the gas can, white towel, or green women's vest found near Magic Video; no connection to the videotapes supposedly removed from Magic Video before the fire. No forensic or circumstantial evidence connected Mr. Brown to the crime. *Nothing* connected Mr. Brown to the crime.

31. Over the seven hours Mr. Brown was forcefully detained by the Officer Defendants, Mr. Brown steadfastly maintained his innocence, denying any knowledge of – let alone involvement in – the Magic Video fire. Faced with the complete lack of evidence to substantiate

any theory of Mr. Brown's involvement, Defendants Fine, Campbell, and Whitehouse manufactured the only evidence that, to this day, has ever connected Mr. Brown to the Magic Video fire: a "confession."[2]

32.     After leaving Mr. Brown handcuffed to the wall for several hours, Defendant Fine stormed into the holding room and yelled, "Motherfucker, you are going to talk to me now."  He then grabbed Mr. Brown by the neck, choking him, and slammed his head and back against the wall several times.  Despite the trauma of this physical attack, Mr. Brown still proclaimed his innocence.  As Defendant Fine continued to choke Mr. Brown, he collapsed (while still chained to the wall) and briefly lost consciousness.  Upon regaining consciousness, Mr. Brown feared for his health, safety and, ultimately, his life.

33.     Shortly after this beating, Defendants Fine and Campbell returned to the holding room and presented several papers to Mr. Brown.   They told Mr. Brown that if he signed these papers, the torture and violence would end.   Mr. Brown was neither asked nor given any opportunity to read the papers in front of him.  In fact, Mr. Brown had limited literacy skills at the time of his arrest.  Rather than allowing Mr. Brown to review the papers, Defendants Fine and Campbell pointed to various places on the documents and instructed Mr. Brown to sign or initial them.  Facing the threat of additional beatings and torture if he did not sign, Mr. Brown complied.

34.     Fearful about the implications of what he was doing, Mr. Brown signed his name differently than his normal signature, believing this would show that he did not intend to signal agreement with the papers he signed.  Only later did he learn that these documents were his purported seven-page "confession."   The "confession," drafted by Defendant Whitehouse,

_____

[2] References to the "confession" throughout this Complaint do not include any notion that the "confession" contains voluntary or true admissions.

contained admissions fabricated from whole cloth by Defendants Whitehouse, Fine, and Campbell to ensure Mr. Brown's trial and conviction.

35.     In an effort to create the appearance of voluntary participation by Mr. Brown in the formulation of his "confession," Defendant Campbell added certain "edits" to the document – i.e., words crossed out and replaced with other words, supposedly at Mr. Brown's direction.   Mr. Brown did not request, direct, or make any edits to the "confession."   Mr. Brown did not voluntarily confess to any involvement in the Magic Video fire and maintained his innocence in the face of overwhelming pressure for almost 30 years.   To this day, the "confession" is the *only* evidence that has ever connected Mr. Brown to the Magic Video fire.

### Defendants' Fabrication of a Story to Explain and Corroborate the "Confession"

36.     Officer Defendants next fabricated additional evidence in an attempt to corroborate Mr. Brown's "confession."   First, realizing that absent torture and coercion, an innocent man with no connection to the crime would not confess, Defendants Fine and Campbell concocted a story to explain Mr. Brown's supposed change of heart.   Specifically, Defendants Fine and Campbell fabricated a confrontation between Mr. Brown and Michael Harper at the police station, during which Michael Harper supposedly accused Mr. Brown of involvement in the crime, leading Mr. Brown to confess.   This confrontation never happened. Defendants Fine and Campbell invented the encounter to cover up their abuse of Mr. Brown, which was the real reason that he signed the fabricated "confession."

37.     Second, Officer Defendants coerced Mr. Hingston to state, consistent with details included in Mr. Brown's "confession," that he sold gas in a gas can to two black males driving a white Ford Bronco.   Detectives Kutz and Fine also rigged Mr. Hingston's lineup identifications of

Albert Harper and Mr. Ford by telling him which suspects to select. Mr. Hingston later admitted his perjury and swore that Officer Defendants coerced his testimony and his false identifications.

38. Third, Officer Defendants fabricated a story to explain why Mr. Brown would help set the Magic Video fire. Despite the fact that Mr. Brown (37) was almost twice Michael Harper's age (21), Defendants invented a friendship between the two men to explain why Mr. Brown would help Michael Harper set the fire. In reality, Mr. Brown's relationship with Michael Harper was limited to the minor repair work he performed at Magic Video.

39. Officer Defendants also fabricated another motive to explain why a 37 year-old, self-employed man with no criminal record, a steady job, and a family, would commit arson: that Mr. Brown was promised x-rated tapes in exchange for helping to burn the video store. In reality, Mr. Brown lived with his mother and did not even own a tape-player.

40. Officer Defendants also deliberately failed to investigate information that would have disproven Mr. Brown's "confession" and the case against him. Their failure to investigate is additional evidence of their intentional misconduct and bad faith. Officer Defendants conducted no investigation into Mr. Brown's whereabouts at the time of the fire. They did not interview any family members who saw him at the time of the fire, as he was getting ready for work. Nor did they interview any of his colleagues from his roofing job, who would have confirmed that he arrived at work on time, less than one hour after the fire started. Further, after Mr. Brown's arrest and "confession," Defendant Campbell received a report from two other CPD officers summarizing an interview with an eyewitness, Joyce Owens, who observed the fire and identified the four individuals involved -- none of whom was Mr. Brown. Unwilling to let any evidence undermine the fraudulent case they built against Mr. Brown, Officer Defendants Campbell, Fine,

and Kutz ignored Ms. Owens' statement and conducted no further investigation into any of the individuals she identified, with the exception of Michael Harper.

41.     Instead, after they fabricated Mr. Brown's "confession," Officer Defendants declared the case closed.

### The Use of the Confession to Try and Convict Mr. Brown

42.     Based entirely on the fabricated, coerced, and involuntary "confession," the State charged Mr. Brown with one count of arson and two counts of murder.  At trial, the State presented the evidence discussed above, including the false "confession" of Mr. Brown and the evidence used to explain and corroborate the "confession."  It also presented evidence to prove that the Magic Video fire was an arson and that the victims died of smoke inhalation.

43.     In April 1990, a jury convicted Mr. Brown of all counts.  The court sentenced Mr. Brown to natural life in prison without the possibility of parole.

44.     In August 2008, after another individual confessed to setting the Magic Video fire, Mr. Brown was tried again, and again was convicted based on the fabricated, coerced, and involuntary "confession."  During the 2008 trial, Defendants Campbell and Fine falsely testified – and allowed the State to argue from their testimony – that Mr. Brown's "confession" led them to discover the gas can at the scene of the fire.  In fact, Defendant Campbell's contemporaneous 1988 police report reflected that the gas can was recovered before Mr. Brown was even taken into custody on the day of the fire.

45.     The testimony by witnesses at both trials established only that several black males were involved in the Magic Video fire.  None of the physical, forensic, or circumstantial evidence presented in either trial had any connection to Mr. Brown.  Without Mr. Brown's "confession," there would not have been a *single* piece of evidence to present against Mr. Brown at either of his

trials. The State took Mr. Brown to trial each time based solely on the "confession" that Defendants Whitehouse, Fine, and Campbell fabricated and coerced. And the juries convicted Mr. Brown each time for the same reason.

### Some Justice at Last: Mr. Brown's Release from Prison

46.     Mr. Brown steadfastly proclaimed his innocence for almost 30 years. After *decades* with no relief, when most would have resigned themselves to their fate, Mr. Brown continued to maintain his innocence. Even when offered the possibility of accepting a guilty plea in exchange for time served, Mr. Brown refused, committed to clearing his name.

47.     On November 14, 2017, the Cook County State's Attorney's Office dropped all charges against Mr. Brown after the Circuit Court of Cook County granted Mr. Brown's Petition for Post-Conviction Relief and vacated his conviction. After 29 years, 5 months, and 17 days, Mr. Brown finally walked out of prison a free man. On February 13, 2018, the Circuit Court of Cook County granted Mr. Brown a Certificate of Innocence, concluding that Mr. Brown is "innocent of the offenses charged."

### The City's Policies and Practices Enabling Police Misconduct

48.     Officer Defendants' flagrant misconduct in this case was not an isolated incident. Rather, it was consistent with and the natural consequence of the *de facto* policies and practice of the City and the CPD.

49.     Beginning in the 1970s, CPD officers engaged in a systematic pattern of coercion, fabrication of evidence, withholding and destruction of exculpatory information, and various other illegal tactics to "solve" cases at all costs. Their methods included many of those employed against Mr. Brown, such as (1) using physical and/or psychological abuse to coerce involuntary and false confessions; (2) fabricating witness statements and other evidence; (3) threatening or otherwise

manipulating witnesses to coerce false testimony; (4) using improperly suggestive identification procedures, or otherwise tampering with line-ups; (5) denying suspects access to counsel; (6) concealing evidence of misconduct and flawed investigations; and (7) committing perjury during criminal proceedings.

50.     These institutional practices were so pervasive and entrenched as to constitute *de facto* policies in the CPD during the relevant time period.  In addition to Mr. Brown, there are now dozens of other known victims of similar abuses.

51.     These practices flourished because municipal policymakers in positions of authority exhibited deliberate indifference to the problem.  The City failed to implement adequate training, supervision, or disciplinary measures to prevent these and similar abuses, instead choosing to perpetuate a "code of silence" within the CPD.

52.     Chicago police officers who manufactured criminal cases against individuals like Mr. Brown understood that they not only enjoyed *de facto* immunity from both departmental discipline and criminal prosecution, but they also stood to be rewarded for closing a case, no matter the cost.  Moreover, they faced pressure from colleagues and supervisors to keep quiet about misconduct and flawed investigations.

53.     The "code of silence" has been well documented.  In a December 2015 speech to the Chicago City Council, current Mayor Rahm Emanuel acknowledged "a tendency to ignore . . . a tendency to deny . . . a tendency, in some cases, to cover up the bad actions of a colleague or colleagues."  And former Chicago Police Superintendent Richard Brzeczek, who held the position at the time of Mr. Brown's wrongful conviction, has publicly admitted that "the code of silence has always existed in the Police Department.  It existed during my time."

## 30 Years Lost: Mr. Brown's Damages

54. Because of Defendants' wrongful conduct, Mr. Brown spent 29 years, 5 months, and 17 days in prison for a crime he did not commit. That is 10,762 days.

55. Mr. Brown first suffered through nearly two years in Cook County Jail, facing a double murder trial and a possible death sentence (Mr. Brown was eligible for the death penalty). The mental and emotional anguish of enduring the period before his conviction cannot be described.

56. After his conviction, Mr. Brown was forced to endure nearly 28 years of incarceration in maximum security prisons. Surviving in this environment for nearly three decades was emotionally, physically, and psychologically dehumanizing and debilitating.

57. Jails and prisons provide no privacy. Mr. Brown was forced to share a cell with another person, and shower and use the restroom in public spaces. He was subjected to indignities that included strip searches and unannounced digging into his personal property. His letters were copied and retained by the State. His phone calls with his loved ones were monitored and recorded. His personal visits were only from behind thick glass, supervised by guards at all times.

58. Mr. Brown was surrounded by violence, sometimes inflicted by guards and sometimes inflicted by other inmates. He lived in constant fear and anxiety for his personal safety, especially as he aged.

59. Mr. Brown had no autonomy. Every second of his day was controlled: when he could eat, when he could sleep, when he could go outside, when he could shower. Mr. Brown was deprived of the opportunity to make his own decisions and live his life as he chose.

60. Mr. Brown was totally deprived of life's everyday joys. He spent nearly 30 years without going to a restaurant, having a drink, socializing with friends, traveling, enjoying a movie,

or any of the thousands of activities that make up a fulfilling life. He missed birthdays, graduations, weddings, births, funerals, and everything in between.

61.     Mr. Brown was also deprived of an income and the ability to work. When he was arrested, Mr. Brown was in the prime of his career, working as a self-employed contractor. He loved his job, and he prided himself on his work. During his incarceration, Mr. Brown was stripped of the opportunity to continue building his career, and he was unable to earn an income to provide for himself and his family. Released from prison at age 66, Mr. Brown is now past his prime working years.

62.     Mr. Brown also lost any chance to build and maintain normal relationships with his loved ones. At the time of his arrest, Mr. Brown had three minor children, whom he never had an opportunity to raise. Over the years, his relationship with his children weakened as they moved away and moved forward with their lives, expecting that their Dad would be in prison for the rest of his life. Mr. Brown had deep connections with his mother and siblings at the time of his arrest, but Mr. Brown was not able to be the son and brother he wanted to be. He has now been deprived of the opportunity to rebuild his relationship with his mother and seven of his siblings, who died while he was in prison.

63.     In addition to everything else he lost while in prison, Mr. Brown lost his name. For unexplained and inexplicable reasons, the Illinois Department of Corrections identified Mr. Brown as Arthur Ford – a name that Mr. Brown has never had, never been identified by, and never used. For 30 years, Mr. Brown had to abandon his identity to survive in a system that refused to acknowledge him.

64.     Mr. Brown must now attempt to make a life for himself outside of prison without the benefit of nearly three decades of normal life experiences and the foundation that helps a person

grow old in our society. At the time of his release, Mr. Brown had never held a cell phone, used a computer, or been exposed to the mountain of other technology that now drives our society. But that deprivation is dwarfed by what he was forced to miss in terms of his family relationships and his connections to the people who would have been important in his life.

65. The emotional pain and suffering caused by losing these 29 years, 5 months, and 17 days has been substantial and immeasurable. Mr. Brown was stolen from his family in his prime and was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. While prison life is traumatic for most, it is unimaginable for an innocent man like Mr. Brown, who knew all along he did not belong there. Mr. Brown has suffered tremendous and immeasurable damage, including physical harm, psychological damage, and emotional pain and suffering, all proximately caused by the Defendants' misconduct.

## CLAIMS FOR RELIEF

### COUNT I – 42 U.S.C. § 1983
### Deprivation of Fair Trial and Wrongful Conviction
### (Against Individual Defendants)

66. Plaintiff re-alleges paragraphs 1 through 65.

67. Each Defendant is named individually, jointly, and/or in conspiracy, as well as acting under color of state law and within the scope of their employment.

68. Defendants deprived Mr. Brown of his constitutional right to a fair trial.

69. This claim is based upon the torture and evidence fabrication that occurred before and after Mr. Brown's arrest on May 28, 1988.

70. Mr. Brown's confession was fabricated by Defendants, and Mr. Brown's signature and initials were coerced through physical and psychological abuse and torture.

71.     Defendants Campbell, Fine, and Whitehouse falsely informed the prosecuting attorneys that they did not physically or psychologically coerce Arthur Brown into signing the false and fabricated confession.

72.     Defendants fabricated a confrontation between Michael Harper and Mr. Brown at the police station in an effort to explain Mr. Brown's decision to confess.

73.     Defendant Kutz fabricated and coerced Mr. Hingston's story in an effort to corroborate Mr. Brown's fabricated confession.  Defendants Kutz and Fine coerced Mr. Hingston's lineup identifications of Mr. Ford and Albert Harper to corroborate Mr. Brown's confession.

74.     Defendants fabricated a relationship between Michael Harper and Mr. Brown, and a motive, in an effort to explain Mr. Brown's supposed participation in the Magic Video fire.

75.     The State's Attorney's Office relied on the fabricated official reports containing the fabricated confession and other evidence described above in deciding to charge Mr. Brown with arson and murder and to try him on these charges.

76.     If the State's Attorney's Office had been aware of the true facts – that Defendants coerced and fabricated the confession – they would not have (and could not have) charged Mr. Brown with any crime, because there was no evidence connecting Mr. Brown to the Magic Video fire.

77.     Additionally, and alternatively, Defendants' actions were taken maliciously, willfully, wantonly and with reckless disregard for Mr. Brown's constitutional rights.


### COUNT II – 42 U.S.C. § 1983
### Coercive Interrogation
### (Against Defendants Fine, Campbell, and Whitehouse)

78.     Plaintiff re-alleges paragraphs 1 through 65.

79.     This claim is based on the torture and evidence fabrication that occurred after Mr. Brown's arrest on May 28, 1988.

80.     Defendants acted individually, jointly, and in conspiracy, under color of law and within the scope of their employment, in coercively interrogating Mr. Brown.

81.     Defendants Campbell, Fine, and Whitehouse employed psychologically and mentally abusive and coercive techniques in interrogating Mr. Brown and attempting to coerce his confession.

82.     Defendant Fine physically abused Mr. Brown, choking him and slamming his head against the wall to the point of loss of consciousness.

83.     Defendants' psychological and physical abuse of Mr. Brown coerced Mr. Brown's signature on a fabricated confession drafted by Defendant Whitehouse and edited by Defendant Campbell.

84.     The false, coerced, and fabricated confession was subsequently used against Arthur Brown in his criminal proceedings.

85.     Defendants' conduct violated Mr. Brown's Fifth and Fourteenth Amendment rights to be free from compulsory self-incrimination and deprivation of liberty without due process of law as guaranteed by the United States Constitution.

86.     Additionally, and alternatively, these actions were taken maliciously, willfully, wantonly and with reckless disregard for Plaintiff's constitutional rights.


**COUNT III – 42 U.S.C. §§ 1983 & 1985**
**Conspiracy to Deprive Plaintiff's Constitutional Rights**
**(Against Individual Defendants)**

87.     Plaintiff re-alleges paragraphs 1 through 65.

88.     After the Magic Video fire, Defendants agreed among themselves to act in concert to deprive Mr. Brown of his constitutional rights, including his rights to due process and to a fair trial.

89.     Additionally, before and after Mr. Brown's conviction, Defendants further conspired to deprive Mr. Brown of exculpatory information to which he was lawfully entitled, namely that his alleged confession was fabricated and the result of psychological and physical coercion.  Upon information and belief, Defendants also failed to disclose that they and their partners had engaged in a pattern and practice of coercing false confessions from arrestees through psychological and physical torture.  The disclosure of this exculpatory information would have led to Mr. Brown not being charged or being acquitted at trial.

90.     As outlined above, Defendants conspired by concerted action to accomplish an unlawful purpose by unlawful means.

91.     In furtherance of the conspiracy, each of the Defendant co-conspirators engaged in and facilitated numerous overt acts, including but not limited to those set forth above – such as fabricating evidence, coercing false witness statements, withholding exculpatory evidence, coercing a false confession, and committing perjury during hearings and trials – and were otherwise willful participants in the joint activity.

92.     The misconduct described in this Count was undertaken with malice, willfulness, and/or reckless indifference to Mr. Brown's rights.

93.     As a direct and proximate result of Defendants' conspiracy and actions in furtherance of the conspiracy, Mr. Brown was wrongly convicted and imprisoned for almost 30 years and suffered other grievous and continuing damages and injuries.

**COUNT IV – 42 U.S.C. §§ 1983 & 1986**

**Failure to Intervene**
**(Against Individual Defendants)**

94.     Plaintiff re-alleges paragraphs 1 through 65.

95.     Defendants Campbell, Fine, Kutz, and Whitehouse, along with as-yet unidentified City employees, failed to intervene and stop the unconstitutional actions of each other during the abuse of Mr. Brown, the fabrication of the confession, and the subsequent fabrication of "corroborating" evidence.

96.     Defendants caused Mr. Brown's wrongful charging, prosecution, conviction, and imprisonment by physically coercing him, fabricating his false confession and other evidence, and suppressing exculpatory evidence.

97.     Defendants knew that they were committing constitutional violations and failed to intervene or stop each other's misconduct, despite having the opportunity to do so.

**COUNT V – 42 U.S.C. § 1983**
***Monell* Claim**
**(Against Defendant City of Chicago)**

98.     Plaintiff re-alleges paragraphs 1 through 65.

99.     The City's policies and practices were underlying causes of the misconduct described in this Complaint, in that CPD employees and agents regularly pursued wrongful convictions through flawed investigations to "solve" cases at all costs – and did so with the knowledge and approval of individuals with final policymaking authority for the City.

100.    At all relevant times, the CPD's interrelated *de facto* policies, practices, and customs included, but were not limited to: (1) conducting improperly coercive interrogations designed to produce involuntary and false confessions; (2) manufacturing, fabricating, or using improperly suggestive tactics to obtain false witness statements; (3) denying suspects access to counsel; (4) filing false reports and giving false statements or testimony; (5) withholding,

destroying, covering up, or suppressing evidence of misconduct; and (6) perpetuating, encouraging, and condoning a "code of silence," under which Chicago police officers and detectives refused to report or otherwise concealed instances of police misconduct.

101. The practices described above were so pervasive and entrenched as to constitute *de facto* policies of the CPD. These practices flourished because municipal policymakers in positions of authority exhibited deliberate indifference to the misconduct, effectively ratifying it.

102. Specifically, the City failed to adequately train, supervise, and discipline its police officers and other employees and agents, including the individual Defendants in this case, to ensure that they:

    a. faithfully represented material facts when seeking criminal charges;

    b. protected suspects' constitutional rights, including the right to counsel, during interrogations;

    c. employed proper and non-suggestive identification techniques;

    d. secured, maintained, and disclosed exculpatory and impeachment information to prosecutors; and

    e. adequately investigated potential leads, including questioning alibi witnesses.

103. The City's failure to adequately train, discipline, and supervise its police officers, and its creation and continued tolerance of unconstitutional customs, policies, and practices, directly and proximately caused Mr. Brown to suffer constitutional deprivations, including his false arrest, unfair trial, wrongful conviction, and other grievous and permanent injuries and damages described above.

### COUNT VI – 42 U.S.C. § 1983
### Federal Malicious Prosecution
### (Against Individual Defendants)

104. Plaintiff re-alleges paragraphs 1 through 65.

105.     Defendants accused Mr. Brown of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings, in violation of Mr. Brown's rights under the Fourth and Fourteenth Amendments.

106.     Defendants caused Mr. Brown to be improperly subjected to judicial proceedings for which there was no legitimate probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury.

107.     Moreover, Defendants caused Mr. Brown to be improperly subjected to judicial proceedings for which Defendants possessed evidence supporting probable cause to believe that an individual *other* than Mr. Brown had committed the crime.  These judicial proceedings against Mr. Brown were instituted and continued maliciously, resulting in injury.

108.     Defendants' statements regarding Mr. Brown's alleged culpability were made with knowledge that the statements were false, fabricated, and perjured.  Defendants also fabricated evidence by coercing false inculpatory testimony from actual and purported eyewitnesses. Defendants withheld the facts of their manipulation and the resulting fabrications from Mr. Brown.

109.     This misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Mr. Brown's rights.

110.     As a result of this misconduct, Mr. Brown sustained, and continues to sustain, injuries including pain and suffering.

**COUNT VII – State Law Claim**
**Malicious Prosecution**
**(Against Individual Defendants)**

111.     Plaintiff re-alleges paragraphs 1 through 65.

112. Defendants accused Mr. Brown of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors with the intent of exerting influence to institute and continue the judicial proceedings.

113. Defendants caused Mr. Brown to be improperly subjected to judicial proceedings for which there was no legitimate probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

114. Moreover, Defendants caused Mr. Brown to be improperly subjected to judicial proceedings for which Defendants possessed evidence to support probable cause to believe that an individual other than Mr. Brown had committed the crime. These judicial proceedings against Mr. Brown were instituted and continued maliciously, resulting in injury.

115. Defendants' statements regarding Mr. Brown's alleged culpability were made with knowledge that the statements were false, fabricated, and perjured. Defendants also fabricated evidence by coercing false inculpatory testimony from actual and purported eyewitnesses. The Defendants withheld the facts of their manipulation and the resulting fabrications from Mr. Brown.

116. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Mr. Brown's rights.

117. As a result of this misconduct, Plaintiff sustained, and continues to sustain, injuries including pain and suffering.

### COUNT VIII – State Law Claim
### Intentional Infliction of Emotional Distress
### (Against Individual Defendants)

118. Plaintiff re-alleges paragraphs 1 through 65.

119. Defendants individually, jointly, and in conspiracy;

    a. Psychologically and physically coerced and tortured Mr. Brown, which led to him signing the fabricated confession that was drafted by Defendant Whitehouse and edited by Defendant Campbell;

b. failed to prevent or stop said physical coercion and torture;

c. procured the prosecution, conviction, and imprisonment of Mr. Brown for murders and an arson he did not commit; and

d. by means of the coercion, torture, and false and fabricated confession and other evidence, engaged in extreme and outrageous conduct.

120. Defendants intended to inflict severe emotional distress on Mr. Brown, and knew that their conduct would cause Mr. Brown severe emotional distress.

121. Defendants' acts and conduct as set forth above were extreme and outrageous. Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. Brown, as is more fully alleged above.

122. As a direct and proximate result of Defendants' outrageous conduct, Mr. Brown was, and continues to be, injured, and has experienced, and continues to experience, severe emotional distress, including nightmares, sleep disruption, anxiety, depression, inability to focus or concentrate, and a recurring fear of re-arrest, torture, and re-prosecution.

**COUNT IX – State Law Claim**
**Civil Conspiracy**
**(Against Individual Defendants)**

123. Plaintiff re-alleges paragraphs 1 through 65.

124. As described more fully in the preceding paragraphs, Defendants conspired by concerted action to accomplish an unlawful purpose by unlawful means.

125. In furtherance of the conspiracy, Defendants committed overt acts and were otherwise willful participants in joint activity.

126. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Mr. Brown's rights.

127.     As a proximate result of Defendants' conspiracy, Mr. Brown suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

**COUNT X – State Law Claim**
**Respondeat Superior**
**(Against Defendant City of Chicago)**

128.     Plaintiff re-alleges paragraphs 1 through 65.

129.     In committing the acts alleged in the preceding paragraphs, Detectives Kutz, Fine, and Campbell were members of, and agents of, the Chicago Police Department acting at all relevant times within the scope of their employment and under color of law.

130.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

**COUNT XI – State Law Claim**
**Indemnification**

131.     Plaintiff re-alleges paragraphs 1 through 65.

132.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

133.     In committing the acts alleged in the preceding paragraphs, Defendants Kutz, Fine, and Campbell were members of, and agents of, the Chicago Police Department acting at all relevant times within the scope of their employment and under color of law.

134.     In committing the acts alleged in the preceding paragraphs, Defendant Whitehouse was a member of, and agent of, the Cook County State's Attorney's Office acting at all relevant times within the scope of his employment and under color of law.

WHEREFORE, Plaintiff Arthur Brown respectfully requests that this Honorable Court enter judgment in his favor and against all Defendants, jointly and severally, for substantial compensatory damages, and, additionally, for substantial punitive damages against Defendants

Kutz, Fine, Campbell, Whitehouse, and the City of Chicago, plus the costs of this action, attorneys' fees, and such other relief as this Court deems equitable and just.

**<u>JURY DEMAND</u>**

Plaintiff Arthur Brown hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ *Ronald S. Safer*
Ronald S. Safer, ARDC # 6186143
Joseph O'Hara, ARDC # 6181207
Tal C. Chaiken, ARDC # 6308729
Allison M. Nichols, ARDC # 6313603
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
(312) 471-8700 (tel)
(312) 471-8701 (fax)
rsafer@rshc-law.com
johara@rshc-law.com
tchaiken@rshc-law.com
anichols@rshc-law.com

*Attorneys for Plaintiff Arthur Brown*