**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ARTHUR BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 18 C 7064** |
| | ) | |
| **CITY OF CHICAGO, Kimberly Campbell** | ) | **Judge Rebecca R. Pallmeyer** |
| **as Special Representative for the Estate of** | ) | |
| **JOSEPH CAMPBELL, Diane Romza-Kutz** | ) | |
| **as Special Representative for the Estate of** | ) | |
| **DAVID KUTZ, and Frank W. Fine as** | ) | |
| **Special Administrator for the Estate of** | ) | |
| **JOSEPH D. FINE, Former Assistant State's** | ) | |
| **Attorney JOEL WHITEHOUSE, and other** | ) | |
| **as-yet unidentified employees of the City of** | ) | |
| **Chicago,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Arthur Brown spent nearly 30 years in prison for a crime he insists he did not commit. Years after being convicted and sentenced on arson and murder charges, Mr. Brown filed a successful petition for post-conviction relief, arguing that trial witnesses offered perjured testimony and that Mr. Brown was denied the effective assistance of counsel at trial. The State chose not to re-try Mr. Brown, who then obtained a Certificate of Innocence and was released from prison on November 14, 2017.[1]

Within a year of his release, Mr. Brown filed this action against the City of Chicago; former Chicago Police Officers Joseph Campbell, David Kutz, and Joseph Fine; former Assistant State's Attorney Joel Whitehouse; and other unidentified City employees, alleging that officers coerced a confession, manufactured false evidence, and otherwise violated his rights under the Constitution. This court granted Defendants' motions to dismiss certain counts, but several of Plaintiff's claims

---

[1] Plaintiff is referred to here as "Mr. Brown" or "Plaintiff," to distinguish him from a police officer, also named Brown, who played a role in the investigation of the arson/murder.

survived the motions, including a claim that the Individual Defendants fabricated evidence against him and that Defendants Fine, Campbell, and Whitehouse engaged in physical and psychological abuse to coerce his confession and ultimately secure his conviction. Mr. Brown brings claims under 42 U.S.C. § 1983, alleging evidence fabrication, compulsory self-incrimination, and malicious prosecution; under 42 U.S.C. § 1985, alleging that the Individual Defendants conspired to deprive him of his constitutional rights; and 42 U.S.C. § 1986, alleging that the Individual Defendants failed to intervene to stop the violation of his constitutional rights. Mr. Brown also asserts state law claims against the Individual Defendants for malicious prosecution, intentional infliction of emotional distress ("IIED"), and civil conspiracy. Finally, Mr. Brown charges that the City of Chicago is liable for the officers' conduct in violation of federal law under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), and for the officers' state law violations under principles of *respondeat superior* and indemnification.

Pursuant to Federal Rule of Civil Procedure 56, all Defendants now move for summary judgment. For the reasons discussed below, the court grants in part and denies in part the Detective Defendants' motion [297], grants in part and denies in part ASA Whitehouse's motion [293], and grants the City's motion for summary judgment on the Monell claim [308].

## BACKGROUND[2]

### I.    The Parties

#### A.    Plaintiff Arthur Brown

In May 1988, a fire destroyed the Magic Video store on Chicago's south side and killed two individuals asleep in a neighboring restaurant. In 1990, Plaintiff Arthur Brown was convicted

---

[2]     The facts come mainly from the parties' Local Rule 56.1 statements and related exhibits. (*See* Def. Joel Whitehouse's L.R. 56.1 Statement of Undisputed Material Facts [294] (hereinafter "DWSOF"); Estate Defs.' L.R. 56.1(a)(3) Statement of Undisputed Facts in Supp. of Summ. J. [298] (hereinafter "EDSOF"); Def. City of Chicago L.R. 56.(1)(a)(2) Statement of Undisputed Material Facts in Supp. of Summ. J. [310] (hereinafter "DCSOF"); Pl.'s Statement of Additional Facts in Opp. to Defs.' Mot. for Summ. J. [320] (hereinafter "PSOAF").) The court has also accounted for each party's responsive statements. (*See* Pl.'s Resp. to DWSOF [316]; Pl.'s Resp. to EDSOF [314]; Pl.'s Resp. to DCSOF [325]; Def.'s Joint Resp. to PSOAF [338].)

on one count of arson and two counts of murder arising out of that incident.  (EDSOF ¶ 2.)  In 2003, following an evidentiary hearing, the Circuit Court of Cook County vacated his conviction and ordered a new trial (*id.* ¶ 86), at which Brown was again convicted.  (*Id.* ¶ 2.)  That conviction was vacated in 2017 on the basis of evidence that prosecutors had made a false statement during closing argument, to which Brown's trial counsel failed to object.  (EDSOF ¶ 108; PSOAF ¶ 38.)  The  Cook County States Attorney's Office (CCSAO) initially took an appeal, but later chose not to pursue a third trial against Mr. Brown and dismissed the charges against him.  (EDSOF ¶ 120.)  Mr. Brown then sought and obtained a Certificate of Innocence (COI) from the Circuit Court of Cook County and was released from prison on November 14, 2017.  (*See* PSOAF ¶ 44.)  In 2018, Mr. Brown filed this lawsuit against the police officers who investigated the crimes for which he was convicted, the Assistant State's Attorney involved in the investigation, and the City of Chicago for its role in the violation of his rights.  (*See* EDSOF ¶ 143.)

###    B.    Detectives David Kutz, Joseph Fine, and Joseph Campbell

Detectives David Kutz, Joseph Fine, and Joseph Campbell (collectively referred to as "Detective Defendants" or "Estate Defendants") are the police officers who were involved in investigating the crime for which Mr. Brown was convicted.[3]  Detectives Kutz and Fine worked as detectives in Area 1 of the Chicago Police Department; Detective Campbell worked in the Bomb and Arson unit.  (EDSOF ¶ 19.)  Mr. Brown claims the Detective Defendants deprived him of his constitutional rights during the arson and murder investigation.  (*See id.* ¶  143.)  He also alleges they fabricated evidence that ultimately led to his conviction.  (*Id.*)  All three Detective Defendants are now deceased, and they are represented here by their estates.  (*See* Estate Defs.' Mem. in Supp. of Summ. J. [299] at 1 n.1.)

---

[3]    This opinion uses "Individual Defendants" when collectively referring to the Detective Defendants and ASA Whitehouse.

### C. Defendant Joel Whitehouse

Joel Whitehouse ("ASA Whitehouse") worked as an Assistant State's Attorney (ASA) in the Felony Review unit of the Cook County State's Attorney's Office in 1988. (DWSOF ¶ 1.) Then, as now, the Felony Review unit was a cadre of Assistant State's Attorneys who were assigned to police districts to provide coverage 24 hours a day, seven days a week. (*Id.* ¶ 2.) When summoned from the Cook County Criminal Court building by police officers, the Felony Review office would assign an ASA to come to the station and assist police officers by preparing applications for search warrants and other court orders. (*Id.* ¶¶ 2, 6.) When called to the station for a particular case, the ASA would evaluate what evidence was available, determine whether it was legally obtained, and make a decision about whether the state should bring charges or the investigation should continue. (*See id.* ¶ 3.)

### D. City of Chicago

Defendant City of Chicago ("the City") is an Illinois municipal corporation. (DCSOF ¶ 4.) In his Second Amended Complaint (SAC) [70], Mr. Brown alleges that the City's policies and practices directly caused violations of his constitutional rights. (SAC ¶¶ 98–103.) Specifically, he alleges that the City engages in policies and practices of (1) using physical and/or psychological abuse to coerce involuntary false confessions; (2) fabricating witness statements and other evidence; (3) threatening or otherwise manipulating witnesses to coerce false testimony; (4) filing false reports and testifying falsely in affidavits, depositions, or court proceedings; (5) committing perjury during criminal proceedings and failing to retain records of such misconduct; (6) withholding, destroying, covering up, or suppressing evidence of misconduct; (7) failing to properly document and retain records of false testimony and related internal investigations and disciplinary proceedings; (8) failing to implement adequate training, supervision, or disciplinary measures; and (9) perpetuating, encouraging, and condoning a "code of silence" on the part of police. (DCSOF ¶ 7.)

II.     **The Events of May 28, 1988**

A.     **Undisputed Background Facts**

On May 28, 1988, the Magic Video store stood on Chicago's south side at 420 East 63rd Street, adjacent to the King Chef restaurant. (*See* EDSOF ¶¶ 6–7.) Michael Harper ("Harper") co-owned Magic Video with his mother. (*Id.* ¶ 17.) Mr. Brown, a general contractor who lived a few blocks from the strip mall, had previously done construction and repair work for shops in the strip mall, including at Magic Video, where he had installed burglar bars on the front and back of the store. (PSOAF ¶¶ 1, 3.)

Around 5:00 a.m. on May 28, 1988, a fire, intentionally set with an accelerant, ignited inside Magic Video while two people, Kiert Phophairat and Pismai Panichkarn, lay sleeping in the King Chef restaurant next door. (*See* EDSOF ¶¶ 5–6.) Overcome by the inhalation of smoke and soot, both Phophairat and Panichkarn died. (*See id.* ¶¶ 8–9.)

While on routine patrol that morning, Chicago police officers Hester Scott and David Brown observed smoke coming from the Magic Video and headed to the scene. (*Id.* ¶ 10.) There, the officers spoke to an eyewitness, Sid Malone ("Malone"), who reported, among other details, that he had seen two men—whom he did not identify—exit a light-colored vehicle with license plates that read "GAS 403" and carry a gas can into Magic Video.[4] (*See id.* ¶¶ 11–14.)

Also at the scene, another man approached Officer Brown and identified himself as Michael Harper, the owner of Magic Video. (*Id.* ¶ 16.) Harper told Officer Brown that, when Harper was last in his store at around 1:00 a.m., he had left the shop with Mr. Brown inside. (*Id.*; Dep. of Michael Harper, Ex. 18 to EDSOF [302-18] (hereinafter "Harper Dep.") at 143:11–16.) Twenty to thirty minutes later, while still on the scene, Harper again approached Officer Brown,

---

[4]     Malone's statements to the police are inadmissible hearsay and thus only noted for the effect they had on the officers' development of an investigative lead. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("[A] court may consider only admissible evidence in assessing a motion for summary judgment."). (*See also* Pl.'s Resp. to EDSOF [314] ¶ 13.)

who directed him to speak with Officer Scott. (EDSOF ¶ 17; Officer Brown Tr. Test., Ex. 16 to EDSOF [302-16] at AB 706:14–24.) Officer Scott handed Harper a report number for the fire and explained how Harper could report the fire for insurance purposes. (EDSOF ¶ 17.) Harper—who was initially viewed as a victim, not as a suspect (Pl.'s Resp. to EDSOF [314] ¶ 18)—agreed to accompany Officers Brown and Scott to Area 1 police headquarters so they could collect additional information about the Magic Video fire. (*See* EDSOF ¶ 18.)

Harper arrived at Area 1 with Officers Scott and Brown between 7:30 and 8:00 a.m., at which point the officers took him to an interview room where he met Detectives Fine and Kutz, two of the Defendants in this case. (*See id.* ¶ 21; Harper Dep. at 167:23–168:5.) Detectives Fine and Kutz asked Harper whether he owned a truck with the license plates "GAS 403" and whether he knew of anyone who might want to harm him. (Harper Dep. at 167:18–168:5.) Harper admitted that earlier that morning he was driving a Ford Bronco with "GAS 403" plates, which he co-owned with his uncle, Albert Harper ("Albert"). (EDSOF ¶¶ 21–22.)

The parties dispute what happened next. As Harper recalls, the officers moved him to another room where they handcuffed him to a ring in the wall. (*See* Harper Dep. at 168:17–24.) Detectives Fine and Kutz interrogated Harper about the fire and, when he said he knew nothing about it, began yelling at him. (EDSOF ¶ 30.) Detective Fine tightened Harper's handcuffs and punched him in the ribs. (*See* PSOAF ¶ 13.) At some point, one of the officers (Harper does not say who) threatened to charge Harper's mother with murders if he did not confess to the crime himself. (Harper Dep. at 189:19–190:12.) It was during this threatening interrogation that Harper mentioned Mr. Brown's name.[5] (*See* EDSOF ¶ 23.) Specifically, Harper told Detectives Fine and Kutz that he was at Magic Video that morning with his uncle Albert, his teenage cousin Geronia

---

[5]      Harper testified that he had mentioned Mr. Brown to Officers Scott and Brown at the scene, earlier that day, but there is no evidence that Officers Scott and Brown provided Mr. Brown's name to the Detective Defendants prior to this interrogation. (*See* Pl.'s Resp. to EDSOF [314] ¶ 23.)

Ford ("Ford"), and Mr. Brown. (*Id.* ¶ 27.) The Detective Defendants' account differs. They contend that Harper told Detectives Fine and Kutz that he met Mr. Brown, Ford, and Albert at the video store, but made that statement voluntarily, not in response to any physical or verbal abuse. (*See* Kutz Tr. Test. in *People v. Harper*, Ex. 20 to EDSOF [302-20] at 860:8–861:3, 862:22–863:4.)

Harper's cousin, Geronia Ford, soon became another focus of the investigation.[6]  Ford testified in his deposition in this case that the police arrested him at his grandmother's apartment around 10:15 a.m. and took him to Area 1, where he was handcuffed to a ring in the wall. (*See* Dep. of Geronia Ford, Ex. 60 to EDSOF [302-61] (hereinafter "Ford Dep.") at 112:2–15.)

Meanwhile, at some point that morning, Detective Campbell of the Bomb and Arson unit was assigned to the case and headed to the strip mall. (EDSOF ¶ 19.) On his arrival at Magic Video, Detective Campbell learned that the investigation also involved potential homicides. (*See id.* ¶ 20.) As he walked into what was left of Magic Video, Detective Campbell detected the smell of gasoline in the rear of the store and noted that the store seemed to be devoid of any videotapes. (*Id.* ¶ 20; Pl.'s Resp. to EDSOF [314] ¶ 20.) Detective Campbell returned to Area 1 around noon. (EDSOF ¶ 33.)

Sometime in the late morning, the Chicago Police Department contacted the Felony Review office and requested that an ASA be assigned to the arson and murder investigation. (*See* DWSOF ¶ 8.) ASA Whitehouse was assigned to the case and reported to Area 1. (*Id.*) At Area 1, ASA Whitehouse met Detectives Fine and Kutz, along with Detective Campbell, who had recently returned from the crime scene. (*Id.* ¶ 7.) ASA Whitehouse had never before worked with any of the Detective Defendants. (*Id.*) ASA Whitehouse spoke with the Detective Defendants,

---

[6]  Harper's uncle Albert participated in a police lineup related to the arson sometime on May 28, 1988 but seems to have had no further involvement after that. (*See* EDSOF ¶ 95.) According to the Estate Defendants, Albert did not confess to any wrongdoing, nor did he implicate Mr. Brown, Ford, or Harper in any crime. (*See* Estate Def.'s Rep. to PSOAF [341] at 21.)

who told him that they were looking to search Harper's Ford Bronco for evidence of the arson and homicide crimes. (*Id.* ¶ 9; Campbell Tr. Test., Ex. 21 to EDSOF [302-21] at AB936:15–937:14.)

ASA Whitehouse then drove his car back to the State's Attorney's office at 26th and California and assisted Detective Campbell in preparing an application for a search warrant for the truck with the "GAS 403" plates.[7] (*See* DWSOF ¶ 10.) He obtained the warrant and returned to the parking lot of Area 1 at around 1:30 p.m, and rode in Detective Campbell's police car to an alley off 63rd Street where Harper's Ford Bronco was parked. (*Id.* ¶¶ 12–14.) One or two other officers, who are not parties to this suit, were also present for the vehicle search. (*See* Deposition of Joel Whitehouse, Ex. 1 to DWSOF [294-1] at 208:18–23; Tr. Test. of Joel Whitehouse, June 12, 1991, Ex. 2 to DWSOF [294-2] at 48:4–9.) ASA Whitehouse's purpose in accompanying Detective Campbell was to ensure that police officers properly executed the search warrant; Whitehouse did not participate in the execution of the warrant himself, and Detectives Kutz and Fine were also not involved in the search. (DWSOF ¶ 15.) In the Ford Bronco, the officers found one plastic bag and two boxes of videotapes. (EDSOF ¶ 33.) ASA Whitehouse and Detective Campbell returned the station at around 3:00 p.m. (DWSOF ¶ 16.)

### B. Initial Interactions Between the Defendants and Mr. Brown

Between noon and 1:00 p.m., Harper, who knew where Mr. Brown lived, accompanied Detectives Fine and Kutz, and Officers Brown and Scott, to look for Mr. Brown. (EDSOF ¶ 35.) Mr. Brown was not home, but his mother told the officers where Mr. Brown was working on a roofing project that day. (*Id.* ¶ 37.) Mr. Brown was not at the worksite when the officers arrived, so Detective Fine gave his business card to one of the workers to give to Mr. Brown so he could call the detectives. (*Id*) The officers then returned to Area 1. (*Id.*)

---

[7] It appears the process was not time-consuming: The record shows that Detective Campbell arrived at Area 1 around noon and that ASA Whitehouse left Area 1 to return to the courthouse, also around noon—after meeting with Campbell. (*See* DWSOF ¶ 10; EDSOF ¶ 33.)

Mr. Brown learned that police officers were looking for him when he returned to the roofing worksite from a lunchbreak. (PSOAF ¶ 16.) At approximately 3:30 p.m., Mr. Brown called Detective Fine, and Detectives Fine, Kutz, and Campbell drove to Mr. Brown's location. (EDSOF ¶ 42.) There, the Detective Defendants asked Mr. Brown if he had been to Magic Video that morning and, when he answered affirmatively, they arrested him and brought him to Area 1. (EDSOF ¶ 42; PSOAF ¶ 16.)

What happened next is hotly disputed. Mr. Brown says that on his arrival at Area 1, Detective Fine and Campbell brought him to a warm, windowless room, where Detective Campbell handcuffed him.[8] (Dep. of Arthur Brown, Estate Defs.' Ex. 5 to EDSOF [302-5] (hereinafter "Brown Dep.") at 232:10–233:1.) Detectives Campbell and Fine told Mr. Brown that they had information regarding his involvement in a fire at Magic Video. (*Id.* at 235:7–15.) Mr. Brown told Detectives that he was at Magic Video that morning, after which statement Detectives Campbell and Fine told Mr. Brown that Harper, Ford, and Albert were at the store, as well. (*Id.* at 236:17–237:8.) Mr. Brown responded to Detectives Campbell and Fine by saying he did not know those three people. (*Id.* at 237:9–11.) Both Detectives then left Mr. Brown in the room. (*Id.* at 238:12–17, 239:10–14.) About an hour later, Detective Campbell returned to the room, and asked Mr. Brown if he wanted to make a statement. (*Id.* at 239:15–20; 240:4–7.) Mr. Brown declined to do so and said that wanted to make a phone call. (*Id.* at 240:4–7.) Detective Campbell then led Mr. Brown into an open area. (*Id.* at 240:14–23.) There, a person Mr. Brown later learned to be ASA Whitehouse asked Mr. Brown what he was doing, and Brown responded that he was contacting his lawyer. (*Id.* at 242:12–9.) Detective Campbell assisted Mr. Brown in

---

[8] The court only accounts for the portions of Mr. Brown's statements that are supported by an accurate citation to the record in accordance with Local Rule 56.1. (*See, e.g.*, Defs.' Joint Resp. to PSOAF [338] ¶¶ 17, 23, 27, 29, 35, 47, 51, 73, 76) (noting various instances in which Plaintiff did not properly comply with Local Rule 56.1).)

calling his mother and then returned Mr. Brown to the interrogation room. (*Id.* at 243:20–244:19, 247:8–10.)

Next, ASA Whitehouse approached the interrogation room where Mr. Brown was held, introduced himself, and read Mr. Brown his rights. (*Id.* at 248:13–15.) ASA Whitehouse asked Mr. Brown if he wanted to make a confession, and Mr. Brown said he did not, but that he wanted to call his attorney. (*Id.* at 249:21–250:3.)

Some time later (Mr. Brown does not say how long), Detective Fine returned to the room. (*Id.* at 250:6–16.) Detective Fine told Mr. Brown that he would have to confess. (*Id.* at 250:17–23.) Using language that Mr. Brown recalled only as being "profane [and] vulgar," Detective Fine told Brown he was accused of being involved in the Magic Video fire.[9] (*Id.* at 251:8–17, 255:9–17.) Detective Fine then left the room and Detective Campbell entered. (*Id.* at 256:24–257:3.) Detective Campbell asked Mr. Brown if he wanted to make a court-reported statement, and Mr. Brown said that he did not and reiterated that he wanted to call his lawyer. (*Id.* at 257:4–17.)

At this point, Detective Campbell left the room, and Detective Fine returned and closed the door. (*Id.* at 257:22–258:4.) Alone in the room with Mr. Brown, Detective Fine yelled at him, grabbed him by the neck, choked him, and slammed him against the cinder block wall several times. (PSOAF ¶ 18; Brown Dep. at 258:4–262:1.) Mr. Brown struggled to breathe and briefly lost consciousness. (PSOAF ¶ 18; Brown Dep. at 260:10–262:1) This was Mr. Brown's final interaction with Detective Fine at Area 1. (Brown Dep. at 262:20–21.)

Detective Campbell returned to the room some time later (Mr. Brown does not specify how long), chided Mr. Brown for having gotten Detective Fine "all hyped up," and warned that it would be best if Mr. Brown cooperated. (*See* PSOAF ¶ 19.) Mr. Brown said he would do whatever the officers wanted, as long as no one put their hands on him. (*Id.*)

---

[9] It is not clear whether Plaintiff was saying that Detective Fine was accusing him of starting the fire, or whether Detective Fine was telling Plaintiff that Harper had accused him of starting the fire. (Brown Dep. at 251:8–17 (Q: "Can you tell me anything that Detective Campbell said to you at that time?" A: "He was accusing me.").)

Defendants' account of this episode is quite different. Defendants assert that, at approximately 4:00 p.m., Detectives Fine and Campbell placed Mr. Brown into an interview room where Detective Fine advised Mr. Brown of his rights. (Defs.' Joint Resp. to PSOAF [338] ¶ 18; Joseph Fine Testimony at Motion to Dismiss, Ex. K to Def's Joint Resp. to PSOAF [338-12] at AB 208:18–209:15.) Detective Fine says he did not physically abuse Mr. Brown, and Mr. Brown had no difficulty breathing, nor did he pass out. (Defs.' Joint Resp. to PSOAF [338] ¶ 18.) Detective Fine recalled that he informed Mr. Brown that Harper told him Brown knew something about the fire, but Brown denied any involvement. (*See* EDSOF ¶ 43.) In response to Mr. Brown's denials, police escorted Harper to Brown's interview room and asked Harper to repeat the statement implicating Brown in the fire, which, Detective Fine's testimony suggests, Harper did.[10] (*Id.* ¶ 45.) Detectives Fine and Kutz summarized this confrontation and recorded a summary of an oral admission Mr. Brown purportedly made following the men's interaction in a police report dated June 1, 1988. (June 1 Supp. Report, Estate Defs.' Ex. 13 [302-13].) Detective Fine did not later testify to the confrontation between Mr. Brown and Harper, but he did testify that during a conversation between Detective Fine and Mr. Brown, Mr. Brown implicated himself, Harper, Ford, and Albert in the arson. (*Id.* ¶¶ 45, 63.)

### C. Mr. Brown's Handwritten Statement

Later than evening, around 10:00 p.m., Mr. Brown signed a handwritten statement, which was prepared by ASA Whitehouse and included several edits penned by Detective Campbell. (PSOAF ¶ 20; EDSOF ¶ 52.) According to that statement, Mr. Brown admitted to the following version of events: In the early morning of May 28, 1988, Mr. Brown received a phone call from Harper, who asked Mr. Brown to meet him at Magic Video. (Brown's Handwritten Confession at

---

[10] The parties especially dispute whether this interaction between Harper and Mr. Brown ever occurred. (Pl.'s Resp. to EDSOF [314] ¶ 45.) The confrontation was not documented in any police report. (EDSOF ¶ 61.) Detective Fine testified that Mr. Brown "denied [involvement in the fire] up until the point he had the face to face interaction with Michael Harper." (Joseph Fine 1990 Trial Testimony, Ex. 22 to EDSOF [302-22] at AB999.)

AB1290, Ex. 25 to EDSOF [302-25].)  Mr. Brown got dressed and went to the store, where he met Harper, Ford, and Albert inside.[11]  (*Id.* at AB1291.)  Upon Mr. Brown's arrival, Harper told Mr. Brown that Harper planned to burn the store down, and asked Mr. Brown to help him make it appear that the store had been broken into.  (*Id.* at AB1291–92.)  At Harper's request, Mr. Brown helped Harper place a mattress against a wall while Ford and Albert left to get gasoline.  (*Id.* at AB1292–94.)  When Albert and Ford returned, Ford handed Mr. Brown a gas can, and Mr. Brown set the store on fire before running home.  (*Id.* at AB1295–96.)

The circumstances surrounding the creation of this document are also contested.  Mr. Brown insists he told ASA Whitehouse he did not want to make a confession and instead wanted to call his attorney.  (PSOAF ¶ 20.) After making that request, Mr. Brown did not see ASA Whitehouse again until Whitehouse presented him with a handwritten document for his signature.[12]  (See *id*. ¶¶ 20–21; Pl.'s Resp. to DWSOF [316] ¶¶ 35–40.)  Mr. Brown attests he did not read the document prior to signing it, and no one read it to him.  (*See* Pl.'s Resp. to DWSOF [316] ¶¶ 41–43; Brown Dep. at 270:24–271:10.)  He did sign it in the presence of Detective Campbell and ASA Whitehouse.  (*See* Brown Dep. at 327:14–328:19.)

ASA Whitehouse's account significantly differs.  He recounts that, after confirming that he understood his rights, Mr. Brown made an oral statement implicating himself and others in the arson.  (DWSOF ¶ 34.)  ASA Whitehouse then gave Mr. Brown the choice of memorializing his confession in a handwritten or court-reported statement.[13]  (*Id.*)  After some back and forth

---

[11]     The document refers to Geronia as "Gerome" and Albert as "Michael's Uncle 'Junior.'"

[12]     Mr. Brown does not recall how much time elapsed between the first interaction with ASA Whitehouse and the moment he was presented with papers to sign, but he attests Detective Fine's physical abuse and Detective Campbell's psychological abuse occurred between his two interactions with ASA Whitehouse.

[13]     It is undisputed that in 1988, the practice for Felony Review ASA's was to prepare a handwritten confession statement on behalf of a criminal suspect; the ASAs had no access to audio recording or videotaping equipment, nor did they allow suspects themselves to write out their statements.  (DWSOF ¶ 20.)

regarding which option he wanted to pursue, Mr. Brown resolved to sign a handwritten statement prepared by ASA Whitehouse. (*See id.* ¶¶ 36–40.)  At around 10:00 p.m., ASA Whitehouse recalls, while ASA Whitehouse sat at a table in the main area of the police station and Mr. Brown stood at the doorway of his interview room, Whitehouse asked Brown what had happened and took his statement.  (*Id.* ¶¶ 36–41; EDSOF ¶ 47.)  Once the statement was drafted, ASA Whitehouse reviewed the statement with Mr. Brown and Detective Campbell, and made certain corrections at Brown's request.  (DWSOF ¶ 42.)

While the circumstances surrounding the confession are, as described here, disputed, the parties agree on certain details.  It was ASA Whitehouse who wrote out the statement by hand, not Detective Campbell, Fine, or Kutz.  (EDSOF ¶ 47.)  Mr. Brown did not see any police officer write the confession, nor did he hear any Detective Defendant provide information included in the document to ASA Whitehouse.  (*Id.* ¶ 49.)  Detective Campbell did make several minor, non-substantive changes to the document.  (*Id.* ¶ 52.)  For example, Detective Campbell revised the statement "Mr. Brown stated that Michael Harper asked him to make the fire look it was done by burglars" to read "Mr. Brown stated that Michael Harper asked him to help make it look like it was broken into."  (*See id.*)

### D.    Mr. Brown's Version of Events the Morning of the Fire

In addition to his contentions regarding the preparation of the confession document, Mr. Brown adamantly disputes the truth of its substance.  His own account is as follows.  Around 3:30 a.m. on May 28, 1988, Mr. Brown woke up to a phone call from Harper.  (PSOAF ¶ 1.)  Harper reported to Mr. Brown that someone had broken into Magic Video, where Mr. Brown had previously installed burglar bars.  (*Id.*)  Mr. Brown got dressed and walked the two blocks from his house to the store.  (*Id.* ¶ 2.)  There, he found Harper with three other men, whom he did not know, but later learned two of them to be Harper's uncle Albert and his cousin Geronia.[14]  (*Id.*)

---

[14]    Mr. Brown does not know who the fourth person was.  (*See* Brown Dep. at 149:20–22.)

Mr. Brown went to the back door of the store and saw that the frame was broken because someone had tried to drill out the lock on the bars. (*Id.* ¶ 3.) The damage was extensive, so, unable to repair it on the spot, Mr. Brown used a two-by-four to secure the door temporarily. (*Id.*) Mr. Brown gave Harper a written bill for the service charge and told him he would come back to repair the door when he had time. (*Id.*)

Mr. Brown then returned home, went to the kitchen for some food and coffee, and handled some business paperwork. (*Id.* ¶ 4.) He saw his mother there and also encountered his niece around 4:30 or 5:00 a.m. and again around 6:00 a.m., when he left for work. (PSOAF ¶ 5; Defs.' Resp. to PSOAF at ¶ 5.) Mr. Brown says he first learned of the fire when he was handcuffed in an interrogation room at Area 1. (Brown Dep. at 221:1–17, 226:23–24, 227:1–3, 228: 3–6, 235:7–15.)

### E.    Additional Interactions Between Defendants, Harper, and Ford

Both Harper and Ford have been deposed in this case, offering testimony on the circumstances surrounding their own court-reported statements regarding the arson.

Harper attests that before giving a statement, transcribed by a court-reporter, he met with Detective Kutz and ASA Whitehouse, who reviewed questions they intended to ask Harper and directed him to rehearse his answers. (PSOAF ¶ 13.) As set forth in that transcribed statement, on the morning of May 28, 1988, Harper told Mr. Brown that he wanted to burn video tapes in his store to collect insurance on them because his business was failing, and Brown agreed to help in exchange for some X-rated tapes. (*Id.*) After making the statement, Harper called his mom "because [Detective Kutz and Fine] repeatedly told [him], prior to [his] giving a confession, that if [he] didn't confess, they were gonna lock her up." (Harper Dep. at 253:9–14.)

Defendants dispute Harper's account. ASA Whitehouse says he had already learned that Harper had confessed when he first met with Harper, and that he followed his standard procedure: He made sure Harper knew that Whitehouse was not his attorney and that it was instead Whitehouse's job to determine whether Harper would be charged. (DWSOF ¶ 18.) He confirmed

14

that Harper understood his constitutional rights and then asked if Harper wanted to make a statement.  (*Id.* ¶ 18–19.)  Defendants contend that Harper agreed to do so, that no one rehearsed Harper's statement with him, and that no one threatened to arrest Harper's mother.  (*See id.*; EDSOF ¶ 38; Defs.' Joint Resp. to PSAOF [338] ¶ 14.)

Ford also gave a statement.  Ford contends that he was also interrogated by Detective Kutz and another officer, and that Kutz hit him in the chest three to four times and threatened that he would get "natural life" if he did not give a statement.  (PSOAF ¶ 15; Ford Dep. at 116:12–19.)  Ford says Detective Kutz gave Ford a few sheets of paper with handwritten notes and told him to memorize them.  (*Id.*)  When ASA Whitehouse and the court reporter entered the interrogation room, Ford says he used the information Detective Kutz provided to give his court-reported statement (which is not in the record).  (*Id.*)

Again, Defendants' version of events differs.  Defendants contend that ASA Whitehouse went to Ford's interview room following his initial interactions with Harper and followed the same procedures described earlier.  (DWSOF ¶ 23.)  Detective Kutz told ASA Whitehouse that Ford had made a confession, and Whitehouse spoke with Ford for approximately fifteen minutes, during which time Whitehouse gave Ford the option of having Whitehouse summarize Ford's statement in handwritten for or to having a court reporter transcribe Ford's oral statement.  (*Id.* ¶ 24; Whitehouse Dep. at 219:11–222:1.)  Ford opted to have a court reporter transcribe his statement.  (Whitehouse Dep. at 221:22–222:1.)  Defendants contend that Ford voluntarily gave both oral and court-reported statements.  (*See* Whitehouse Test. on May 3, 1991, Ex. H to Defs.' Joint Resp. to PSOAF [338-9] at 18:2–11.)  Defendants note that Ford's testimony is also inconsistent regarding whether it was Detective Fine or Kutz who struck him.[15]  (*See* Geronia

---

[15]     Estate Defendants also assert that ASA Whitehouse neither saw nor heard any indication that Detective Kutz had struck Ford.  (*See* Defs.' Joint Resp. to PSOAF [338] ¶ 15.)

Ford Test. on May 3, 1993, Ex. I to Defs.' Joint Resp. to PSOAF [338-10] at 47:1–8; Ford Dep. at 283:23–284:1.)

### F. Additional Investigatory Materials

Other details concerning the investigation do not fit neatly into the timeline and are also the subject of disputes. These include interactions between the police and two people: a gas station attendant named Cecil Hingston and an eyewitness named Joyce Owens.

On May 30, 1988, Detective Kutz wrote a police report summarizing statements from Cecil Hingston, a gas station attendant who was working the nightshift at a gas station near the strip mall in the early morning of May 28, 1988. (May 30, 1988 General Progress Report, Ex. G to PSOAF [321-7].) According to that report, Hingston told the police that he saw a white Ford Bronco with one passenger drive into the gas station at around 3:30 a.m. that morning.[16] (*See id.*) The passenger, who "was acting silly," haphazardly poured some gas in a two-gallon can. (*See id.*) According to the report, Hingston identified Geronia as the driver in a lineup and Albert as the passenger in a photo array sometime on May 28th. (*See id.*)

On May 29, 1988—the day after Mr. Brown, Harper, and Ford had "confessed" to the arson—two Bomb and Arson detectives named Micek and Scheithauer (first names not in the record) interviewed a witness named Joyce Owens. (PSOAF ¶ 9.) Owens told the detectives that she and several companions were using cocaine at the strip mall in the wee hours of the morning on May 28. (*Id.*) One of her companions had contacted Harper to buy more cocaine, and a small group of them walked over to Magic Video. (*Id.*) Owens says she waited outside the store while three of her companions met with Harper inside. (*Id.*) About 15 minutes later, Harper ran out of the store. (*Id.*) Owens's account was internally inconsistent on whether Harper ran out of the store alone or with the three people Owens had gone to the store with. (Micek &

---

[16] The report does not indicate which officers interacted with Hingston or where the interview took place.

Scheithauer Memo, Ex. E to PSOAF [321-5].) Owens had seen news reports of the fire and related arrests over the past day, but told police she did not recognize any of the suspects in custody.[17] (*Id.*) Detectives Micek and Scheithauer documented this interview in two police reports and a typed memo to Defendant Campbell and their sergeant.[18] (See May 29, 1998 General Progress Report, Ex. C to PSOAF [321-3]; Micek & Scheithauer General Progress Report, Ex. D to PSOAF [321-4]; Micek & Scheithauer Memo, Ex. E to PSOAF [321-5].)

### III.    Mr. Brown's 1990 Trial

Mr. Brown, Ford, and Harper were all tried for arson and murder. Mr. Brown was convicted for arson and two murders in April 1990. Mr. Brown and Harper's trial proceeded together for pretrial purposes, but they were tried by different juries. (*See* Defs.' Joint Resp. to PSOAF [338] ¶ 13.) Harper was convicted and remains in custody. (EDSOF ¶ 126.) Geronia was convicted by a separate jury and completed his sentence for arson. (*See id.* ¶ 127)

In Mr. Brown's trial, the State's case rested largely on the testimony of Malone, Hingston, Officers Brown and Scott, Detectives Campbell and Fine, and ASA Whitehouse. (*See* EDSOF ¶¶ 12–15, 17–18, 71, 59–61, 63, 66, 68.) Detective Kutz did not testify. (*Id.* ¶ 73.) Nor did Harper. (*Id.* ¶ 75.) Malone testified to witnessing two men with a gas can exit a vehicle with license plates "GAS 403" outside Magic Video shortly before the fire. (*Id.* ¶¶ 12–15.) He also testified to seeing two or three other people outside Magic Video and said there "[s]eemed to have been one person inside." (Testimony of Sid Malone, Ex. 17 to EDSOF [302-17], at AB 665:7–19.) Malone did not identify Mr. Brown, or anyone else, as being present at the scene near the time of the fire. (PSOAF ¶ 8.)

---

[17]    The report suggests that the interview took place off-site from Area 1 and that Owens only knew who was in custody based on news reports from May 28 and 29. (*See* Micek & Scheithauer Memo as AB1281.)

[18]    Estate Defendants state that Owens denied being present at the strip mall at the time of the fire, but their attached exhibit does not include the pages they cite to support this statement. (*See* Deposition of Joyce Owens, Ex. C to Defs.' Joint Resp. to PSOAF [338-4] (missing lines 61:12–21).)

Hingston testified that two men in a white Ford truck purchased gas in a gas can from him at around 5:00 a.m. (EDSOF ¶ 71.) Although Hingston had identified Geronia and Albert at Area 1, no evidence of those identifications was introduced at trial. (*Id.* ¶ 95.)

Officers Brown and Scott testified to their conversations with Harper and witnesses at the scene. (*See id.* ¶¶ 12–15.) Detective Campbell testified to the substance of the inculpatory statements he averred Mr. Brown made at Area 1, but a police report he wrote on May 29 summarizing these statements was neither admitted into evidence nor used to refresh his recollection. (*Id.* ¶¶ 66–67, 69.) Mr. Brown's trial counsel did use the May 29 report, but only to cross-examine Detective Campbell on why he made no mention in the report that he smelled gasoline in Magic Video. (*Id.* ¶ 68.) Detective Fine also testified to the substance of inculpatory statements Mr. Brown purportedly made to him; the prosecution did not offer Detective Fine's June 1 report in evidence or use it to refresh his recollection at trial. (*Id.* ¶ 65.) Mr. Brown's attorney, again, used the June 1 report to cross-examine Detective Fine on the report's omission of any mention of Mr. Brown's denials of involvement in the arson or any description of the confrontation between Mr. Brown and Harper at the police station. (*Id.* ¶ 61.) ASA Whitehouse testified to the contents and circumstances of the handwritten confession, which was admitted into evidence. (*Id.* ¶ 72.)

The jury convicted Mr. Brown for two counts of first-degree murder and one count of arson. (*Id.* ¶ 2.)

## IV. Bell's Affidavit

Following his conviction, from July 1990 to June 1997, Mr. Brown was incarcerated at Pontiac Correctional Center. (EDSOF ¶ 77; Pl.'s Resp. to EDSOF [314] ¶ 77.) Another inmate, James Bell, was also incarcerated at that facility from February 1992 to February 1995.[19] (*See id.*) Bell has testified that he saw Mr. Brown "all the time," but Mr. Brown denies that he ever met

---

[19]  Bell is serving a natural life sentence for armed robbery. (EDSOF ¶ 82.)

or communicated with Bell during their overlap at the facility. (EDSOF ¶ 77; Pl.'s Resp. to EDSOF [314] ¶ 77.)

On May 28, 1999, Mr. Brown filed a petition for post-conviction relief based on newly-discovered evidence: the confession of Bell that he alone committed the arson. (EDSOF ¶ 78.) In 2001, Bell signed a notarized affidavit swearing that he, acting alone, set fire to Magic Video. (PSOAF ¶ 31; EDSOF ¶ 79.) The affidavit identified a motive: Bell stated that Mr. Brown owed Bell approximately $1,500 to $2,000 for drugs Bell had supplied. (EDSOF ¶ 80). According to Bell's affidavit, Brown had told Bell he owned the store, so, out of anger for this unpaid debt, Bell burned it down using a gas can. (*Id.*)

When Mr. Brown first received Bell's affidavit, he knew some of its details were plainly wrong.[20] He knew he never owed Bell money, and no one ever supplied him with drugs. (*Id.* ¶ 81). Mr. Brown says he told his attorney that he owed nothing to Bell. (*Id.*) Defendants dispute this, citing testimony from Mr. Brown's then-attorney that Mr. Brown never told her that statements in Bell's testimony were false, and that she would not have called Bell as a witness had she known that. (See Defs.' Joint Resp. to PSOAF [338] ¶ 32; Deposition of Erica Reddick, Ex. M to Defs.' Joint Resp. to PSOAF [338-14] at 26:11–27:16; 30:1–11.) Whatever Mr. Brown in fact told his lawyer, counsel did present Bell's testimony at his June 23, 2003, post-conviction relief evidentiary hearing, and Judge Suria of the Circuit Court of Cook County found Bell's testimony sufficient to warrant a new trial. (EDSOF ¶¶ 2, 82, 86.)

## V. Brown's 2008 Trial

Mr. Brown was re-tried in 2008 and, on August 8, 2008, again convicted of two counts of first-degree murder and one count of arson. (*Id.* ¶ 2.) Mr. Brown's counsel relied on Bell's confession during the trial, and Bell served as the only defense witness. Mr. Brown says he

---

[20]       The parties argue over whether Bell was mistaken or dishonest in his affidavit. To rebut the theory that Bell was simply mistaken about the identity of the person to whom he sold drugs, Defendants note that Bell identified Mr. Brown as his customer in open court during Mr. Brown's 2008 trial. (*See* Defs.' Resp. to PSOAF [338] ¶ 31.)

provided his attorney with the names of alibi witnesses she failed to call at trial, but this, too, is disputed.  (PSOAF ¶ 33; Defs.' Joint Resp. to PSOAF [338] ¶ 33.)

The prosecution's evidence included the testimony of Detectives Fine and Campbell and portions of the 1990 trial testimony of Hingston, who had since died.  (EDSOF ¶ 94.)   Detective Fine testified that he interviewed Mr. Brown at Area 1 and, after Mr. Brown denied involvement, Detective Fine escorted Harper to Mr. Brown's room, where the two had a conversation before Detective Fine escorted Harper away.  (*Id.* ¶ 89.)  Detective Fine testified to the substance of inculpatory statements he averred Mr. Brown made to him on May 28, 1988.  (*Id.* ¶ 90.)

Because this case concerns evidence-fabrication claims, the court also notes what evidence was *not* used during Mr. Brown's trial.  In 2008, Detective Campbell made no reference to his June 1 report, nor was that report admitted into evidence.  (*Id.*)  Detective Campbell also testified to the substance of inculpatory statements he averred Mr. Brown had made to him and ASA Whitehouse but, as in 1990, did not refer to or authenticate the May 29 Supplemental Report.  (*Id.* ¶ 92.)  Again, Hingston's lineup identification was not introduced.  (*Id.* ¶ 94.)  Detective Kutz did not testify.  (*Id.* ¶ 103.)

Mr. Brown notes another piece of evidence missing from the 2008 trial: a 2002 affidavit in which Hingston averred (contrary to his 1990 trial testimony) that he did not actually sell gas to anyone driving a truck the morning of the Magic Video fire.[21]  (EDSOF ¶ 96.)  The affidavit avers Hingston was "approached by detectives and police officers" at his workplace and asked if he had sold gas in a can to someone driving a truck or a van at around 5:00 a.m.  (*Id.* ¶ 97.)  Hingston stated he had not.  (*Id.*)  Later that day, Hingston averred he was approached by "the same detectives and police officers" and was told they had two people in custody who had confessed to purchasing gas from him.  (*Id.*)  "The detectives and officers" showed Mr. Hingston pictures of

---

[21]     Neither party has explained to the court the circumstances surrounding the creation of this affidavit.

a truck and a picture of one of the suspects.  (*Id.*)  After the police threatened to report him, he went to the police station, viewed a lineup, and identified persons at a detective's direction.[22]  (*Id.* ¶ 98.)  Several days later, he returned to view another lineup and again followed a detective's directions in picking persons out of the lineup.  (*Id.*)  Hingston stated he cooperated with the police because he feared he would be fined and lose his job if he did not.  (*Id.*; Pl.'s Resp. to EDSOF [314] ¶ 98.)

Mr. Brown's 2008 trial resulted in a conviction, which an appellate court affirmed, finding there was overwhelming evidence of Brown's guilt.  (EDSOF ¶ 107.)

## VI.    The Circumstances of Mr. Brown's Post-Conviction Relief

Mr. Brown filed a petition for post-conviction relief on August 27, 2016.  (2016 Amended Petition for Post-Conviction Review, Ex. T to PSOAF [321-20]; PSOAF ¶ 37.)  On October 3, 2017, a post-conviction review court ruled that there was a significant problem with Mr. Brown's 2008 trial:  The prosecutor had argued in closing that Mr. Brown's confession led detectives to discover a gas can in the alley behind Magic Video.  (PSOAF ¶ 38.)  That was false.  In a police report from May 28, 1988, Campbell stated the gas can was discovered by an individual named William Henry Lewis at approximately 3:00 p.m., before Mr. Brown was in custody.  (*Id.* ¶ 36.)  Judge Claps concluded that Mr. Brown received ineffective assistance of counsel when his appellate counsel failed to raise the claim of prosecutorial misconduct on appeal.  (*See People v. Brown*, No. 88 CR 8605, Order Granting New Trial, Ex. 53 to EDSOF [302-53] at 16.)  The court vacated Mr. Brown's conviction.

Initially, the State filed a notice of appeal from the order vacating Mr. Brown's convictions.  (EDSOF ¶ 108.)  The State then changed course.  On November 3, 2017, First Assistant State's Attorney Eric Sussman became aware of the case and began reviewing CCSAO's decision to pursue an appeal.  (*Id.* ¶¶ 109–10.)  In making this decision, Sussman considered, among other

---

[22]    Hingston does not identify these officers by name or physical characteristics.

things, whether a third trial was "feasible" and "whether it was in the interests of justice." (Pl.'s Resp. to EDSOF [314] ¶ 110; Dep. of Eric Sussman, Estate Defs.' Ex. 56 to EDSOF [302-56] (hereinafter "Sussman Dep.") at 88:7–22.)

On November 9, 2017, Sussman met with Mr. Brown's counsel and Mark Rotert, the Director of the CCSAO's Conviction Integrity Unit. (EDSOF ¶ 111.) The attorneys representing Mr. Brown before this court told Sussman and Rotert that Mr. Brown was in poor health, that he was innocent, and that his representation had been "inadequate on various levels." (Id.; Pl.'s Resp. to EDSOF [314] ¶ 111.) After that discussion, Sussman began reviewing materials from Mr. Brown's counsel, and Rotert reviewed Brown's criminal case to provide an opinion on it to Sussman.[23] (EDSOF ¶¶ 112–13.)

After reviewing the case, Rotert told Sussman that he was uncertain of Brown's innocence, believed the proceedings had not been carried out at the best standards, and was concerned about Mr. Brown's age.[24] (Id. ¶ 114.) Rotert further characterized the case as "a real head-scratcher" which "didn't make a lot of sense." (PSOAF ¶ 42; Dep. of Mark Rotert, Estate Defs.' Ex. 57 to EDSOF [302-57] (hereinafter "Rotert Dep.") at 108:4–109:21, 118:16–119:6.)

Sussman himself explained that in determining whether to retry Mr. Brown, he considered the feasibility of a retrial in light of the death of at least two witnesses, the interests of justice, and the decision to use CCSAO resources to retry someone who was "67 years old and spent nearly 30 years in jail." (EDSOF ¶ 115.) He also expressed concerns about "Arthur Brown's confession

---

[23] The depositions of Sussman and Rotert disagree over whether Plaintiff counsel told the two that "they could be heroes." (See Sussman Dep. at 45:1–5 ("I recall Mr. Safer talking about how we could be heroes and that it could be a response to whatever the media coverage had been at that point and that this was an easy way for us to be heroes or something along those lines."); Dep. of Mark Rotert, Estate Defs.' Ex. 57 [302-57] at 77:18–24 (responding, when asked whether Mr. Safer told him that he and Mr. Sussman could be heroes if they chose not to try Brown, with the statement, "I'm sure that he didn't make that comment, because I would have reacted with great sarcasm to that").)

[24] The record does not contain the actual statements that Rotert expressed to Sussman. Rather, at his deposition Rotert confirmed statements he wrote in an email to a reporter, recounting a conversation with Sussman. (Rotert Dep. at 104:10–106:12.)

and the reliability of the confession" and "about the Hingston affidavit." (PSOAF ¶ 41; Sussman Dep. at 103:6–12.) When Sussman called the State's Attorney on November 12, 2017, she agreed with his position not to pursue the appeal or retrial of Mr. Brown. (EDSOF ¶ 118.)

Ultimately, the CCSAO entered a *nolle prosequi*, a formal notice that the prosecutors were abandoning the case. On November 14, 2017, the CCSAO withdrew its notice of appeal and dismissed the criminal case against Mr. Brown. (*Id.* ¶ 120.) He was released from custody that same day. (Petition for Certificate of Innocence, Ex. 62 to EDSOF [302-62] at AB6090.)

On December 21, 2017, Mr. Brown filed for a Petition for a Certificate of Innocence ("COI"). (EDSOF ¶ 128.) The policy of the CCSAO in mid-December 2017 through February 2018, when reviewing a petition for a COI, was to consider the following: (1) whether any CCSAO personnel could be subject to civil liability in a future proceeding; (2) the use and amount of resources that would need to be expended on investigating and litigating the COI proceeding; (3) procedural considerations; (4) legal issues; and (5) the factual circumstances of the case. (*Id.* ¶ 132.) Actual innocence "could be" something the CCSAO considered when determining what position to take on a petition for COI under the factual and legal factors. (*Id.* ¶ 133.)

At the CCSAO office, Sussman and former Assistant State's Attorney James Hanlon, who was then Chief of the Special Litigation Division, reviewed Mr. Brown's COI petition. (*Id.* ¶ 134.) This review did not include inspection of impounded evidence, witness interviews, interviews of the officers involved in the investigation, communication with the victims' family, or a complete review of documentary evidence.[25] (*Id.* ¶ 135.) Sussman explained that he found Mr. Brown's allegations against Whitehouse "concerning," (*id.* ¶ 136), but that "[a]t no point in time was [he] reviewing the case to make a determination whether Mr. Brown was innocent." (Sussman Dep.

---

[25] Whether a review of impounded evidence and witness interviews is necessary depends on the case. (Pl.'s Resp. to EDSOF [314] ¶ 135 (citing Dep. of Joseph Magats, Ex. 59 to EDSOF [302-59] at 58:20–60:14).)

at 152:24–153:5.) Ultimately, the CCSAO took no position on Mr. Brown's petition for COI. (EDSOF ¶ 139.)

At the court appearance on the petition, Rotert informed the court that CCSAO was not contesting the petition for COI or the factual underpinnings of the petition. (*Id.* ¶ 140.) The court granted Mr. Brown's COI, determining that Mr. Brown's petition established his innocence by a preponderance of the evidence. (PSOAF ¶ 46.) The record before the court in making this decision included the following:

- the post-conviction court's order finding that, absent the prosecutor's mischaracterization of evidence during the 2008 trial, there was a reasonable likelihood that the jury could have reached a different verdict;
- Plaintiff's 1990 trial testimony that he had no connection to the Magic Video store other than occasionally performing construction work there;
- the 2017 testimony of Plaintiff's niece, Nenorah Anderson, from a post-conviction evidentiary hearing in which she stated she saw Mr. Brown early in the morning of the fire; and
- the 2001 affidavit of James Bell, who swore under oath that he alone was responsible for setting the fire.

(*Id.*)

In his submissions in support of the COI petition, Mr. Brown did not inform the court that he knew portions of Bell's affidavit were incorrect, namely those stating that Mr. Brown bought drugs from Bell and owed him money. (*See* EDSOF ¶ 128.) Plaintiff notes that he has no information about Bell's subjective beliefs regarding the truth of all the statements in the affidavit. (Pl.'s Resp. to EDSOF [314] ¶ 128.) On February 28, 2018, the court granted Mr. Brown a COI without an evidentiary hearing. (EDSOF ¶ 142.) On October 22, 2018, Mr. Brown filed this lawsuit.

## VII. Evidence of the City's Procedures and Practices

As noted, Plaintiff contends in this case that misconduct leading to his conviction was the product of policies of the City of Chicago and its police department. The court reviews evidence on this issue below.

### A. Written Policies

The City has produced over 3,000 pages of training documents and policy directives related to how officers should conduct interviews, investigations, and interrogations in a manner that protects criminal suspects' constitutional rights. (*See* DCSOF ¶ 27.) For example, CPD's Rules and Regulations expressly prohibit the disrespect or maltreatment of any person, engaging in any unjustified verbal or physical altercation, making a false report (written or oral), failing to report promptly any information concerning any crime or unlawful action, and failing to report any violation of any rule or regulation or any other conduct contrary to the policy, orders, or directives of the CPD. (*Id.* ¶ 14). Additionally, CPD General Order (G.O.) 78-1 prohibits coercing confessions (*id.* ¶ 15); G.O. 88-12 directed CPD members to protect each person's civil rights (*id.* ¶ 16); and G.O. 82-14 required CPD members to report allegations of misconduct to a supervisor and prepare a report (*id.* ¶ 20). According to CPD written policies, CPD members were to memorialize allegations and suspicious of misconduct in Complaint Register (CR) files, unless the misconduct was to be addressed through "Summary Punishment." (*Id.* ¶ 21.)

### B. Testimony of Paul Carroll

The City designated Paull Carroll as a Rule 30(b)(6) witness regarding training and CPD policy directives related to interviews and investigations. (*Id.* ¶ 28; Dep. of Paul Carroll, Ex. 13 to DCSOF [310-13] (hereinafter "Caroll Dep.").) Carroll testified about his personal experience being trained and providing training to detectives from 1970 to 1988. (*See* DCSOF ¶ 29; Carroll Dep. at 17:4–7.) He testified that, in his experience, the first thing CPD recruits are trained on is due process, the law enforcement code of ethics, and honoring the rights of suspects. (DSCOF ¶ 31.) When officers were promoted to the rank of detective, they undergo four weeks of pre-service training.[26] (*Id.* ¶ 32.) Carroll testified that during his time in the CPD, both patrol officers and

---

[26]     Mr. Brown's assertion that Carroll was referring only to the training he personally underwent is inconsistent with Carrol's statement that "[w]e used to train our detectives for four weeks before assignment." (*See* Pl.'s Resp. to DCSOF [325] ¶ 32; Carroll Dep. at 40:9–16.) Carroll also said he underwent such a training himself. (Carroll Dep. at 46:9–17.)

detectives received ongoing training, including "roll call training," which sometimes included a review of new laws or appellate decisions, as well as in-service training at the police academy. (Carroll Dep. at 46:9–51:8.) Among other things, officers were specifically trained (1) not to violate a suspect's constitutional rights and not to abuse a suspect, (2) that any violation of the suspect's civil rights would cause a statement to be inadmissible, (3) that a suspect is to be provided *Miranda* warnings, and (4) that the law enforcement code of ethics requires officers to treat citizens with respect. (*See id.* at 84:10–85:23, 89:9–24, 119:2–120:8, 168:4–169:8, 170:2–19, 188:1–11, 190:24–192:14).

Carroll further testified that each Detective Defendant in this case underwent pre-service training, and Detective Kutz and Campbell received additional training on investigative files. (DCSOF ¶ 33.)

### C. Testimony of Tiny Skahill

Another Rule 30(b)(6) witness, Tina Skahill, testified for the City concerning complaints against the Defendant Officers, the organization and reporting structure of the CPD, and CPD's policies regarding investigating and disciplining officers for misconduct from 1983 to 1988. (DCSOF ¶ 37.) Skahill testified that from 1983 to 1988 officers were (and today still are) required to report misconduct by other officers. (*Id.*) Skahill also testified regarding audits of the Office of Professional Standards (OPS) in 1987 and 1989, which revealed deficiencies in the manner in which OPS was operating and identified particular ways in which the department could improve. (*See id.* ¶¶ 41–45.)

### D. Statistical Evidence

The City has provided statistical evidence about its operations. Regarding relevant crime rates, CPD annual reports show that from 1983 to 1988 there were 4,231 homicides in Chicago

(with 867 in Area 1) and 1,679,150 "Index" offenses (with 306,915 in Area 1).[27]  (DCSOF ¶ 56.) During that same time period, the CPD made 5,045 homicide arrests and 350,598 citywide Index offense arrests and had 1,713,570 calls for service for this category of crimes (with 308,814 calls for service for Index crimes in Area 1).  (*Id.* ¶ 57.) Regarding officer discipline, between 1984 and 1988 CPD took disciplinary actions to correct employee behavior, including cases in which complaints of misconduct were sustained, by issuing 1,083 reprimands, imposing 2,374 suspensions, and conducting investigations that resulted in over 337 employees being discharged or resigning. (*Id.* ¶ 58).

### E.    Plaintiff's Documentary Evidence

Mr. Brown has offered a number of documents to the record as evidence of the City's *de facto* policies.  Several of these either fall outside of the five-year time period leading up to Mr. Brown's arrest or are expressly limited to addressing misconduct at units unrelated to this case. The court concludes these documents, listed here, are immaterial: a panel report titled "The Misuse of Police Authority in Chicago" from 1972, a full 16 years before the events of this case (The Misuse of Police Authority in Chicago, Ex. V to PSOAF [321-22]); a 1984 memo regarding complaints—none of which arose from a unit relevant to this case—of officers' using electronic shocking devices on criminal suspects (Nov. 5, 1984, Memo from David Fogel to Fred Rice, Ex. W to PSOAF [321-23]); a 1990 report specifically investigating abuse by Jon Burge and those under his command (Sept. 28, 1990, Report of Michael Goldston, Ex. X to PSOAF [321-24]); a 2006 Special Prosecutor's report, which is expressly limited to "*police officers under the command of Jon Burge at Area 2 and Area 3 Headquarters*" from 1973 to 2006 (2006 Special State's Attorney Report, Ex. Y to PSOAF [321-25]; at AB23643 (emphasis in original); and statements contained in the 2006 Special Prosecutor's report made by Richard Brzeczek, who served as

---

[27]        "Index" offenses include murder, rape, aggravated assault, robbery, burglary, theft, auto theft, and arson.  (DCSOF ¶ 46.)  These numbers also include instances of involuntary manslaughter and attempted sexual assault.  (*See* Pl.'s Resp. to DCSOF [325] ¶¶ 46–57.)

CPD Superintendent from 1980 to 1983, regarding his dereliction of duty to take action against Jon Burge and officers under his command (*see* PSOAF ¶¶ 52–53; Defs.' Joint Resp. to PSOAF [338] at ¶¶ 52–53).

### F.    Dennis Waller Report and Testimony

Mr. Brown's retained expert on police practices and *Monell* issues is Dennis Waller. Waller reviewed CPD written policies and general orders and concluded that they reflect nationally accepted standards of police practices. (DCSOF ¶ 61.)

Waller also completed a paper review of CR files. From more than 1,300 CR files produced in this litigation, Waller reviewed 157 CRs and analyzed 149 CR files in conducting his *Monell* analysis. (*Id.* ¶ 63; Pl.'s Resp. to DCSOF [325] ¶ 63.) Waller did not identify any specific deficiencies in his review of the 149 CR files, though he opined that they displayed "varying degrees of completeness." (DCSOF ¶ 64; Pl.'s Resp. to DSCOF [325] ¶ 64.)

With respect to the Detective Defendants in this case, Waller's report noted the following: Detective Kutz had one CR filed against him. Detective Kutz was accused on May 2, 1988 of failing to advise a suspect of his *Miranda* rights, handcuffing the suspect to the wall of an interrogation room in Area 1 Violent Crimes, and punching the suspect in the stomach multiple times. (DCSOF ¶ 67.) Upon review by OPS, these allegations were determined to be "unfounded" and "not sustained." (*Id.*) Waller's report also included a CR for Detective Fine from 1996, which involved allegations that OPS determined were not sustained. (*Id.* ¶ 68.) The report also notes that Fine was named and then dismissed as a defendant in a case arising from a 1995 arrest that allegedly led to a wrongful conviction. (*Id.* ¶ 69.) Waller did not review any CRs against Campbell or identify any other case or allegation of misconduct against him. (*Id.* ¶ 71.) He also did not opine that the investigations into the Detectives' Kutz or Fine CRs were in any way deficient. (*Id.* ¶ 70.)

Otherwise, Waller identified four cases of police misconduct, only one of which took place during the period from May 1983 to May 1988.[28]  (*Id.* ¶ 73.)  None of the four cases involved allegations against Area 1 officers or any of the Detective Defendants.  (*Id.* ¶ 75.)

In his report, Waller also discusses shortcomings of OPS in the 1980's and beyond.  Waller reviewed audits of OPS in 1987 and OPS Chief Administrator David Fogel's responses to those audits, in which he recognized both ongoing deficiencies and notable improvements.  (*See id.*  ¶¶ 81–82.)  Fogel also made recommendations for improving OPS.  (*See id.* ¶ 83.)

Waller's report additionally opines that a "code of silence" existed within CPD at the time of Mr. Brown's arrest.  (Waller Report at 31–32.)  The materials he references for supporting this conclusion are what he calls "The Police Accountability Task Force Report" and a 2017 Department of Justice report.  (Waller Report at 31–32; *id.* at Ex. D.)  This "Police Accountability Task Force Report" is not referenced again in Waller's appendix of "Materials Reviewed," so the court is left with no information about the nature, materiality, or limitations of this report.  (*See id.* at Ex. D.)  The 2017 DOJ Report investigated CPD practices beginning in 2015, so it is not material to whether a "code of silence" existed in 1988.  As far as the court can discern, these documents are immaterial to Plaintiff's *Monell* claim, which is based on CPD practices in and around 1988.  Nonetheless, Waller opined that the Detective Defendants' failure to conduct their investigation in a manner that protected Mr. Brown's constitutional rights in 1988 was "consistent" with "the widespread acceptance among all ranks of the 'code of silence.'"  (Waller Report at 28.)

---

[28]     The four cases were brought by the following plaintiffs: Daniel Andersen (1980, Area 3), Andrew Wilson (February 1982, Area 2), Stanley Wrice (September 1982, Area 2), and Madison Hobley (1986, Area 2).  Those men filed suit against the City and its officers.  Waller was a paid expert retained by the counsel for individuals in three of those four civil suits (Andersen, Wrice, and Hobley).  (DCSOF ¶ 74.)  Plaintiff states that Wilson was abused in Area 1.  (Pl.'s Resp. to DCSOF ¶ 74.)  The evidence Plaintiff cites on this score shows that the one person who abused Wilson at Area 1 was Jon Burge, who brought him there for a lineup before returning him to Area 2.  (Special State's Attorney Report, Ex. Y to PSOAF [321-25] at AB023687.)  The Wilson case is outside of the five-year time period leading up to this case and, except for this one noted instance, outside of Area 1.

A significant portion of the documents Waller cites or references do not concern police misconduct in Area 1 or the Bomb and Arson Unit in the five-year period leading up to Mr. Brown's arrest, let alone the City's awareness of police misconduct in those units during the timeframe relevant to this case.  (*See* DCSOF ¶¶ 77–79.)

## PROCEDURAL HISTORY

Mr. Brown filed this suit on October 22, 2018, after spending nearly 30 years in prison. (*See* Compl. [1] ¶ 1.)  Mr. Brown amended his complaint on November 14, 2018 [10], and the City moved to dismiss certain claims in the amended complaint of February 12, 2019 [41].  On June 17, 2019, Mr. Brown submitted the operative Second Amended Complaint (SAC) [70].  The SAC includes eleven counts: deprivation of fair trial and wrongful conviction, against Individual Defendants (Count I); coercive interrogation, against Defendants Fine, Campbell, and Whitehouse (Count II); conspiracy to deprive Plaintiff's constitutional rights, against Individual Defendants (Count III); failure to intervene, against Individual Defendants (Count IV); a *Monell* claim, against City (Count V); federal malicious prosecution, against Individual Defendants (Count VI); state law malicious prosecution, against Individual Defendants (Count VII); state law intentional infliction of emotional distress, against Individual Defendants (Count VIII); state law civil conspiracy, against Individual Defendants (Count IX); state law *respondeat superior*, against City (Count X); state law indemnification (Count XI).  The City and the Estate Defendants again moved to dismiss [87].

The court granted in part and denied in part each of the Defendant's motions [106, 108]. The City moved to dismiss Mr. Brown's IIED and federal malicious prosecution claims, as well as Mr. Brown's constitutional claims to the extent they seek damages from Mr. Brown's 1990 trial and convictions.  The court concluded, first, that Mr. Brown's claims associated with his 1990 trial and convictions were timely, as they did not begin to accrue until 2017 when Mr. Brown's convictions were vacated and the charges against him were finally dropped.  The court noted that the Seventh Circuit does not recognize a federal constitutional claim for malicious prosecution

30

and therefore dismissed Count VI. Third, the court concluded that Mr. Brown's IIED claim was timely under *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994), and *McDonough v. Smith*, 139 S. Ct. 2149, 2157 (2019). Counts I through V and VII against the Estate Defendants survived the motion.

All Defendants have now submitted motions for summary judgment. ASA Whitehouse seeks summary judgment on all claims [293]. ASA Whitehouse argues [301] that he is entitled to prosecutorial immunity or, alternatively, that all but one of Mr. Brown's claims (his evidence-fabrication claim regarding the handwritten confession) fail on the merits. The Estate Defendants have also moved for partial summary judgment [297] seeking dismissal of the following claims: (1) Mr. Brown's alleged Fourteenth Amendment violation of his right to trial on the basis of Detectives Campbell, Fine, and Kutz withholding exculpatory evidence and fabricating evidence; (2) Fifth and Fourteenth Amendment coerced-interrogation claims against Detectives Campbell and Fine; (3) federal conspiracy; (4) failure to intervene; (5) state law malicious prosecution; (6) intentional infliction of emotional distress; and (7) state law conspiracy. The City moves for summary judgment on the *Monell* claim (Count V), and Mr. Brown's vicarious liability claims (Counts X and XI) to the extent that any other claims against individual defendants are dismissed. As explained below, the Defendants' motions are granted in part and denied in part.

## LEGAL STANDARD

Summary judgment is appropriate when the movant shows that there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmovant then must come forward with specific facts showing there is a genuine issue for trial. *LaRiviere v. Bd. of Trs.*, 926 F.3d 356, 359 (7th Cir. 2019). Surviving summary judgment requires the nonmovant to do more than show some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). While the court

must construe the facts in the light most favorable to the nonmovant and draw all reasonable inferences in his favor, this obligation does not extend to drawing inferences that are supported by only speculation or conjecture. *Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013).

## DISCUSSION

Because there can be no *Monell* liability absent an underlying constitutional violation, the court begins by addressing the Individual Defendants' liability before addressing *Monell*. First, however, the court turns to the threshold issues of immunity and timeliness.

## I.    Timeliness

In their motion for summary judgment, the Estate Defendants renew an argument that this court has already rejected: They argue that Counts I through IV of the SAC are untimely to the extent they seek damages from Mr. Brown's 1990 trial, because this case was filed more than two years after his first conviction was vacated on August 11, 2003. The court rejected this argument when ruling on the Defendants' motions to dismiss and, presented with no new legal authority casting doubt on its former ruling, stands by that ruling. *See Brown v. City of Chicago*, No. 18-C-7064, 2019 WL 4694685, at *5 (N.D. Ill. Sept. 26, 2019); *Brown v. City of Chicago*, No. 18-C-7064, 2019 WL 4958214, at *1–2 (N.D. Ill. Oct. 08, 2019).

Defendants again cite *Johnson v. Winstead*, 900 F.3d 428, 439 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 2776 (2019), in which the Seventh Circuit held that a plaintiff's constitutional tort claim accrued after his conviction was reversed, despite the fact that the criminal defendant remained subject to retrial. *Johnson* stands in tension with *McDonough v. Smith*, 139 S. Ct. 2149, 2153–54 (2019). In *McDonough*, the plaintiff had been prosecuted twice on the basis of allegedly fabricated evidence—the first time ending in a mistrial and the second time ending in an acquittal. The plaintiff brought a fabricated-evidence claim against the prosecutor, which the district court and Second Circuit held to be time-barred. The Supreme Court reversed, holding that "[t]he statute of limitations for fabricated-evidence claim . . . does not begin until the criminal proceedings against the defendant (*i.e.*, the § 1983 plaintiff) have terminated in his favor." *Id.* at

2154–55. The Court reasoned that this outcome was necessary because parallel criminal proceedings and civil litigation "would run counter to core principles of federalism, comity, consistency, and judicial economy." *Id.* at 2158.

In the time since this court issued its ruling on the motions to dismiss, the Seventh Circuit has recognized the tension between *Johnson* and *McDonough*. *See Savory v. Cannon*, 947 F.3d 409, 416 n.3 (7th Cir. 2020) (en banc), (noting that *McDonough* decided the plaintiff's claim began accruing after the second trial, whereas *Johnson* allowed for two accrual dates: one at favorable termination of the first trial and another at the reversal of the second appeal), *cert. denied*, 141 S. Ct. 252 (2020). Rather than deciding the issue in *Savory*, the Seventh Circuit concluded in that case "that the more prudent course is to allow the district court to consider in the first instance . . . whether and how *McDonough* affects *Johnson*." *Id.* On remand, Judge Feinerman of this court concluded that *McDonough* overruled *Johnson*. *Savory v. Cannon*, 532 F. Supp. 3d 628, 635 (N.D. Ill 2021). The *Savory* court's reasoning mirrored much of what this court discussed when ruling on the motions to dismiss. Namely, a defendant who remains fully subject to criminal charges is not in an appropriate position to bring claims against the state. *See id.* Under *Johnson*, criminal defendants are faced with the "untenable choice" against which the Supreme Court warned: They must decide "between (1) letting their claims expire and (2) filing a civil suit against the very person who is in the midst of prosecuting them." *McDonough*, 129 S. Ct. at 2158. Mr. Brown was subject to either the threat of pending charges or the reality of incarceration until the charges against him were dropped in 2017, so his claims did not begin to accrue until that time. On these grounds, the court adheres to its conclusion that Mr. Brown's claims are timely.

## II.     ASA Whitehouse's Immunity

In support of his motion for summary judgment, ASA Whitehouse has argued he is shielded from liability by either absolute immunity, qualified immunity, or sovereign immunity. For the reasons discussed below, the court concludes ASA Whitehouse has no claim to absolute or

sovereign immunity.  He is entitled to qualified immunity only for Mr. Brown's failure-to-intervene claim (Count IV).

### A.    Absolute Immunity

ASA Whitehouse argues he is immune from suit on all claims because at all relevant times he was protected by absolute prosecutorial immunity.  The Supreme Court has been "quite sparing" in recognizing absolute immunity for state actors in the § 1983 context, and ASA Whitehouse has the burden of proving its application here.  *See Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993).

"A prosecutor is absolutely immune from suit for all actions and decisions undertaken in furtherance of his prosecutorial duties."  *Fields v. Wharrie*, 672 F.3d 505, 510 (7th Cir. 2012).  "Prosecutorial immunity attaches to the failure to comply with disclosure obligations and the suppression of evidence, the initiation of a criminal prosecution, the evaluation and preparation of evidence collected by the police for presentation at trial, and court appearances to obtain search warrants."  *Heidelberg v. Manias*, 503 F.Supp. 3d 758, 779–80 (C.D. Ill. 2020) (internal citations omitted).  Prosecutors are entitled to absolute immunity even if they act with malice or unreasonably in their role as an advocate for the state.  *See Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003).  However, fabricating evidence is categorically not the type of activity that an attorney can take in furtherance of his or her prosecutorial duties.  *See Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1045 (N.D. Ill. 2016) ("*Patrick I*") ("Indeed, a showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity.").

On this record, read in the light most favorable to Plaintiff, ASA Whitehouse's absolute immunity argument fails.  Mr. Brown has presented evidence that he never confessed to the crime and that ASA Whitehouse penned a handwritten statement outside of Mr. Brown's presence.  ASA Whitehouse has cited no case in which a prosecutor was entitled to absolute immunity in such circumstances.  For example, in *Hunt v. Jaglowski*, 926 F.2d 689, 691–92 (7th Cir. 1991), the

34

court affirmed a verdict in favor of a defendant prosecutor when the criminal defendant, unlike Mr. Brown, testified that he agreed to make a confession. *Id.* In another of ASA Whitehouse's cited cases, *Andrews v. Burge*, 660 F. Supp. 2d 868, 878 (N.D. Ill. 2009), an assistant state's attorney was entitled to absolute immunity when the criminal defendant did not allege that prosecutor departed from the common practice of "tak[ing] a confession by asking questions as he or she would put to a witness examined in a courtroom." Mr. Brown has alleged a departure from common practice: He claims he never made a statement to ASA Whitehouse at all. *Cf. Harris v. City of Chicago*, 330 F.R.D. 508, 516 (N.D. Ill. 2018) (finding an ASA entitled to prosecutorial immunity when taking statements from a suspect after being told by police he had confessed). In short, ASA Whitehouse's absolute immunity argument fails because it does not credit Mr. Brown's version of disputed events. *See Hill v. Coppleson*, 627 F.3d 601, 605–06 (7th Cir. 2010) (noting absolute immunity cannot be resolved on summary judgment when it depends on "a disputed issue of fact that requires making credibility determinations and weighing the evidence").

ASA Whitehouse's additional arguments for absolute immunity are also unpersuasive. First, he argues he is protected because all of ASA Whitehouse's substantive interactions with Mr. Brown happened only after Detective Campbell told him that Brown had confessed and wanted to talk to the State's Attorney. Given this timing, ASA Whitehouse says, all of his interactions with Mr. Brown were part of his prosecutorial duties to verify the confession, evaluate the evidence, and decide whether charges should be approved. But Mr. Brown's version, which must be credited at this stage, is that he told Whitehouse he did not want to make a confession, and the next time Brown saw Whitehouse was when he was presented with a handwritten document for his signature. On this version of the facts, Whitehouse did not verify the confession—he manufactured it.

Second, ASA Whitehouse argues he is entitled to absolute immunity because of the particular function he was performing rather than the particular actions he undertook. But again, none of the authorities Whitehouse cite suggest that hand-writing a suspect's statement, outside

of the suspect's presence, aligns with a prosecutorial function.  This case appears similar to *Kitchen v. Burge*, No. 10 C 4093, 2012 WL 346450, at *2 (N.D. Ill Feb. 1, 2012), relied upon by ASA Whitehouse himself, in which the court found no absolute immunity when the plaintiff, like Mr. Brown, "had denied any involvement with the murders at the time [the ASA] was first brought into the interrogation."

Factual disputes regarding ASA Whitehouse's role in the process of gathering and creating evidence preclude summary judgment on an absolute immunity theory.[29]  Because "Illinois and federal doctrines of prosecutorial immunity are coterminous," ASA Whitehouse is not entitled to absolute immunity on either his federal or his state law claims.  *See Kitchen v. Burge*, 781 F. Supp. 2d 721, 737 (N.D. Ill. 2011); *see also Andrews*, 660 F. Supp. 2d at 879; *White v. City of Chicago*, 369 Ill. App. 3d 765, 772, 861 N.E.2d 1083, 1090 (1st Dist. 2006).

### B.   Qualified Immunity

When a prosecutor acts as an investigator rather than as a legal advocate, he is entitled to qualified immunity to the same extent as police officers carrying out those same duties.  *Fields*, 672 F.3d at 511.  Qualified immunity protects governmental officials from civil liability unless the plaintiff (1) demonstrates a violation of a constitutional right, and (2) that right was clearly established at the time of the defendant's alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Because it is beyond reasonable dispute that fabricating evidence and conspiring to frame a suspect violates an individual's constitutional rights, ASA Whitehouse is not entitled to qualified immunity on Mr. Brown's claims for evidence fabrication, coercive interrogation, or conspiracy. *See Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) (listing "fabricating evidence" as

---

[29]     The parties also argue about whether the absence of probable cause to arrest Mr. Brown defeats ASA Whitehouse's claim of absolute immunity.  (Pl.'s Resp. to Whitehouse's Mot. for Summ. J. [317] at 9–10; Def. Whitehouse's Rep. to PSOAF [335] at 4–5.)  Because the reasons provided above are sufficient to resolve the absolute immunity issue presented, the court declines to address these arguments.

conduct that undisputedly violates clearly established constitutional rights); *Patrick I*, 213 F. Supp. 3d at 1051 (deeming qualified immunity "off the table" when "there are facts from which a jury could infer that the ASAs participated in coercive interrogations, that they fabricated the confessions, and that they reduced the confessions to writing so the codefendants could sign them").

ASA Whitehouse is, however, entitled to qualified immunity on Count IV, for failing to intervene and stop the unconstitutional actions of the Detective Defendants. Plaintiff has not offered support for the argument that a prosecutor's duty to intervene was clearly established in 1988.[30] Mr. Brown instead invokes *Whitlock v. Brueggemann*, 682 F.3d 567, 580–81 (7th Cir. 2012), in which the Seventh Circuit held that a prosecutor who acts in an investigatory capacity is subject to the same qualified immunity analysis as a police officer. Issued in 2012, *Whitlock* is irrelevant to addressing the issue of whether a prosecutor's duty to intervene was clearly established in 1988. Indeed, *Whitlock* does not even involve a failure-to-intervene claim, and it confirms the general principle that the qualified immunity analysis entails "consider[ing] whether the law was clearly established such any reasonable person should have known what was required." *Id.* at 580.

Another district court in this circuit has thoughtfully reasoned through this issue. In *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1039 (N.D. Ill. 2018), the court held that prosecutors who were involved in coercing witness testimony during a 1993 investigation were entitled to

---

[30]     Plaintiff's cited cases on this point (all district court decisions, and most unpublished) do not address the status of failure-to-intervene law as applied to prosecutors in 1988 and are thus of limited value in this analysis. *See Resendiz v. City of Chicago*, No. 16 C 11046, 2017 WL 11569364, at *1 (N.D. Ill. Aug. 10, 2017) (motion to dismiss concerning prosecutor's actions in 2012); *Harris v. City of Chicago*, No. 15 CV 3859, 2015 WL 5445012, at *1 (N.D. Ill. Sept. 15, 2015) (motion to dismiss concerning events in 2001); *Chatman v. City of Chicago*, No. 14 C 2945, 2015 WL 1090965, at *1 (N.D. Ill. Mar. 10, 2015) (motion to dismiss concerning events in 2002); *Patrick v. City of Chicago*, No. 14 C 3658, 2014 WL 7204501, at *10 (N.D. Ill. Dec. 17, 2014) (motion to dismiss concerning events in 1992); *Saunders v. City of Chicago*, No. 12 CV 09158, 2013 WL 6009933, at *10 (N.D. Ill. Nov. 13, 2013) (motion to dismiss concerning events in 1994); *Rivera v. Lake County*, 974 F. Supp. 2d 1179, 1191 (N.D. Ill. 2013) (motion to dismiss concerning events in 1992).

qualified immunity from a failure-to-intervene claim. *Id.* Contra Mr. Brown's characterization, the *Serrano* court did not "disregard[]" *Whitlock*, but rather recognized that *Whitlock* does not address whether prosecutors, even while acting in an investigatory function, were on notice of their duty to intervene in police officer misconduct in 1993. *Id.* That court found no authority that shows this obligation was clearly established in 1993, and this court has found none that it was clearly established in 1988.[31] ASA Whitehouse is thus entitled to qualified immunity for Mr. Brown's failure-to-intervene claim.

### C.    Sovereign Immunity

ASA Whitehouse argues he is entitled to sovereign immunity on Mr. Brown's state law claims. Sovereign immunity precludes a lawsuit against an agent of the State of Illinois in any court other than the Illinois Court of Claims unless the state's agent acts in violation of statutory or constitutional law or in excess of his or her authority.[32] *See Gossmeyer v. McDonald*, 128 F.3d 481, 487 (7th Cir. 1997); *Healy v. Vaupel*, 133 Ill. 2d 295, 309, 549 N.E.2d 1240, 1247 (1990). For sovereign immunity purposes, ASAs are state, rather than county of local, officials. *White*, 369 Ill. App. 3d at 779, 861 N.E.2d at 1095.

ASA Whitehouse is not entitled to sovereign immunity here. His duties as ASA included investigating facts, evaluating evidence, and determining whether an offence had been

---

[31]    The *Serrano* opinion recognizes that a case from 1972 made clear that police officers had such a duty, but it did not mention prosecutors. *See Serrano*, 315 F. Supp. 3d at 1038–39; *see also Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). Nor was it clearly established prior to *Whitlock* that prosecutors and police officers should be treated the same in a qualified immunity analysis.

[32]    Sovereign immunity may apply even when a state official acts with malice, so long as, their malicious actions were taken within the scope of their employment with the state. *See Welch v. Illinois Supreme Court*, 322 Ill. App. 3d 345, 354, 751 N.E.2d 1187, 1195 (3rd Dist. 2001) (distinguishing between malicious acts taken for one's own purposes from those believed by the employee to be in furtherance of the State employer's purposes); *see also Watkins v. Office of State Appellate Defender*, 2012 IL App. (1st) 112104, ¶ 39, 976 N.E.2d 387, 400 (finding no claim that defendant acted outside his scope of duties when he reduced his employee's salary and encouraged her resignation in an allegedly-retaliatory manner).

committed. *Ware v. Carey*, 75 Ill. App. 3d 906, 913–14, 394 N.E.2d 690, 694–95 (1st Dist. 1979). He would be entitled to sovereign immunity if he only acted pursuant to those duties. But the parties dispute whether ASA Whitehouse acted outside of those duties by fabricating Mr. Brown's confession and working with the Detective Defendants to implicate Mr. Brown in a crime he insists he did not commit. A violation of Mr. Brown's due process rights and his right against self-incrimination would clearly violate law and fall outside the normal and official functions of the state. *Compare Healy*, 133 Ill. 2d at 311, 549 N.E.2d at 1248 (dismissing complaint against attorneys because plaintiff did not allege that they acted "outside of their authority in or violation of law"); *see also Smith*, 222 F. Supp. 3d at 696 (collecting examples). The court declines to grant summary judgment to ASA Whitehouse on this ground.[33]

## III. Individual Defendants' Motions for Summary Judgment

With the threshold issues of timeliness and immunity out of the way, the court turns to resolving the motions for summary judgment on each count of the SAC.

### A. Count I: Fabrication and Suppression of Evidence

Estate Defendants move for summary judgment on Count I of Brown's SAC, which alleges the Individual Defendants deprived Mr. Brown of his constitutional right to a fair trial as result of torture and the fabrication of evidence.[34] (SAC ¶¶ 68–69.) For the reasons discussed below, the court grants summary judgment to the Individual Defendants, including ASA Whitehouse, on all

---

[33] ASA Whitehouse argues that all of his actions arose from duties imposed on him by virtue of his employment as a prosecutor, so he owed no separate duty to Brown. (*See* Def. Whitehouse's Rep. to PSOAF [335] at 6.) That ASA Whitehouse owed no general duty to Mr. Brown does not resolve the factual dispute of whether he acted in violation of law and thus beyond the scope of his prosecutorial duties when he (disputedly) fabricated Mr. Brown's confession.

[34] Mr. Brown claims that Officer Defendants violated his "due process rights by fabricating and/or concealing several pieces of evidence." (Pl.'s Resp. to Estate Defs.' Summ. J. at 7.) He lists the "suppressed statement of eyewitness Joyce Owens" as a concealed piece of evidence. But Count I of the SAC itself does not mention concealment of evidence, only fabrication of evidence, and makes no mention of Joyce Owens's statement. (*See* SAC ¶¶ 66–77.)

claims unrelated to the handwritten confession. It grants summary judgment to Detectives Fine and Kutz and denies summary judgment to ASA Whitehouse and Detective Campbell on Mr. Brown's evidence-fabrication claim with regards to the handwritten statement.

### 1. Fabrication Claims

Count I alleges the Individual Defendants fabricated several pieces of evidence that contributed to Mr. Brown's conviction. Because falsified evidence never helps a jury perform its truth-seeking function, "convictions premised on deliberately falsified evidence will always violate the defendant's right to due process." *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017); *see also Napue v. People*, 360 U.S. 264, 269 (1959) (reciting the principle that the state "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction"). Notably, there is a difference between fabricated evidence, which is necessarily untrue, and evidence obtained through coercion, which may be true. *See Coleman v. City of Peoria*, 925 F.3d 336, 346 (7th Cir. 2019).

An evidence-fabrication claim has four elements: (1) the defendant knowingly fabricated evidence against the plaintiff, (2) the evidence was used at his criminal trial, (3) the evidence was material, and (4) the plaintiff was damaged as a result.[35] *Patrick v. City of Chicago*, 974 F.3d 824,

---

[35] Mr. Brown argues that a fabricated-evidence claim can succeed so long as the manufactured evidence was "used to deprive plaintiff of his liberty." (Pl.'s Resp. to Estate Def.'s Mot. for Summ. J. [315] at 8.) The Seventh Circuit has rejected this standard for Fourteenth Amendment evidence-fabrication claims, which require a showing that the evidence was used at trial. *See Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020) ("*Patrick II*"). In *Patrick*, the district court instructed the jury that to succeed on his evidence-fabrication claim, the plaintiff must prove by a preponderance of evidence (1) that the defendant knowingly fabricated false evidence, (2) that the evidence was used to deprive the plaintiff of his liberty "in some way," and (3) that the fabricated evidence proximately caused the plaintiff to be damaged. *Id.* The Seventh Circuit stated "[t]his instruction was incomplete in that it failed to explain that [plaintiff] had the burden to prove that the fabricated evidence was used against him at his criminal trial and was material." *Id.* The Seventh Circuit has thus instructed that usage at trial is the particular way that a plaintiff must show the fabricated evidence deprived him of his rights when bringing a Fifth and Fourteenth Amendment evidence-fabrication claim.

Plaintiff's other citations are similarly unpersuasive. He misplaces reliance on Fourth Amendment pre-trial detention cases that predate *Patrick*. *See Lewis v. City of Chicago*, 914 F.3d 472, 479 (7th Cir. 2019); *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2019), *overruled by Lewis*, 914 F.3d 472; *Jones v. City of Chicago*, 856 F.2d 985, 991 (7th Cir. 1988). Mr. Brown's citation

835 (7th Cir. 2020) ("*Patrick II*"); Federal Civil Jury Instructions of the Seventh Circuit § 7.14. "Knowledge and intent must often be proven by circumstantial evidence." *Stinson v. Gauger*, 868 F.3d 516, 527 (7th Cir. 2017) (quoting *United States v. Nocar*, 497 F.2d 719, 725 (7th Cir. 1974)). At summary judgment, a plaintiff "need not have a smoking gun or an admission to prove knowledge." *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022). Rather, he must "offer sufficient evidence from which a reasonable jury could find that the Individual Defendants knew the evidence they were eliciting was false." *Id.*

### a. Handwritten Confession

Mr. Brown has testified repeatedly that he did not make the statements attributed to him in the handwritten statement. (PSOAF ¶¶ 20–21.) It is undisputed that the confession was a material piece of evidence that the State used at trial to secure his conviction. The only remaining question is whether Detectives Campbell and Fine knowingly fabricated the evidence.[36]

For Mr. Brown's claim against each Individual Defendant to succeed, he must show that each of them personally participated in manufacturing the handwritten confession, meaning they deliberately and knowingly created the false evidence. *Coleman*, 925 F.3d at 344; *Whitlock*, 682 F.3d at 580. He must provide evidence showing that each Individual Defendant "created evidence that they knew with certainty to be false." *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (quoting *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014)).

---

to *Fields* is similarly off-point, as the line of dicta he cites concerns whether a prosecutor is entitled to absolute immunity rather than the elements of an evidence-fabrication claim. *See Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) (finding no absolute immunity for prosecutor whose "fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him").

[36] Count I claims in part that "Mr. Brown's confession was fabricated by Defendants." (SAC ¶ 70.) On its face, it is unclear whether this statement is meant to include Detective Kutz. Plaintiff has clarified that he does not claim that Defendant Kutz participated in his interrogation or in preparing his fabricated statement, only that he fabricated police reports and coerced Harper and Ford's statements, which made possible and corroborated the fabricated confession. (*See* Pl.'s Resp. to Estate Defs.' Mot. for Summ. J. [315] at 12 n.5.)

The parties disagree about what it means to "create" the handwritten confession. The Detective Defendants say they cannot be liable for the document's creation because only ASA Whitehouse wrote it out. Mr. Brown counters that the Detective Defendants were the mostly likely sources of ASA Whitehouse's information. Because Plaintiff himself was not the source of the information in the document, he contends that ASA Whitehouse must have received it from some other source. Mr. Brown suggests two possibilities: The information came (1) directly from the Detective Defendants, whose police reports contained the same information, or (2) indirectly from Harper and/or Ford, who had already given transcribed statements by the time ASA Whitehouse wrote the statement attributed to Mr. Brown. (See Pl.'s Mem. in Opp. to Estate Def. Mot. for Summ. J. [315] at 11.) In either scenario, Detective Fine would be a source of the information.

This theory is too speculative to overcome Detective Fine's motion. The undisputed evidence shows that Mr. Brown did not see any police officer write the handwritten confession; at no point did he hear any Detective Defendant provide information to ASA Whitehouse to be included in the handwritten confession; and only Detective Campbell and ASA Whitehouse were present when Brown signed and initialed the handwritten confession. (EDSOF ¶ 49.) There is no genuine dispute that Detective Fine was personally responsible for the document's creation, so Fine is entitled to summary judgment on this claim. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (affirming grant of summary judgment to defendant officers where plaintiff failed to identify which four out of ten defendants had caused property damage during a search).

This case is distinguishable from *Phillips v. City of Chicago*, No. 14 C 9372, 2018 WL 1309881, at *26 (N.D. Ill Mar. 13, 2018), on which Mr. Brown relies to argue that the Detective Defendants' conduct "suggests a calculated effort to weave a complex narrative out of whole cloth." *Id.* In *Phillips*, the court denied summary judgment on an evidence-fabrication claim when the plaintiffs testified that the police provided each of them with pre-written stories, urged them to adopt the stories in exchange for leniency, and coached them to memorize the stories. *Id.* Mr. Brown is the only plaintiff in this case. He does not attest that Detective Fine coached him to

42

repeat a story; he claims he told no story at all. Without any evidence personally implicating Detective Fine in the creation of this handwritten confession, nothing suggests that he knowingly created evidence that he knew with certainty was false.

While this claim cannot succeed against Detective Fine, Mr. Brown has offered evidence that implicates Detective Campbell in the document's creation. Detective Campbell made several superficial edits to the document before Mr. Brown signed it, and thus had a hand in reviewing and finalizing the document. If Mr. Brown's version of events is credited, then insofar as the handwritten document uses the phrase "Mr. Brown states," Campbell would have known it contained falsehoods. This is so even if Detective Campbell had reason to believe the substance of the underlying statements was true.[37] *See also Mitchell*, 895 F.3d at 498 ("The personal-involvement requirement is satisfied if the constitutional violation occurs at a defendant's direction or with her knowledge or consent.").

Resisting this conclusion, the Estate Defendants identify particular changes that Detective Campbell made to the statement, changes they say would have inured to Mr. Brown's benefit and were thus undoubtedly immaterial to his conviction. As an initial matter, it is not clear how Detective Campbell's edits are beneficial to Mr. Brown. (*See* EDSOF ¶ 52 (explaining, for example, that Detective Campbell switched "Mr. Brown stated that Michael Harper asked him to help put the mattress against the wall" to "Mr. Brown stated that Michael Harper told him to put the mattress against the wall").) Furthermore, what matters for now is not the particular changes in details or word choice, but rather Detective Campbell's representation that the edits reflect Mr.

---

[37]     As the Estate Defendants emphasize, the Detectives may well have had reason to believe that the substance of Mr. Brown's alleged confession could be true. (*See* Estate Defs.' Mem. of Law in Supp. of Summ. J. [299] at 15.) At this stage, however, it does not matter that Detective Campbell's "superficial edits" were not material to the substance of the handwritten statement; those edits show that he was present for part of the document's creation. (*See id.* at 16.) Accordingly, if the jury were to accept Plaintiff's version of events and believe he never made the statements attributed to him in the handwritten statement, it would be reasonable for the jurors to infer that ASA Whitehouse received information from Detective Campbell, who had been involved in the investigation and edited the handwritten document.

Brown's own corrections.  Again, Mr. Brown insists he never made any of the initial statements or any revisions.  (PSOAF ¶ 21.)  Detective Campbell's signature on the document is evidence that he was part of its creation and finalization.  He is not entitled to summary judgment on this claim.

### b. The Supplementary Reports

Intermixed with Mr. Brown's allegations regarding the Detectives' alleged involvement in the creation of the handwritten confession are allegations regarding the fabrication of evidence through police reports: the June 1 Supplementary Report written by Detective Campbell and the May 29 Supplemental Report authored by Detectives Kutz and Fine.  Both reports state that Brown made inculpatory statements to police and summarize the contents of those purported statements.

Mr. Brown's evidence-fabrication claim regarding these reports fails because these reports were not used against him at trial.  Neither report was introduced at either of Mr. Brown's trials, and neither report was used to refresh a witness's recollection during either trial.  *Cf. Avery*, 847 F.3d at 442 (ruling in favor of the plaintiff on an evidence-fabrication claim when false police reports stating plaintiff confessed to the crime were admitted at trial).

The fact that Detectives Fine and Campbell testified to a version of events consistent with the reports makes no difference.[38]  False testimony at trial does not give rise to a viable constitutional claim because witnesses are entitled to absolute immunity.  *Briscoe v. LaHue*, 460

---

[38]    Plaintiff's citation to *Walker v. White*, No. 16 CV 7024, 2021 WL 1058096, at *8 (N.D. Ill. Mar. 19, 2021), misses the mark.  There, the court noted that an officer "is not immune from testimony that repeats or authenticates the content of fabricated evidence." *Id.* at *8.  Plaintiff emphasizes the use of "repeat" in this snippet.  (Pl.'s Resp. to Estate Defs.' Mot. for Summ. J. [315] 10.)  But in *Walker*, the officer was describing a photograph, thus repeating, in a sense, its contents. *Walker*, 2021 WL 1058096, at *8.  Here, the officers did not "repeat" the contents of the reports, which were not referred to at trial.  They simply testified to a similar version of events as those listed in the absent reports.  Plaintiff's reference to an out-of-context line that "the prosecution might have ended sooner if the state knew that most of the seemingly inculpatory information at its disposal was fabricated or impossible" similarly fails to bolster his argument. (Pl.'s Resp. to Estate Defs.' Mot. for Summ. J. [315] 10.)  *See also Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018), *overruled by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019).

U.S. 325, 327 (1983).  This is so even when the false testimony is consistent with fabricated but unadmitted police reports.  *See Avery*, 847 F.3d at 443 (noting the officers' "trial testimony, standing alone, would not subject them to damages liability").

In an effort to distinguish this case, Mr. Brown points to *Taylor v. City of Chicago*, No. 14-C-737, 2021 WL 4401528, at *7 (N.D. Ill. Sept. 27, 2021), in which Judge Lee, then of this court, found that a police report was used against a plaintiff at his criminal trial when the report itself was not admitted into evidence, but its contents were.  In *Taylor*, the police report was "discussed at length" during both the cross- and redirect examinations of the office who wrote it.  *Id.*  Unlike here, testimony in *Taylor* "include[ed] reference to the document itself," which was used to refresh the officer's recollection.  *Id.*  In this case the only party to use the reports was Mr. Brown, whose counsel referenced the reports on cross-examination for purposes of impeachment.  (*See* EDSOF ¶ 68.)

The Detective Defendants are entitled to summary judgment on his evidence-fabrication claim with regards to the May 29 and June 1 Supplemental Reports.[39]

### c.  Harper & Ford Statements

In opposing the Estate Defendants' motion, Mr. Brown argues, seemingly for the first time, that the officers deprived him of his due process rights by fabricating statements by Harper and Ford.  (Pl.'s Resp. to Estate Defs.' Mot. for Summ. J. [315] at 13.)  Although the State did not introduce those statements at either of Mr. Brown's trials, Mr. Brown argues they were used against him by virtue of their very creation.  Mr. Brown argues that Detectives Fine and Kutz and ASA Whitehouse put him in a "Catch-22":  By fabricating the statements of Harper and Ford, the Individual Defendants deprived Mr. Brown of the opportunity to call the men as witnesses himself

---

[39]    The Estate Defendants make an additional argument about the timeliness of Mr. Brown's claim against Detective Campbell for testifying to the circumstances and substance of Mr. Brown's confession during the 1990 trial.  (*See* Estate Defs.' Mem. of Law in Supp. of Summ. J. [299] at 12–13.)  The court has already rejected Defendants' timeliness arguments and need not readdress those points here.

to rebut the State's theory of the case. (Pl.'s Resp. to Estate Defs.' Mot. for Summ. J. [315] at 13.)

This argument lacks factual and legal support. First, it is purely speculative. Mr. Brown provides no citation to record evidence to show that his attorneys would have called Harper or Ford as witnesses, but for their statements to the police. Further, Mr. Brown improperly relies on the district court opinion in *Patrick I*, 213 F. Supp. 3d at 1050, where the court denied summary judgment on the theory that the fabricated confessions of codefendants resulted in the plaintiff's being "deprived of liberty in some way." *Id.* (internal citation omitted). The Seventh Circuit rejected this standard, clarifying that fabricated evidence must be "used against [plaintiff] in his criminal trial." *Patrick II*, 974 F.3d at 835. For additional support, Mr. Brown cites *Baker v. City of Chicago*, 483 F. Supp. 3d 543, 554 (N.D. Ill. 2020), but that case regards a *Brady* claim in which fabricated evidence was presented at the criminal defendant's trial, unlike the statements of Harper and Ford here. No reasonable jury could find that the unintroduced and unreferenced statements of Harper and Ford were "used" against him at trial, so Defendants are entitled to summary judgment on this claim.

### d. Motive Evidence

Mr. Brown next argues that the Detective Defendant's violated his due process rights by fabricating Harper's statement, which reflects that Harper enlisted Mr. Brown to help with the arson in exchange for X-rated video tapes. Again, however, it is undisputed that the State did not introduce Harper's statements as evidence at either of Mr. Brown's trials (EDSOF ¶ 74); Harper did not testify at either of Mr. Brown's trials (*id.*); no Individual Defendant testified that the promise of X-rated videos was Brown's motive for helping in the arson at either trial; and juries at both trials were unaware of Harper's statements to the police concerning Brown's motive (*see id.* ¶¶ 74, 102, 103, 105). Because the State did not use motive evidence derived from Harper's

statements at either of Mr. Brown's trials, the Individual Defendants are entitled to summary judgment on this claim.[40]

### e.   Testimony Regarding Confrontation Between Brown and Harper

The Individual Defendants are entitled to summary judgment on Mr. Brown's claim that the Detectives' testimony regarding a confrontation between Mr. Brown and Harper deprived him of his constitutional rights.  It is undisputed that this alleged confrontation was not documented in any police report, and the only evidence of this confrontation is the 1990 trial testimony of Detective Fine and the 2008 trial testimony of Detectives Fine and Campbell.  (*See* EDSOF ¶ 61.) The Detective Defendants have argued that they are entitled to absolute immunity for their testimony, and Mr. Brown has not responded to this argument.  (*See* Estate Defs.' Mem. in Supp. of Mot. for Summ. J. [299] at 20; Pl.'s Resp. to Estate Defs.' Mot. for Summ. J. [315] at 7–13.) The well-settled case law resolves the issue in Defendants' favor: "Witnesses in a § 1983 trial have absolute immunity from liability based on their testimony at trial."  *Stinson v. Gauger*, 868 F.3d 516, 528 (7th Cir. 2017); *see also Briscoe*, 460 U.S. at 345-46.  Defendants are therefore entitled to summary judgment on this claim.

### f.   Fabrication of Hingston's Testimony and Lineup Identification

Mr. Brown contends that "Hingston's false trial testimony was used to corroborate the narrative constructed by the Officer Defendants in Plaintiff's fabricated statement."  (Pl.'s Resp. to Estate Defs.' Mot. for Summ. J. [315] at 15–17.)  Recall, here that (under unexplained circumstances) Hingston signed an affidavit that casts doubt on truthfulness of the testimony he

---

[40]     Plaintiff's brief opposing the Estate Defendants' motion mentions Plaintiff's "supposed motive" in the facts section, but cites to a statement that makes no mention of motive evidence.  (Pl.'s Resp. to Estate Defs.' Mot. for Summ. J. [315] at 3; PSOAF ¶ 20 (stating Plaintiff signed a statement penned by Whitehouse but did not make the statements attributed to him therein).)  Mr. Brown makes no substantive argument to counter the Estate Defendants' motion regarding motive evidence, so he has waived the point.

gave at Mr. Brown's 1990 trial. The court concludes, however, that the affidavit is hearsay and that any claim arising from it is unsupported.

Mr. Brown first argues that the affidavit falls under a hearsay exception as a statement against interest under Federal Rule of Evidence 804(b)(3). That exception allows hearsay evidence to be admitted depending on whether (1) the declarant is unavailable as a witness; (2) the statement was against the declarant's penal interest when made; and (3) corroborating circumstances clearly suggest that the statement is trustworthy. *United States v. Jackson*, 540 F.3d 578, 588 (7th Cir. 2008). Mr. Brown, as the proponent of the hearsay statement, bears the burden of demonstrating that each element is satisfied. *See id.*

The first element of this test is easily met; Hingston is deceased. But Mr. Brown has not met his burden on the second or third elements. The statements in the affidavit do not implicate Hingston in wrongdoing, but Mr. Brown argues that the second factor is satisfied because the affidavit amounts to an admission that Hingston perjured himself at Mr. Brown's 1990 trial, which is a class 3 felony Illinois law. FED. R. EVID. 804(b)(3); 720 ILCS 5/32-2(a). Mr. Brown notes that this factor can be satisfied even when the possibility of prosecution is remote. *Hampton v. City of Chicago*, No. 12 CV 5650, 2017 WL 2985743, at *13 & n.5 (N.D. Ill. July 13, 2017). But here the probability is not remote; it is non-existent.[41] In Illinois, the statute of limitations for a perjury charge is three years. 720 ILC 5/3-5 (b); *People v. Webb*, 144 Ill. App. 3d 83, 87, 493 N.E.2d 1190, 1193 (5th Dist. 1986). Hingston's prior sworn statements are old enough that any potential perjury charge was time-barred when he submitted the affidavit.

Mr. Brown also has not met the third element, which requires a showing of corroborating circumstances that "clearly suggest" the affidavit is accurate. *Jackson*, 540 F.3d at 588. The Seventh Circuit has identified three non-exhaustive circumstances for district courts to consider

---

[41] The *Hampton* court did not discuss a statute of limitation issue in its analysis of 804(b)(3). *See Hampton*, 2017 WL 2985743, at *13–14.

in determining whether corroborating circumstances exist: "(1) the relationship between the declarant and the exculpated party; (2) whether the statement was voluntarily given after *Miranda* warnings; and (3) whether there is any evidence the statement was made to curry favor with authorities." *Id.* at 589. The parties present no evidence suggesting a relationship between Hingston and Mr. Brown in 1988, questioning the voluntariness of the statement, or suggesting that Hingston submitted the affidavit to curry favor with the State. But that does not mark the end of the inquiry.

It is also appropriate to consider "independent evidence supporting the statement itself, or . . .the circumstances in which the statement was made suggesting that the statement is trustworthy." *United States v. Henderson*, 736 F.3d 1128, 1131 (7th Cir. 2013). Such considerations are especially important here because "there are reasons to treat recantations generally with a healthy dose of skepticism." *Arnold v. Dittman*, 901 F.3d 830, 839 (7th Cir. 2018).

Mr. Brown has neither offered evidence that corroborates the statements in Hingston's affidavit nor any evidence regarding the circumstances of its creation.[42] The court does not know, for example, whether anyone asked Hingston to create the affidavit, who drafted the affidavit, who was present when it was signed, or whether Hingston received anything in return for signing the affidavit. Without such information, the court cannot say that corroborating circumstances "clearly indicate" its trustworthiness as the evidentiary rule requires. Because the affidavit is inadmissible and Brown proffers no other evidence that Hingston's testimony was fabricated, the Detectives are entitled to summary judgment on this claim.[43]

---

[42] The court's own review of the record shows that Ford stated in his deposition that he never bought gas that evening, but this portion of the deposition was not cited or referenced in any manner by the Plaintiff, who bears the burden of proving admissibility. (*See* Ford Dep. at 98:13–99:8.)

[43] The Estate Defendants offer additional arguments for why the affidavit would not support an evidence-fabrication or *Brady* claim even if it were admitted. (*See* Estate Defs.' Mem. of Law in Supp. of Summ. J. [299] at 23–25.) Having found the affidavit inadmissible, the court declines to address those arguments.

g.    Fabrication of Friendship Between Mr. Brown and Harper

The Estate Defendants argue that Mr. Brown's claim that the Individual Defendants fabricated evidence of a friendship between him and Harper must fail. Mr. Brown's own account is that he performed work at the Video Magic store, owned by Harper. But evidence of any other relationship between the men was not introduced at trial, and the Detective Defendants contend they did not know with certainty that the two men were not friends. (*See* EDSOF ¶¶ 26, 57, 70, 75, 87, 93, 104, 106.) Mr. Brown did not respond to this argument. Accordingly, the point is waived, and the Detective Defendants are entitled to summary judgment on the evidence-fabrication claim with regards to Mr. Brown and Harper's disputed friendship.

2.    Suppression Claims

Count I also alleges that the Detective Defendants violated Mr. Brown's constitutional rights by suppressing exculpatory evidence from him in violation of *Brady v. Maryland*, 373 U.S. 83, 90 (1963). The Seventh Circuit has recognized that police misconduct that "results in a conviction might also violate the accused's right to due process under the rubric of *Brady* . . . if government officials suppressed evidence of the fabrication." *Patrick II*, 974 F.3d at 834–35 (quoting *Lewis v. City of Chicago*, 914 F.3d 472, 480 (7th Cir. 2019)).

To prevail on a *Brady* claim, a civil plaintiff must demonstrate that the suppressed evidence was favorable to him, the defendant officers suppressed the favorable evidence, and, due to the materiality of the withheld evidence, the plaintiff was prejudiced. *Anderson*, 932 F.3d at 504. Evidence is improperly suppressed when the prosecution fails to disclose it in time for the defendant to make use of it and it was not otherwise available to the defendant through the exercise of reasonable diligence. *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008). Suppressed evidence is material if there is a reasonable probability that the jury's verdict would have been different if the evidence had been presented. *Goudy v. Cummings*, 922 F.3d 834, 842 (7th Cir. 2019).

### a. Coercive Interrogation Tactics Against Non-Witnesses

Mr. Brown does not contend that the Defendant Officers violated *Brady* by failing to disclose the coercive circumstances of his own confession,[44] but he does argue that the Detective Defendants violated his due process rights by suppressing evidence of their coercion of Harper and Ford.[45]  This argument contravenes Seventh Circuit law, which "makes clear that *Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution."  *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015).  Mr. Brown, like the plaintiff whose *Brady* claim failed in *Saunders-El*, "seeks to charge the officers with a *Brady* violation for keeping quiet about their wrongdoing, not for failing to disclose any particular piece of *evidence* to the prosecution."  *See id.* (emphasis in original).  This claim is thus a nonstarter.

The only authority Mr. Brown cites are cases in which officers failed to disclose the coercive tactics they used to obtain a witness's testimony, which the plaintiff could have used to impeach those witnesses at trial. *See Avery*, 847 F.3d at 439; *Petty*, 754 F.3d at 423–24; *Gray*,

---

[44]     As the Detective Defendants observe (and Mr. Brown does not challenge), failure to disclose the coercive circumstances of one's own confession does not state a viable *Brady* due process claim.  *See, e.g.*, *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1028 (7th Cir. 2006) (stating *Brady* cannot be a basis of a cause of action against an officer for failing to disclose circumstances of an interrogation to a prosecutor); *Wallace v. City of Chicago*, 440 F.3d 421, 429–30 (7th Cir. 2006) ("A section 1983 plaintiff cannot base his *Brady* claim on a defendant's failure to disclose plaintiff's own false confession."); *Walden v. City of Chicago*, 755 F. Supp. 2d 942, 965 (N.D. Ill. 2010) (stating an allegedly coerced confession cannot constitute a *Brady* violation, as no "suppression" occurs because plaintiff is aware of the circumstances of his own confession).

[45]     Defendants argue that this claim was not adequately pleaded.  (*See* Estate Defs.' Rep. to PSOAF [341] at 3.)  As the court understands the claim, however, it derives from Plaintiff's contention that "[t]he State's Attorney's Office relied on the fabricated official reports containing the fabricated confession and other evidence described above in deciding to charge Mr. Brown with arson and murder and to try him on these charges."  (SAC ¶ 75.)  On this reading, the police reports, which discuss statements Harper and Ford made to the police under disputed circumstances, contributed to the State's decision to pursue the case.  Considering the claim therefore would not run afoul of the principle that a plaintiff may not ordinarily amend the complaint in a responsive brief.  *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011).

2022 WL 910601, at *12. Neither Harper nor Ford were witnesses at Mr. Brown's trials, and Mr. Brown has not explained how those authorities are otherwise on point. The Detective Defendants are therefore entitled to summary judgment on Mr. Brown's claim that they violated *Brady* when they failed to disclose the coercive interrogation tactics they used against Harper and Ford.

### b. Coercive Tactics to Obtain Hingston's Testimony

Mr. Brown claims that the Detective Defendants failed to disclose to prosecutors evidence of the coercive tactics they used to obtain Hingston's testimony. (*See* Pl.'s Resp. to Estate Defs.' Mot. for Summ. J. [315] at 15.) This argument rests on Hingston's affidavit—which, as explained earlier, is inadmissible. Mr. Brown makes no attempt to apply the elements of a *Brady* claim to admissible (or even inadmissible) evidence of Hingston's interactions with the police. Accordingly, he has not met his burden to establish a question of fact concerning a *Brady* violation with regards to the circumstances surrounding Hingston's 1990 trial testimony.

### c. Suppressing Reports of Joyce Owens interview

Mr. Brown claims that police reports written by Detectives Micek and Scheithauer—neither of whom are parties in this case—regarding Joyce Owens's witness statement were withheld from him during his 1990 trial in violation of *Brady*. From what the court can tell, Mr. Brown's responsive brief to the Estate Defendants is the first place he ever raised this claim, which does not appear in the SAC. The court could decline to entertain the claim on this basis. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011).

On the merits, the court concludes that Mr. Brown has not established a factual dispute concerning his allegation that "[t]he State's Attorney's Office relied on fabricated official reports" in deciding to prosecute him. (SAC ¶ 75.) First, Mr. Brown claims that neither of the two Violent Crimes Unit Investigative Files that the City produced during discovery in the present case contained the reports of the two detectives, and that those reports should have been forwarded from the Bomb and Arson Unit. (PSOAF ¶ 29.) But he does not provide evidence that any particular Detective Defendant was responsible for ensuring the reports were included in the

Violent Crimes Unit investigative files. *See Cairel v. Alderden*, 821 F.3d 823, 832 (7th Cir. 2016) (stating *Brady* evidence must be concealed by the defendant officer to establish liability), *cert. denied*, 137 S. Ct. 493 (2016). Second, Mr. Brown does not claim that the Micek and Scheithauer report were missing from the Bomb and Arson investigative file, so there is no evidence that the report was concealed from him, let alone that he could not find the reports through reasonable diligence.[46] (*See* PSOAF ¶ 29.) Finally, he has not shown a reasonable probability that the jury's verdict would have been different if he called had Owens as a witness—especially considering that her own statements to the police, reportedly made while high on cocaine, were riddled with inconsistencies. (*See* Micek & Scheithauer Memo, Ex. E to PSOAF [321-5]; Defs.' Joint Resp. to PSOAF ¶ 9.)

For these reasons, the Estate Defendants are entitled to summary judgment on the *Brady* claims in Count I of the SAC.

## B.      Count II: Coercive Interrogation

Count II of the SAC alleges that Detectives Fine and Campbell and ASA Whitehouse violated his Fifth and Fourteenth Amendment rights when they engaged in a coercive interrogation with him at Area 1.[47]  Detective Fine and Campbell move for summary judgment on this claim on grounds that it is time-barred. As explained earlier, the court has already rejected the timeliness challenge to Mr. Brown's Fifth Amendment claim in Count II. Detectives Fine and Campbell ask the court to separately consider the timeliness of a Fourteenth Amendment coerced confession claim, however, and ASA Whitehouse seeks summary judgment on all claims made against him

---

[46]      The court disregards the following statements from Mr. Brown's statement of facts because they are not supported by a citation to the record: "These documents were not maintained in a file folder. Some pages were missing." (*See* PSOAF ¶ 29.) For the same reason, it disregards the following statement: "The trial court record does not reflect that these documents . . . were produced to Plaintiff before his 1990 trial." (*See id.*)  This court has not reviewed the trial court record to verify that statement, nor have Mr. Brown's attorneys presented a witness who has done so.

[47]      Mr. Brown makes no claim against Detective Kutz in Count II.  (*See* SAC ¶¶ 78–86.)

in Count II for lack of evidence that he personally engaged in any kind of abusive interrogation of Mr. Brown.  As explained below, those motions are denied.

### 1.    Estate Defendants' Timeliness Claim

The Estate Defendants construe Mr. Brown's argument as alleging two separate coerced confession claims, one under the Fifth Amendment and one under the Fourteenth Amendment.[48] Defendants argue these two claims accrue differently.  The Fifth Amendment claim, as this court decided at the motion-to-dismiss stage, accrued when Mr. Brown's conviction was vacated.[49]  The Estate Defendants do not move for summary judgment on that claim.   The Fourteenth Amendment claim, they argue, accrued as soon as the coercion took place in 1988 and expired in 1990.

This argument is unsupported.  Estate Defendants cite to *Savory*, 947 F.3d at 411, where the Seventh Circuit held the *Heck* accrual rule applied to the claims of a § 1983 plaintiff who had received a pardon.  The plaintiff in that case, like Mr. Brown, alleged among other claims that the officer defendants "coerced a false confession from Savory in violation of the Fifth and Fourteenth Amendment."  *Id.* at 412.  The *en banc* court held that claims such as Savory's, which necessarily imply the invalidity of a plaintiff's conviction, accrue upon a favorable termination of a criminal defendant's conviction.   *Id.* at 431.   The court also clarified that "[c]laims that relate only to conditions of confinement and that do not implicate the validity of a conviction or sentence are not subject to the *Heck* bar."  *Id.* at 424.  Here, as was true for the plaintiff in *Savory*, all of Mr. Brown's

---

[48]       For his part, Mr. Brown has not briefed the matter under two different theories.  It is unclear whether Mr. Brown intended to bring a Fourteenth Amendment substantive due process claim or whether he invoked the Fourteenth Amendment because it incorporates the Fifth Amendment to the states.  To the extent he intended to bring a substantive due process claim, he has waived it by failing to respond to the Estate Defendants' arguments in his reply brief.

[49]       Defendants do not argue that the Fifth Amendment claim is time-barred, though the Plaintiff mistakes them as doing so in his responsive brief.  (*See* Pl.'s Resp. to Estate Defs.' Mot. for Summ. J. [315] at 5–6.)

claims "necessary imply the invalidity of his conviction." *Id.* at 431. The Estate Defendants are therefore not entitled to summary judgment on Count II on this theory.[50]

### 2. ASA Whitehouse's Motion

ASA Whitehouse argues he is entitled to summary judgment on Mr. Brown's coercive interrogation claim because he did not participate in, nor was he aware of, any physical and psychological abuse Mr. Brown endured. Because an individual's Fifth Amendment privilege against self-incrimination is violated only at trial, however, *see Chavez v. Martinez*, 538 U.S. 760, 767 (2003) (collecting authority), a plaintiff may assert a claim by drawing "[a] causal or connection, or an affirmative link between the misconduct complained of and the official sued." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983).

Mr. Brown argues that, under these principles, he need not show that ASA Whitehouse was present for any instance of abuse—it is enough that he wrote the handwritten confession. ASA Whitehouse counters that this court itself dismissed a plaintiff's due process claim against City officials because when he "ha[d] not alleged that [defendants] were personally involved in his torture, an allegation necessary to establish their liability under § 1983." *Tillman v. Burge*, 813 F. Supp. 2d 946, 974 (N.D. Ill. 2011) (citing *Wolf-Lillie*, 699 F.2d at 869). ASA Whitehouse also attempts to distinguish this case from those cited by Mr. Brown. In *Orange v. Burge*, No. 04 C 0168, 2008 WL 4443280, at *10 (N.D. Ill. Sept. 29, 2008), the court denied summary judgment because it found a disputed question of fact as to whether the plaintiff told the defendant ASA he had been tortured before giving his statement. Additionally, in *Wilson v. O'Brien*, No. 07 C 3994, 2011 WL 759939, at *6 (N.D. Ill. Feb. 25, 2011), evidence showed that plaintiff confessed only

---

[50] Estate Defendants look to *Moore v. Burge*, 771 F.3d 444, 446 (7th Cir. 2014), for support. There, the Seventh Circuit held that a Fourteenth Amendment claim based solely on injuries suffered during "out-of-court events, such as evidence gathering, accrue as soon as the constitutional violation occurs." *Id.* The *Moore* plaintiffs alleged discrete actions of torture that were violative of their rights regardless of the validity of their convictions. *See id.* at 447. *Moore* is not helpful for resolving this case, which is premised entirely on damages resulting from Mr. Brown's wrongful conviction.

after the ASA told him that the defendant "police officers would likely beat him up if he did not." ASA Whitehouse argues that these cases suggest personal involvement in the coercive tactics is necessary to sustain Mr. Brown's claim, and ASA Whitehouse undisputedly did not engage and was not aware of such abuse.

Mr. Brown has the better argument on this score. This court's statement in *Tillman* cited to *Wolf-Lillie*'s "affirmative link" standard, which does not require personal involvement in an act of torture to sustain a Fifth Amendment claim. *See Tillman*, 813 F. Supp. 2d at 974. Additionally, *Orange* and *Wilson* show only that direct involvement in torture is a sufficient condition for sustaining a § 1983 claim, not that it is a necessary one. Because there is evidence (albeit disputed) that ASA Whitehouse wrote out Mr. Brown's handwritten confession after Mr. Brown told him he did not want to give a statement and instead wished to speak to his lawyer, ASA Whitehouse is not entitled to summary judgment on Count II.

### C.     Count IV: Failure to Intervene

Estate Defendants move for summary judgment on Count IV of Brown's SAC, in which he alleges that the police officers failed to intervene to stop each other's deprivation of his constitutional rights.[51] To prevail on this claim, Mr. Brown must establish (1) "an underlying constitutional violation," (2) that the defendant "knew that the constitutional violation was committed," and (3) that the defendant "had a realistic opportunity to prevent it." *Baker*, 483 F. Supp. 3d at 558–59 (citing *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017)). A failure to intervene claim is a mechanism to hold additional defendants liable for an underlying constitutional violation. *See Walker v. White*, No. 16 CV 7024, 2021 WL 1058096, at *17 (N.D. Ill. March 19, 2021); *see also Sanchez v. City of Chicago*, 700 F.3d 919, 928 (7th Cir. 2012) (stating failure to intervene theory of liability is to hold Officer A liable for the wrongdoing of Officer B when Officer A has knowledge of the wrongdoing and ability to stop it).

---

[51]     Because ASA Whitehouse is entitled to qualified immunity on Count IV, the court does not address his alternative arguments on the point.

Here, Mr. Brown's surviving constitutional claims are (1) his Count I fabricated evidence claim with regards to the handwritten confession against Detective Campbell and ASA Whitehouse, and (2) his Count II coerced confession claim against Detectives Campbell and Fine and ASA Whitehouse. For the reasons outlined below, the court denies summary judgment on Mr. Brown's failure-to-intervene claim against the Detective Defendants.

### a. Failure to Intervene in Evidence Fabrication

The Detective Defendants argue that summary judgment is warranted on Count I because a failure-to-intervene claim is derivative of an underlying constitutional violation, and no claim of an alleged violation from Count I can survive summary judgment. Because the court denies summary judgment on the evidence-fabrication claim of Count I (and the Detective Defendants offer no other argument on the claim), however, the court denies the Detective Defendants' motion for summary on the failure-to-intervene/evidence-fabrication claim as well. *See, e.g.*, *Bartl v. City of Chicago*, No. 12 C 7653, 2014 WL 4244218, at *7 (N.D. Ill. Aug. 27, 2014) (denying summary judgment on a failure-to-intervene claim when the underlying § 1983 Fourth Amendment claim survives).

### b. Failure to Intervene in Coercion

The Detective Defendants concede that disputed facts remain regarding Mr. Brown's Fifth Amendment coercive-interrogation claim but argue that no Detective Defendant can be held liable for failing to intervene in the coerced interrogation. First, they argue that Mr. Brown has offered no evidence that Detective Kutz had a realistic opportunity to stop the others from coercing Mr. Brown. Second, they argue that Mr. Brown also has no evidence that Detective Campbell had an opportunity to stop Detective Fine's misconduct or vice versa.

There is evidence from which a jury may find that Detective Kutz failed to intervene to stop Detective Fine, Detective Campbell, or both from coercively interrogating Mr. Brown. True, Detective Kutz was not present when Brown was physically abused by Detective Fine or psychologically coerced by Detective Campbell, and Kutz never interviewed Mr. Brown at Area 1.

(EDSOF ¶¶ 53–55.)  But Detective Kutz was an integral part of the investigation: there is no dispute that he drove to Mr. Brown's home and work site to look for him and was involved with Mr. Brown's arrest.  Whether he worked with Detective Fine to coerce Harper, whose inculpatory statements implicated Mr. Brown, or coerced Ford, whose statements also implicate him in the crime, is disputed.  A reasonable jury could find, however, that Detective Kutz knew one or more of his colleagues were determined to extract Mr. Brown's confession without regards to protecting his constitutional rights and had an opportunity to warn them to stop.  *Cf. Hinojosa v. City of Chicago*, No. 11 C 0067, 2013 WL 2422630, at *3 (N.D. Ill. May 30, 2013) (granting summary judgment to officers because plaintiff's evidence did little more than show that the defendant officer was present at the scene).

The facts of this case are distinguishable from *Hampton*, 2017 WL 2985743, at *24, which the Estate Defendants cite for support.  In that case, the court granted summary judgment on a failure-to-intervene claim where the underlying violation was use of suggestive identification techniques.  *Id.*  The two defendant officers used the same techniques on different witness on different days, so there was no way for a jury to infer that they had knowledge or an opportunity to intervene in each other's conduct.  *See id.*  By contrast, all three Detective Defendants here worked on the same investigation on the same day at the same place, where Detectives Fine and Campbell coordinated to interrogate Mr. Brown and Detectives Fine and Kutz worked together to interrogate Harper.  Mr. Brown does not need to pinpoint a particular moment when each Detective Defendant could have stepped in; that is a question for the trier of fact.  *See Yang v. Handin*, 37 F.3d 282, 285 (7th Cir. 1994) (reversing ruling in favor of defendant officer when, although the plaintiff's complaint "fail[ed] to *explicitly* specify the existence of an opportunity for [the defendant officer] to have intervened, the facts demonstrate several opportunities during which [the defendant officer] could have acted" (emphasis in original)).  Should the jury find either Detective Campbell or Fine liable for Count II, it may find the remaining Detective Defendants

knew of and failed to stop Mr. Brown's coerced interrogation.  Summary judgment is denied to the Estate Defendants on Count IV.

### D.    Count VII: State Law Malicious Prosecution

Estate Defendants and ASA Whitehouse move for summary judgment on Mr. Brown's remaining state law malicious prosecution claim.[52]  Malicious prosecution requires proof of five elements: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding: (4) the presence of malice; and (5) damages resulting to the plaintiff."  *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 74, 183 N.E.3d 767, 782 (internal quotations omitted).  Defendants challenge only the favorable termination element.

As explained below, disputes of fact preclude summary judgment for the Individual Defendants on Count VII.

#### 1.    *Nolle Prosequi*

The proceedings against Mr. Brown terminated when the CCSAO issued a *nolle prosequi*, dismissing the charges against him.  Under Illinois law, abandonment via *nolle prosequi* amounts to a favorable termination "unless the abandonment is for reasons not indicative of the innocence of the accused."  *Swick v. Liautaud*, 169 Ill. 2d 504, 513, 662 N.E.2d 1238, 1243 (1996).  In determining whether a plaintiff can establish this element of the claim, it is imperative to examine why prosecutors dropped the charges.  "To support a malicious prosecution claim, the circumstances surrounding the abandonment of the criminal proceedings must compel an inference that there existed a lack of reasonable grounds to pursue the criminal charge."  *Beaman*, 2021 IL 125617, at ¶ 109, 183 N.E.3d at 788.  A *nolle prosequi* does not indicate innocence when it results only from "an agreement or compromise with the accused" or "the impossibility or

---

[52]    This court has already dismissed Mr. Brown's federal malicious prosecution claim in Count VI with regards to the Estate Defendants.  ASA Whitehouse is also entitled to summary judgment on the dismissed federal claim.

impracticability of having the accused tried." *Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997) (interpreting Illinois law).

Unlike the court in *Beaman*, which had to make inferences about the prosecutors' reasoning for issuing a *nolle prosequi* by looking to the postconviction relief proceedings and issuance of a certificate of innocence, this court has the benefit of depositions from CCSAO officials. Those depositions, read in the light most favorable to Mr. Brown, create a factual dispute about whether the prosecutors dropped charges in a manner indicative of innocence. Take the statements of Sussman, who instructed Special Assistant State's Attorney Joseph Magats to issue the *nolle prosequi*. (*See* Sussman Dep. at 94:13–15.) In his discussion with Magats, Sussman stated he thought "it wasn't practical to retry the case in terms of witnesses" and that he "had concerns about whether it was in the interest of justice to pursue the case given what [he] had read." Sussman also stated that the attorneys who reviewed the case "had concerns about the reliability of [Mr. Brown's] confession." (*Id.* at 108:19–20.) Sussman crafted a public statement saying that the CCSAO "determined there were significant evidentiary issues that raised deep concerns about the fairness of Mr. Brown's conviction." (*Id.* at 100:23–101:16.) These statements tend to show that the prosecutor who directed the issuance of the *nolle prosequi* was concerned with more than issues of resource managements and impracticability alone. The depositions also make clear that the prosecutors were concerned about the practicality of putting on a trial when so many witnesses were deceased and the potential for sympathy due to Mr. Brown's age and health.[53] But these are not the only concerns the attorneys mention, and they are not mutually exclusive with concerns about the fairness of Mr. Brown's trial

---

[53] Rotert was not involved in the decision to issue a *nolle prosequi*, so his statements are not relevant to this point. (*See* Rotert Dep. at 186:13–15.) The testimony of Magats does not resolve whether the *nolle prosequi* was based on a lack of reasonable grounds to pursue the criminal charge or pure practicality concerns. (*See* Magats Dep. at 95:5–16 ("Q: There was no finding or determination by the State's Attorney's Office in taking that action, the *nolle pros*, in deciding not to try the case; no action or determination by the State's Attorney's Office with regard to whether or not Mr. Brown was actually innocent, is that true? A: That is true.").)

or the reliability of his confession. (*See* Estate Def.'s Mem. in Supp. of Summ. J. [299] at 27–30.) Disputes of fact preclude summary judgment on this issue.

### 2. Certificate of Innocence

Mr. Brown also contends that his COI creates a dispute regarding whether proceedings against him terminated in a manner indicative of innocence. Although a COI is not part of a criminal proceeding and is issued after charges have been dismissed, the Seventh Circuit has recognized that a certificate of innocence is "directly relevant" to the favorable termination element of a malicious prosecution claim.[54] *Patrick II*, 974 F.3d at 832–33.

If the COI is relevant, the Estate Defendants argue, the court should disregard it as hearsay, because civil judgments like the COI are not admissible in a subsequent proceeding as evidence of facts underlying the judgment. *See Greycas, Inc. v. Proud*, 826 F.2d 1560, 1567 (7th Cir. 1987). The *Greycas* court actually questioned the soundness of this rule when it upheld the trial court's admission of a state court judgment determining the priority of liens as "some evidence of the degree to which [the defendant's] misconduct injured [the plaintiff]." *Id*. After *Greycas*, several courts in this district have concluded that a COI is admissible evidence for evaluating the favorable termination element of a malicious prosecution claim.[55] For example, in *Kluppelberg v.*

---

[54]     Estate Defendants argue that the *Patrick* court found the COI relevant only in the absence of other evidence on point, but *Patrick* does not state this limitation. The availability of other evidence here does not defeat the COI's relevance. (*See* Estate Defs.' Mem. in Supp. of Summ. J. [299] at 30.) *See also Patrick II*, 874 F.3d 824 at 833–34.)

[55]     See *Patrick II*, 974 F.3d at 832-33 ("The district judge held—and we agree—that Patrick's certificate of innocence was directly relevant to an element on which he bore the burden of proof: that the prosecution against him was terminated in a manner indicative of innocence."); *Harris v. City of Chicago*, No. 14 C 4391, 2018 WL 2183992, at *3 (N.D. Ill. May 11, 2018) ("Plaintiff's certificate is relevant and admissible to demonstrate that Plaintiff's underlying criminal proceedings were terminated in her favor in relation to her malicious prosecution claim"); *Walker*, 2017 WL 2653078, at *5 ("Walker's Certificate of Innocence is not irrelevant [to his malicious prosecution claim]—to obtain it, he had to prove his innocence by a preponderance of the evidence."); *Patterson v. Dorrough*, No. 10 C 1491, 2012 WL 5381328, at *5 (N.D. Ill. Oct. 31, 2012) (denying summary judgment on plaintiff's malicious prosecution claim because "the charges against Patterson were not simply dropped by the prosecutor . . . Patterson was subsequently issued a certificate of innocence"); *Logan v. Burge*, No. 09-cv-05471, ECF No. 423,

*Burge*, 84 F. Supp. 3d 741, 746–47 (N.D. Ill. 2015), another court in this district took a cue from *Greycas* to admit a COI for a malicious prosecution claim. Because here, like in *Kluppelberg*, "the application for the COI is part of the narrative of this case," this court is inclined to follow suit. *See id.* at 747.

The Estate Defendants have offered one additional objection to the court's consideration of the COI in this case: Mr. Brown obtained it by providing Bell's affidavit, which he knew contained false statements. *See Settlement Funding, LLC v. Brenston*, 2013 IL App (4th) 120869, ¶ 42, 998 N.E.2d 111, 122 (defining fraud as "anything calculated to deceive, including all acts, omissions, and concealments" and finding suppression of material fact results in active concealment amounting to fraud). In his petition for a COI, Brown submitted an "Affidavit of Verification" in which he swore "under oath that the facts set forth in this Petition for a [COI] are true to the best of [his] knowledge and belief." (EDSOF ¶ 129.) Among the evidence Mr. Brown submitted to the COI court was Bell's affidavit, which the Estate Defendants characterize as "false" and Mr. Brown as "mistaken." In Mr. Brown's view, because the record contains evidence that drug use was common in the strip mall where Magic Video was located, it is possible that Bell confused Mr. Brown with someone else. Mr. Brown says that because he lacked first-hand knowledge of why Bell thought he sold drugs to Mr. Brown or whether Bell set the fire, his submission of the affidavit was not fraudulent. (*See* Pl.'s Resp. to EDSOF ¶¶ 88, 128.) The Estate Defendants are correct that Bell's identification of Mr. Brown in open court as the person to whom he sold drugs tends to rebut Mr. Brown's theory of mistake, but whether Mr. Brown was, in fact, the person Bell sold drugs to is an open question regardless of that identification. (*See* Estate Defs.' Rep. to PSOAF [341] at 30.) The parties dispute whether there was sufficient evidence for the issuing court to grant the COI even without Bell's affidavit. (*See* Estate Defs.' Rep. to PSOAF [341] at 30; Pl.'s Resp. to Estate Defs.' Mot. for Summ. J. [315] at 24.) Looking

---

at 1–3 (N.D. Ill. Oct. 19, 2012) (denying motion *in limine* seeking to bar reference to plaintiff's certificate of innocence).

at the evidence in the light most favorable to the Mr. Brown, as the court must do at this stage of the proceeding, it cannot conclude that the uncontested COI is inadmissible on the grounds of fraud. Weighing this evidence is a matter best left to a properly-instructed jury.

Finally, the Estate Defendants argue Mr. Brown cannot establish a factual dispute because all three CCSAO witnesses confirmed that the CCSAO never made a determination that Mr. Brown was innocent when deciding whether to contest the COI. (EDSOF ¶ 121). The relevant factual question here, however, is not whether CCSAO made a determination of Brown's innocence *vel non*, but whether the decision to drop charges was *indicative* of innocence. Under this objective standard, a reasonable jury could find in Mr. Brown's favor. Accordingly, summary judgment on Count VII is denied.

### E. Count VIII: Intentional Infliction of Emotional Distress

The Estate Defendants and ASA Whitehouse all move for summary judgment on Count VIII of Brown's SAC, in which he alleges a state law claim for IIED against Individual Defendants. For the reasons discussed below, the court grants partial summary judgment to ASA Whitehouse and denies summary judgment to the Estate Defendants on Count VIII.

The Estate Defendants argue, as they did at the motion-to-dismiss stage, that this claim is subject to a one-year statute of limitation under Illinois law and must be dismissed as time-barred. *See* 745 Ill. Comp. Stat. 10/8-101(a). The court stands by its earlier determination on this issue and declines to grant summary judgment on this score. *See Brown,* 2019 WL 4694685, at *6–7.

ASA Whitehouse moves for partial summary judgment on Mr. Brown's IIED count for "all claims unrelated to the drafting of the handwritten confession." (Def. Whitehouse's Rep. to PSOAF [335] at 14–15.) Because Mr. Brown has adduced no evidence that ASA Whitehouse physically or psychologically abused him, drafting the handwritten confession is the only pertinent conduct ASA Whitehouse took that could form the basis of his IIED claim. Accordingly, ASA Whitehouse is entitled to partial summary judgment on this point.

63

Detective Kutz also moves for summary judgment on Mr. Brown's IIED claim on the grounds that he was not present during Detectives Fine and Campbell's abuse. Detective Kutz contends that because his activities involved Harper, not Mr. Brown, he cannot be held liable here. *See Duffy v. Orlan Brook Condo. Owners' Ass'n*, 2012 IL App (1st) 113577, ¶ 36, 981 N.E.2d 1069, 1079 (stating the extreme and outrageous conduct must be directed at plaintiff).

Physical presence, however, is not the end of the inquiry. To prove the IIED claim, Mr. Brown must show (1) that the conduct was extreme and outrageous; (2) that the actor intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress; and (3) that the conduct in fact caused severe emotional distress. *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2010). In making this determination, the court considers the totality of the circumstances and "does not look at each of the acts separately." *Holder v. Ivanjack*, 39 F. Supp. 2d 965, 970 (N.D. Ill. 1999).[56] The record shows that Detective Kutz was an integral member of the investigative team. A finder of fact could reasonably conclude he acted in an extreme and outrageous manner toward Mr. Brown by fabricating the court-reported statements of his co-suspects, which placed Mr. Brown at the scene.

The Estate Defendants have unpersuasively attempted to liken this case to *Walker*, 2021 WL 1058096, at *14. There, the court granted summary judgment on an IIED claim in favor of an officer who was neither involved in the plaintiff's arrest nor the recovery of any evidence. *Id.* The officer in *Walker*, unlike Detective Kutz, never communicated with the criminal suspect or his detained counterpart (there, his brother) and did not write a case report. *Id.* The "minimal" role

---

[56] The *Holder* opinion cited by Mr. Brown resolves a motion to dismiss. The court decided, at that stage of the proceedings, it was unnecessary for the plaintiff to draw factual distinctions among each individual police officer. *Holder*, 39 F. Supp. 2d at 969. While such factual distinctions are not required prior to discovery, they may well be necessary at the summary judgment stage. *See, e.g.*, Walker, 2021 WL 12058086, at *14 (granting summary judgment on IIED claims to officers when the plaintiff "ma[de] no attempt to parse the actions or liability of any of the individual defendants in his responsive brief").

of the officer in *Walker* thus does not mirror Detective Kutz's own integral role here. Mr. Brown's IIED claim against Detective Kutz is best left to a jury.

### F.     Counts III and X: Conspiracy Claims

Detective Kutz and ASA Whitehouse move for summary judgment on Count III, in which Brown alleges that they conspired to deprive him of his constitutional rights in violation of federal law. They also move for summary judgment on Count X, which alleges the Estate Defendants and ASA Whitehouse conspired in violation of state law. For the reasons discussed below, these requests are granted in part and denied in part.

#### 1.     Federal Conspiracy

To prove a conspiracy under § 1983, a plaintiff must prove that the defendants reached an agreement to deprive him of his constitutional rights, and that a member of the conspiracy engaged in an overt act to deprive him of those rights. *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018). Mr. Brown must establish that the Individual Defendants understood the general objective of the scheme, accepted them, and agreed, either explicitly or implicitly, to do their part to further them. *Indep. Tr. Corp. v. Stewart Info Servs. Corp.*, 665 F.3d 930, 939 (7th Cir. 2012). The agreement need not be express, and instead may be "inferred through the combination of common sense and circumstantial evidence." *Id.* (citing *Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015); *Adcock v. Brakegate*, Ltd., 164 Ill. 2d 54, 645 N.E.2d 888 (1994)).

Conspiracy claims are not independent bases of § 1983 liability. They derive from an underlying constitutional violation. *Drager v. Village of Bellwood*, 969 F. Supp. 2d 971, 984 (N.D. Ill. 2013). Mr. Brown has brought a broad conspiracy claim and made little effort to disaggregate it from his surviving claims. The court will undertake that analysis for the sake of completion, but notes that this is a redundant task. Although claims for "alleged conspiracies between state actors are possible under section 1983," they generally "add nothing but needless complexity." *Ewell v. Toney*, 853 F.3d 911, 917–18 (7th Cir. 2017).

### a. Conspiracy to Fabricate Evidence

The Estate Defendants argue that because Count I should be dismissed, no conspiracy claim can survive with regards to Mr. Brown's evidence-fabrication and suppression claims. The court has ruled that Mr. Brown's evidence-fabrication claim survives summary judgment. The Estate Defendants have made no other argument that the Detectives are entitled to summary judgment if a claim from Count I survives, and the court therefore denies summary judgment on this claim.

ASA Whitehouse is also not entitled to summary judgment on this claim.[57] The disputed facts that he wrote and Detective Campbell edited the handwritten confession outside of Mr. Brown's presence are enough to establish that a jury could find they agreed to fabricate evidence against Mr. Brown.

### b. Conspiracy to Coercively Interrogate

ASA Whitehouse is not entitled to summary judgment on the conspiracy claim with regards to Count II. Although Detective Whitehouse was not present for any instance of physical abuse, Mr. Brown has presented evidence that ASA Whitehouse worked with Detective Campbell to manufacture his handwritten statement, which was used against him at trial. *See Hampton v. City of Chicago*, No. 12 CV 5650, 2017 WL 2985743, at *25 (N.D. Ill. July 13, 2017) (denying summary judgment on conspiracy claims to two officers who, among other acts, wrote a false police report together). The two men's collaboration, evidenced by their signatures on the document, is circumstantial evidence of an agreement. *Cf. Hinojosa*, 2013 WL 2422630, at *3 (granting summary judgment on a conspiracy claim to an officer who did little more than talk to other officers on the scene). On this record, a jury could find that ASA Whitehouse was aware of the general

---

[57] ASA Whitehouse argues that he is entitled to partial summary judgment on this claim with respect to Detectives Fine and Kutz because there is no evidence they were present for the alleged fabrication of the handwritten statement. (*See* Def. Whitehouse's Rep. to PSOAF [335] at 11.) Whether Detectives Fine and Kutz participated in the conspiracy is immaterial to the question of ASA Whitehouse's own liability on this claim.

objective to get Mr. Brown to incriminate himself without regards to his constitutional rights.[58] *See Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) ("To be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are.").

By contrast, Mr. Brown has adduced no evidence that Detective Kutz had agreed with the other detectives to coerce Mr. Brown's confession. Indeed, Detective Kutz had no meaningful interaction with Mr. Brown at Area 1, and Mr. Brown has no evidence of Detective Kutz's awareness of any plan to extract Mr. Brown's confession. (*See* EDSOF ¶¶ 47–49, 53–56.) Absent evidence of a tacit or express agreement to help with Mr. Brown's own interrogation, as opposed to the interrogations of Harper and Ford, Mr. Brown's conspiracy claim cannot survive against Detective Kutz on this count.[59]

### 2. State Conspiracy

The standard for conspiracy under state law is similar. Mr. Brown must prove that two or more people agreed to participate in an unlawful act, and that one of the parties performed a tortious act in furtherance of the agreement that caused an injury. *Fritz v. Johnston*, 209 Ill. 2d

---

[58] ASA Whitehouse additionally argues that he is entitled to summary judgment because Mr. Brown has offered no explanation for ASA Whitehouse's motivation for working with the Detectives, whom he had never met before, to incriminate Mr. Brown, whom he also did not know. That ASA Whitehouse lacked any history with the Detectives may be relevant evidence, but he cites no authority for the argument that motive evidence is necessary for a conspiracy charge to survive summary judgment. *See Miller v. Dolton*, No. 94 C 765, 1995 WL 137051, at *7 (N.D. Ill. Mar. 28, 1995) (denying summary judgment when circumstantial evidence showed that a patrol officer and his sergeant may have conspired to cover up the patrol officer's potential civil liability for a car accident). The significance of ASA Whitehouse's lack of a pre-existing relationship with the other parties in this suit is for the jury to decide.

[59] This conclusion is not inconsistent with the court's ruling on the failure-to-intervene claim against Detective Kutz. The elements of these claims are different. Failure-to-intervene liability is premised on an omission. Mr. Brown has adduced evidence to create a factual question of whether Detective Kutz could have stepped in to stop the other Detectives from coercively interrogating Mr. Brown yet failed to do so. By contrast, conspiracy liability is premised on the act of agreement. Mr. Brown presented no evidence that Detective Kutz, who never interviewed or meaningfully interacted with Mr. Brown at Area 1, did his part to extract Mr. Brown's coerced confession.

302, 317, 807 N.E.2d 461, 470 (2004).  Under Illinois law, a plaintiff can succeed on a conspiracy claim using circumstantial evidence only if that evidence is clear and convincing.  *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 134, 720 N.E.2d 252, 258 (1999).

Mr. Brown's state law conspiracy claims resolve in the same manner as his federal ones, for the same reasons as those discussed above.  To the extent Brown alleges a stand-alone conspiracy claim detached from a specific underlying tort, all Individual Defendants are entitled to summary judgment on that claim.  *Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 59, 984 N.E.2d 132, 151 ("[C]onspiracy is not an independent tort: the conspiracy claim fails if the independent cause of action underlying the conspiracy allegation fails.").

## IV.    The City's Motion for Summary Judgment

The City of Chicago seeks summary judgment on the *Monell* claims in Count V, the *respondeat superior* claims in Count X and the indemnification claim in Count XI.  The motion is granted with respect to *Monell* and otherwise denied.

### A.    *Monell* Claims

The SAC alleges that the City's policies and practices directly caused his constitutional injuries, exposing it to *Monell* liability.  Mr. Brown seeks to hold the City liable for his constitutional injuries under the following theories: The City was deliberately indifferent to a widespread pattern and practice of (1) coercing confessions, (2) fabricating statements, (3) failing to investigate and discipline CPD officers for misconduct, (4) failing to supervise and train CPD officers to prevent misconduct, and (5) condoning a code of silence.

Under *Monell* and its progeny, a municipality is liable for a § 1983 violation only when execution of the local government's policy or custom inflicts the particular constitutional injury.  "A municipality may not be held liable under § 1983 based on a theory of *respondeat superior* or vicarious liability."  *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (citing *Monell*, 436 U.S. at 694).  Nor can the City be held liable simply because it employs an individual who is personally liable for a tort.  *Monell*, 435 U.S. at 691; *Bryan County v. Brown*, 520 U.S. 397, 430 (1997).  A

plaintiff who proves he has suffered a constitutional violation may support a *Monell* claim through showing any of three actions: (1) an express policy, (2) a widespread practice that is so permanent and well-settled as to constitute a custom or usage within the force of law, or (3) a decision by a person with final policymaking authority. *McCormick v. City of Chicago*, 230 F.3 319, 324 (7th Cir. 2000).

If, as here, a plaintiff claims a widespread practice is responsible for his constitutional injury, he must prove three elements: (1) a widespread policy or custom, (2) deliberate indifference, and (3) causation. *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). "These requirements—policy or custom, municipal fault, and 'moving force' causation—must be scrupulously applied in every case alleging municipal liability." *Id.* at 987.

To be "widespread" a practice must be "so permanent and well-settled that it constitutes a custom and practice with the force of law even though it was not authorized by written law express policy." *Id.* at 986; *see also Monell*, 436 U.S. at 692 (a widespread practice is "persistent," "permanent," and "well settled"). The gravamen "is not individual misconduct by police officers (that is covered elsewhere under § 1983), but a *widespread* practice that permeates a critical mass of an institutional body." *Rossi v. Chicago*, 790 F.3d 729, 737 (7th Cir. 2015) (emphasis in original).

Next, if a plaintiff shows the existence of a widespread practice, he must also show that the municipality acted with deliberate indifference to the widespread practice. *See J.K.K v. Polk County*, 960 F.3d 367, 477 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1125 (2021). Deliberate indifference is a higher bar than negligence or gross negligence. *See Bryan County*, 520 U.S. at 407. "A plaintiff must prove that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *Id.* Municipal liability attaches only where the final policymaker acts with deliberate indifference as to the known or obvious consequences of that action. *Id.* at 407.

Finally, a *Monell* plaintiff must prove the municipality's action was the "moving force" behind his constitutional violation. *First Midwest Bank*, 988 F.3d at 987. This rigorous causation standard requires a plaintiff to show a "direct causal link" between the challenged municipal action and the violation of his constitutional rights. *Id.* At the summary judgment stage, a plaintiff must have adduced evidence that would allow a reasonable jury to conclude that the municipality's actions were a direct cause of the plaintiff's injury. *See Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019) (affirming grant of summary judgment for city when plaintiff failed to provide evidence to support her contention that the city failed to properly train its police "much less evidence that a failure to train or supervise was the moving force" behind her constitutional injury) (internal quotation omitted); *Grieveson v. Anderson*, 538 F.3d 763, 771–75 (7th Cir. 2008) (similar).

The City is entitled to summary judgment on each of Mr. Brown's *Monell* claims because Mr. Brown has failed to set forth evidence of causation, or even to argue the point. In an effort to avoid his burden to bring forward causation evidence, Mr. Brown cites distinguishable cases.[60] The first is *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 991 (N.D. Ill. 2017), in which the court denied summary judgment when the plaintiff argued that the City's condonation of a "code of silence" in the Chicago Police Department led to the plaintiff's injury. *Id.* Unlike Mr. Brown, the *LaPorta* plaintiff adduced evidence that the defendant officer had a long history of citations for similar misconduct in the past, so it was reasonable to infer that he felt emboldened to act with

---

[60] In addition to the cases the court discusses in this opinion, Mr. Brown unpersuasively argues that the question of causation must be left to the jury so long as the other two requirements—widespread policy and deliberate indifference—are established. He points to *Thomas v. Cook County Sheriff's Department*, 604 F.3d 293, 303 (7th Cir. 2010) in which the Seventh Circuit suggested that, after a plaintiff established these two "threshold requirements" of widespread practice and deliberate indifference, the question of causation goes to the jury. In making his argument, Mr. Brown misquotes the *Thomas* opinion, which states the following: "Beyond these threshold requirements, the jury must make a factual determination as to whether the evidence demonstrates that the County had a widespread practice that the alleged constitutional harm." *Id.* Whether due to a typological error or otherwise, the sentence does not—contra Plaintiff's representation—include the word "caused."

impunity.  *Id.* at 976 (noting the defendant officer had accumulated at least 18 CRs in the past).

The court concluded there was a direct causal link between the City's deficient disciplinary

procedures and plaintiff's particular injury.  *Id.* at 991.  Similarly, in *Cazares v. Frugoli*, No.13 CV

5626,  2017 WL 1196978, at *18 (N.D. Ill. Mar. 31, 2017), also cited by Mr. Brown, the defendant

officer "had been the subject of numerous citizen complaints, none of which were sustained or

resulted in discipline."  The record in this case does not show that the Detective Defendants had

the kind of checkered records that would suggest they felt that they could act with impunity due

to the City's policies.[61]

        For all of the evidence Mr. Brown has gathered against the City, he has not made a

concerted effort "to show a connection between those cases and the case at hand, with an

appropriate degree of specificity."  *See Black v. City of Chicago*, No. 18 CV 6518, 2022 WL

425586, at *6 (N.D. Ill. Feb. 11, 2022).  Indeed, after receiving a second chance to brief the issue,

Mr. Brown summarily contended that "Plaintiff's 20-page Opposition and 81-paragraph Statement

of Additional Facts explain, step by step, the interrelated policies that resulted in the constitutional

violations suffered by Plaintiff in this case."  (Pl.'s Resp. to City's Mot. of Summ. J. [347] at 5.)

This court "is not required to scour the party's various submissions to piece together appropriate

arguments."  *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).  Because Mr. Brown

has failed to adduce evidence or argue the issue of causation in this case, the City is entitled to

summary judgment on the *Monell* claims in Count V.

        Although the issue of causation is dispositive, the court notes that Mr. Brown's arguments

on widespread practice and deliberate indifference are muddled together in his briefing and

unpersuasive in their own right.  For example, Mr. Brown's first *Monell* theory claims that City

---

[61]        Within five years prior (or after) Mr. Brown's arrest, Detectives Campbell and Fine
faced no allegations, not sustained or otherwise, of misconduct.  (DCSOF ¶¶ 69, 71.)  Detective
Kutz had one CR with allegations deemed "unfounded" and "not sustained."  (*Id.* ¶ 67.)  Waller
did not identify any deficiency with the investigation OPS made into Detective Kutz's CR.  (*Id.* ¶
70.)

turned a blind eye to the widespread practice of coercing confessions and fabricating statements around the time of Mr. Brown's arrest. Most of the evidence he uses to support this claim are reports expressly limited to the conduct of Jon Burge and those under his command. This evidence does not support an inference that the abusive tactics that occurred at Area 2 "permeate[d] a critical mass" of the CPD at the time of Mr. Brown's arrest. *See Rossi*, 790 F.3d at 737. Next, Mr. Brown argues the City was deliberately indifferent to OPS's practice of improperly managing allegations against officers. Mr. Brown's evidence tends to show the City audited OPS and implemented improvements, actions which are more consistent with vigilance than with gross negligence—let alone deliberate indifference, an even higher bar.[62] *Bryan County*, 520 U.S. at 407. Mr. Brown additionally does not adduce evidence that failing to supervise and train detectives was a widespread practice in 1988. He simply asserts that the "need for more or different training" was "obvious" given the misconduct that occurred in this case. *See Canton v. Harris*, 489 U.S. 378, 390 (1989). Finally, the only evidence Mr. Brown put forth to show the existence of a widespread code of silence in 1988 is his expert's report, which stated that the Detective Defendants' failure to respect Mr. Brown's constitutional rights "was consistent with the widespread acceptance among all ranks of the 'code of silence.'"[63]  (*See* PSOAF ¶ 81.)

---

[62]    For example, the record shows OPS made significant improvements through the hiring of better investigators, implementing a 10-week training program, and creating a new division dedicated to investigating the most serious cases. (*See* Defs.' Resp. to PSOAF [338] ¶ 66.)

[63]    The additional evidence Mr. Brown provides as evidence of a code of silence is entirely unsupportive. First, Plaintiff points to an October 1988 statement by CPD Superintendent Martin, characterizing his testimony as "admitting" that a code of silence exists. But that testimony actually shows that Martin stated "there is no such thing as a code of silence" and he did not believe such a code exists. (*See* Defs.' Joint Resp. to PSOAF [338] ¶ 78.)
Second, Plaintiff offers testimony by OPS Chief Administrator Fogel, in which he stated that many OPS complaints have nowhere to go because an accused officer will often have a partner who serves as his corroborating witness. (PSOAF ¶ 79.) Whatever the merits of the statement that "officers are inclined to lie for their partners when there is no corroborating evidence of excessive force," the statement is not supported by the portions of Fogel's testimony that Plaintiff cites.
Third, Plaintiff points out that, absent the filing of a CR, the City "made no independent effort to track and investigation allegations the officers lied under oath or were otherwise found

In sum, on the record of this case, the City is entitled to summary judgment on Mr. Brown's *Monell* claims.

### 1. *Respondeat Superior* and Statutory Indemnification claims

The City moves for summary judgment on Mr. Brown's counts of *respondeat superior* and state law indemnification on any claims dismissed as against the Defendant Officers. *See* 745 ILCS 10/2-109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable."); 745 ILCS 10/9-102 (a public entity must pay a judgment or settlement for compensatory damages only if the employee himself is liable). Summary judgment is accordingly denied with regards to all surviving claims in Counts I–IV, VII, and VIII–IX.

### CONCLUSION

For the foregoing reasons, ASA Whitehouse's, Estate Defendants' and the City's motions [293, 297, 308] are granted in part and denied in part.

For Count I (fabrication and suppression), the court grants summary judgment to Estate Defendants and ASA Whitehouse on all claims unrelated to the handwritten confession. Summary judgment is denied to Detective Campbell on the evidence-fabrication claim in Count I, and this claim also survives against ASA Whitehouse.

For Count II (coercive interrogation), the court grants summary judgment to Detective Kutz on the coerced-confession claim. Summary judgment on Count II is denied to ASA Whitehouse.

---

not credible during court proceedings." (*Id.* ¶ 80.) Lack of an alternative procedure for investigations does not create a fact question regarding the code of silence. *See Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000) ("The existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent.").

Fourth, Plaintiff points to testimony in which one of the City's experts opined that, hypothetically, officers would observe a code of silence when their colleagues use excessive force during an interrogation. (PSOAF ¶ 80.) He was not asked and did not opine on whether Chicago police officers in general observed a code of silence in the 1980s. (*See* Deposition of Jeffrey Noble [321-26] at 133:14–134:18.)

Plaintiff's evidence on this and other *Monell* theories does not create a genuine factual dispute.

For Counts III and X (federal and state conspiracy), the court denies summary judgment to all Individual Defendants with regards to the evidence-fabrication claim of Count I. Summary judgment is granted to Detective Kutz on the conspiracy claims related to Mr. Brown's coerced interrogation. It denies summary judgment to ASA Whitehouse on the conspiracy claims related to Mr. Brown's coerced confession.

For Count IV (failure to intervene), the court grants summary judgment to ASA Whitehouse. Summary judgment is denied to the Estate Defendants on Count IV.

For Count VII (state law malicious prosecution), the court denies summary judgment to Individual Defendants.

For Count VIII (IIED), the court denies summary judgment to the Estate Defendants. It grants partial summary judgment to ASA Whitehouse for all conduct unrelated to creating the handwritten confession.

Regarding claims against the City, the court grants summary judgment to the City on Count V's *Monell* claims. Summary judgment is granted in part and denied in part to the City on Counts X and XI.

ENTER:

Dated: September 30, 2022

REBECCA R. PALLMEYER
United States District Judge