**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ARTHUR BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 18 C 7064** |
| | ) | |
| **CITY OF CHICAGO, Kimberly Campbell** | ) | **Judge Rebecca R. Pallmeyer** |
| **as Special Representative for the Estate of** | ) | |
| **JOSEPH CAMPBELL, Diane Romza-Kutz** | ) | |
| **as Special Representative for the Estate of** | ) | |
| **DAVID KUTZ, and Frank W. Fine as** | ) | |
| **Special Administrator for the Estate of** | ) | |
| **JOSEPH D. FINE, Former Assistant State's** | ) | |
| **Attorney JOEL WHITEHOUSE, and other** | ) | |
| **as-yet unidentified employees of the City of** | ) | |
| **Chicago,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

The parties' *Daubert* motions are before the court. For the reasons explained here, Defendants' motions to limit the testimony of Dr. Antoinette Kavanaugh, Mr. Dennis Waller and Dr. Richard Leo [363, 367, 368], and Plaintiff's motion to bar the testimony of Dr. Michael Welner [366] are granted in part and denied in part.

**BACKGROUND**

Plaintiff Arthur Brown spent nearly 30 years in prison for a crime he insists he did not commit. The court assumes familiarity with the facts of this case, which are set forth in its summary judgment opinion. *See generally Brown v. City of Chicago*, No. 18 C 7064, 2022 WL 4602714 (N.D. Ill. Sept. 30, 2022). In summary, on May 28, 1988, an arson occurred in a video rental store on the south side of Chicago, resulting in the death of two persons who were asleep in the restaurant next door. Mr. Brown was arrested by the Chicago Police Department ("CPD") and charged with the arson and murders. Mr. Brown was convicted of these crimes, but in 2017,

the Circuit Court of Cook County vacated Mr. Brown's convictions, and Mr. Brown was released from prison.

Mr. Brown has sued former CPD Detectives Joseph Campbell, Joseph Fine, and David Kutz, and former Assistant State's Attorney Joel Whitehouse.[1]  Mr. Brown alleges in this lawsuit that he is entitled to damages because he was wrongfully convicted and incarcerated due to the Defendants' misconduct.  Specifically, he claims that the investigators fabricated an inculpatory statement, which he signed as a result of their coercion, and which was used to convict him. Defendants maintain that they did not violate Mr. Brown's constitutional rights or Illinois law, and they deny that Mr. Brown is entitled to any damages.

Pursuant to the Federal Rules of Evidence 702 and 703, and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 479 (1993), each party seeks to exclude or, in the alternative, to limit expert testimony offered by the opposing party at trial. Defendants seek to limit the testimony of three individuals: (1) Dr. Antoinette Kavanaugh, Mr. Brown's expert on mental and emotional damages; (2) Mr. Dennis Waller, Mr. Brown's expert on police practices; and (3) Dr. Richard A. Leo, Mr. Brown's expert on false confessions. Mr. Brown seeks to exclude the testimony of Dr. Michael Welner, Defendants' expert on disputed confessions.

## DISCUSSION

Trial judges act as gatekeepers to screen expert evidence for relevance and reliability. *Daubert*, 509 U.S. at 589; *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015).  Under Federal Rule of Evidence 702, the court will admit expert opinion testimony if four conditions are met: (a) the expert's scientific, technical, or otherwise specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony

---

[1]     The court refers to these individuals collectively as "Defendants."  When referring to Detectives Campbell, Fine, and Kutz (but not former ASA Whitehouse), the court uses the phrase "Detective Defendants."

is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. The expert's opinion must be based on "knowledge" rather than mere "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014). When determining admissibility, the court is not as concerned with "the ultimate correctness of the expert's conclusions" so much as "the soundness and care with which the expert arrived at her opinion." *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 826 (7th Cir. 2021) (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)) (internal quotation marks omitted).

To determine whether an expert passes *Daubert* muster, the court engages in a three-step analysis, assessing (1) the expert's qualifications, (2) the reliability of the expert's methodology, and (3) the relevance of the expert's testimony. *Anderson v. Raymond Corp.*, No. 22-1872, 2023 WL 2335845, at *1 (7th Cir. Mar. 2, 2023); *see also Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). The question is not whether the expert is qualified in general, but rather whether he or she is qualified to offer a specific opinion. *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). The party offering the expert testimony bears the burden of demonstrating by a preponderance of the evidence that the evidence satisfies Rule 702 and *Daubert*. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *see also* FED. R. EVID. 702 advisory committee's note to 2000 amendment.

## I. Plaintiff's Expert Antoinette Kavanaugh

### A. Dr. Kavanaugh's Qualifications

Plaintiff has retained Antoinette Kavanaugh, Ph.D. to offer expert opinions regarding Mr. Brown's mental health and emotional damages. (*See generally* Expert Report of Antoinette Kavanaugh ("Kavanaugh Report"), Ex. 1 to Pl.'s Resp. to Defs.' Mot. to Bar Pl.'s Expert ("Pl.'s Kavanaugh Resp.") [383-1].) Dr. Kavanaugh is a clinical psychologist and a board-certified

forensic psychologist.  (Kavanaugh Report at 1.)  She received her undergraduate degree at Bowdoin College, earned her doctoral degree in clinical psychology from Northwestern University Medical School, and completed a forensic postdoctoral fellowship at the University of Massachusetts Medical Center.  (*Id.*)  She has been in private practice for more than 20 years and, on several occasions, has conducted forensic evaluations and provided testimony in criminal and civil cases.  (*Id.*)  Defendants do not challenge Dr. Kavanaugh's qualifications as an expert on mental and emotional damages in general.

### B.      Dr. Kavanaugh's Expert Opinion

Dr. Kavanaugh opines that Mr. Brown suffers from Post Traumatic Stress Disorder ("PTSD") caused by his allegedly wrongful conviction and imprisonment.  She also opines that Mr. Brown "has yet to psychologically process all that he experienced as a man who suffered long-term wrongful incarceration."  (*Id.* at 3.)  She remarks that Mr. Brown "will likely have other psychological consequences" as he continues to process his experience.  (*Id.*)  Her expert report further states that, "[w]hile he currently suffers from PTSD, over time he may experience symptoms of another disorder such as depression."  (*Id.* at 35.)

### C.      Admissibility

Defendants do not challenge the admissibility of Mr. Brown's PTSD diagnosis, but they argue that Dr. Kavanaugh's report contains other improper, speculative, and inflammatory opinions that are not reliable or relevant, and thus inadmissible [363].  The court addresses these challenges in turn.

#### 1.      Future Mental Injuries

Defendants argue that Dr. Kavanaugh should be barred from testifying that, although Mr. Brown has not been diagnosed with depression, he may develop a depression disorder in the future.  (*Id.*)  When Defendants questioned Dr. Kavanaugh about the basis of this conclusion at her deposition, she testified that she based that opinion on Mr. Brown's depressed mood.  (Dep. of Antoinette Kavanaugh ("Kavanaugh Dep."), Ex. 2 to Pl.'s Kavanaugh Resp. [383-2] at 238:6–

17.)  When asked if this remark about a future diagnosis was speculative, Dr. Kavanaugh stated: "Based upon the data that I have reviewed and knowing the levels of comorbidity, yes, but that's so—I wouldn't call it speculation.  I would just say that it's reflective of the data and knowing that often PTSD is a comorbid diagnosis."  (Kavanaugh Dep. at 238:22–239:3.)

Under Illinois law, evidence of potential future harm is admissible and not speculative so long as the increased risk—as opposed to the actual harm—is likely to occur.[2]  *In re Yasmin and Yaz (Drospirenone) Mktg. Sales Pracs & Prods Liability Litig.*, No. 3:09–md–02100–DRH–PMF, 2011 WL 6732245 at *10 (S.D. Ill. Dec. 16, 2011).  Mr. Brown contends that Dr. Kavanaugh has met this threshold by explaining at her deposition that "often PTSD is a comorbid diagnosis." (Kavanaugh Dep. at 238:22–239:3.)   However, Dr. Kavanaugh did not explain what the comorbidity rate is, or how likely it is that Mr. Brown specifically faces the risk of a future depression diagnosis.  Based on Dr. Kavanaugh's expert report and deposition testimony, the court does not find that Dr. Kavanaugh's opinion is based on a reasonable degree of medical certainty.   Without such a foundation, Dr. Kavanaugh's opinion that Mr. Brown may suffer depression in the future is inadmissible speculation.

### 2.    Opinion on Actual Innocence

Defendants argue that the court should bar Dr. Kavanaugh from offering opinions that Mr. Brown is in fact innocent because that is a legal conclusion that will determine the outcome of the case.  *See Good Shepherd Manor Foundation, Inc. v. City of Momence*, 323 F.3d at 557, 564

---

[2]      Plaintiff cites to the legal standard Illinois courts use for awarding damages in medical malpractice claims: a plaintiff may recover damages for an increased risk of a future harm if it can be shown to a reasonable degree of certainty that the proximate cause of that harm was the defendant's negligence.   The Illinois Supreme Court has instructed lower courts to award damages "to the extent that the future harm is likely to occur as measured by multiplying the total compensation to which the plaintiff would be entitled if the harm in question were certain to occur by the proven probability that the harm in question will in fact occur."   *Dillon v. Evanston Hosp.*, 199 Ill. 2d 483, 506, 771 N.E.2d 357, 372 (2002) (citing and adopting a Connecticut civil jury instruction).   Assuming this same formula for calculating damages applies in this case, Dr. Kavanaugh's testimony does not provide jurors adequate information for calculating damages on Mr. Brown's future potential depression diagnosis.

(7th Cir. 2003) (applying, in a Fair Housing Amendment Act case, the rule that "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible"). Defendants correctly point out that Dr. Kavanaugh's report and deposition contain statements that are not the proper subject of expert testimony, including her belief that, because Mr. Brown received a Certificate of Innocence, he is, in fact, innocent. (Kavanaugh Dep. at 16:22–17:23.) She may not testify regarding the legal significance of Mr. Brown's Certificate of Innocence to the jury.

Dr. Kavanaugh is, of course, free to rely on Mr. Brown's version of events to render her opinion. *See Harris v. City of Chicago*, No. 14 C 4391, 2017 WL 2436316, at *13 (N.D. Ill. June 5, 2017) (collecting authority that an expert may base an opinion on their client's version of disputed facts); *Caine v. Burge*, No. 11 C 8996, 2013 WL 1966381, at *2 (N.D. Ill. May 10, 2013) (same). And she may testify to her opinion that Mr. Brown's damages are exacerbated because he believes he has been wrongfully convicted, and that mental distress suffered by individuals who believe they have been wrongfully convicted is more severe than for those who do not hold such a belief. (Kavanaugh Report at 34–35.) In so testifying, Dr. Kavanaugh must abide by a subtle but meaningful distinction: she may testify that, if the jury were to credit Mr. Brown's account, the jury could find that he has suffered severe mental and emotional damages; but she may not testify that Mr. Brown's PTSD and risk of depression is evidence that he has in fact been wrongfully convicted.

### 3. Prejudicial Comparisons

Defendants take issue with a portion of Dr. Kavanaugh's report that Mr. Brown assures the court she will not repeat at trial. The court agrees that the opinions at issue—that Mr. Brown's experience "is akin to trying to survive in a concentration camp or being a civilian prisoner of war" (Kavanaugh Report at 2)—are inflammatory and unfairly prejudicial. In addition, Dr. Kavanaugh has not offered a sufficient factual basis for these opinions. They are therefore inadmissible under Rule 402 and 702.

### D. Summary

Dr. Kavanaugh may opine on Mr. Brown's PTSD diagnosis and risk of future harms. Absent additional foundation (not presented in her expert report or deposition), she may not testify that Mr. Brown faces a future risk of depression. She may not testify regarding the legal significance of Mr. Brown's Certificate of Innocence, nor will she be permitted to compare Mr. Brown's experience with those of prisoners of war or persons confined in concentration camps.

## II. Plaintiff's Expert Dennis Waller

### A. Mr. Waller's Qualifications

Mr. Brown has retained Mr. Dennis Waller as an expert on police practices. Mr. Waller has served as a police officer, field training officer, detective, sergeant, lieutenant, department training officer, and police chief. (*See generally* Curriculum Vitae, Ex. A to Expert Report of Dennis Waller ("Waller Report"), Ex. 1 to Defs.' Mot. to Bar Pl.'s Expert ("Defs.' Waller Br.") [367-1].) Mr. Waller holds a Bachelor of Science degree in police administration from Michigan State University and a Master of Science in Public Administration from Florida International University. (Waller Report at 1.) He has participated in over 3,700 hours of law enforcement training. (*Id*.) He has several law enforcement certifications and has reviewed over 750 cases involving issues related to police policies, procedures, and practices. (*Id*.) Defendants do not challenge Mr. Waller's qualification in general as an expert on police practices.

### B. Mr. Waller's Expert Opinion

Mr. Waller offers five opinions in his expert report. First, he opines that the manner in which the Detective Defendants conducted their investigation "was inconsistent with CPD training, CPD policy, ethical conduct, and nationally accepted standards of police practice." (Waller Report at 9–18 (Opinion A).) Second, he states that the CPD officers in this case used interrogation tactics that deviated from nationally accepted standards of law enforcement practice. (*Id*. at 18–26 (Opinion B).) Third, he opines that, crediting Mr. Brown's version of events, CPD officers and

former-ASA Whitehouse fabricated the statement used to convict Mr. Brown. (*Id.* at 26–28 (Opinion C).) Fourth, he concludes that Defendants Campbell, Fine, and Kutz failed to abide by their obligation to prevent a violation of Mr. Brown's constitutional rights. (*Id.* at 28–32 (Opinion D).) Fifth, he discusses what he believes are pitfalls in CPD policies and practice. (*Id.* at 32–41 (Opinion E).) Sixth, he opines that "substantial circumstantial evidence" supports Mr. Brown's contention that he never confessed to the crimes of which he was convicted, so the basis for probable cause in his criminal case was manufactured. (*Id.* at 41–42 (Opinion F).)

Mr. Waller's report describes his methodology for examining police-related issues in litigation as follows: (1) developing an understanding of the facts, (2) analyzing the actions of the officers, (3) comparing the officers' actions with training and practice standards, and (4) defining and explaining consistencies or inconsistencies in the officers' actions as compared with applicable standards of training, practice, and professional ethics. (*Id.* at 2–3.)

### C.    Admissibility

Defendants argue that Mr. Waller's report contains inadmissible testimony regarding witness credibility, legal conclusions, retrospective critiques of the Detective Defendants' investigation, and state-of-mind speculations [367].

### 1.    Credibility and Legal Conclusions

Defendants argue that Mr. Waller's opinions and conclusions about credibility, reliability, the law, and Mr. Brown's innocence should be barred. The law on this matter is clear. "It is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence." *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013). "As a general rule, accordingly, an expert may not offer legal opinions." *Id.* The court agrees with Defendants that Mr. Waller's report is rife with impermissible legal opinions that rest on Mr. Brown's disputed allegations. As examples (and there are many), Waller may not offer testimony on the following topics:

- The legal import of Mr. Brown's Certificate of Innocence (Waller Report at 15, 22);[3]

- Whether Defendants, in fact, coerced Mr. Brown to confess (*id.* at 26, 28, 30);

- Whether CPD detectives violated the Fourth, Fifth, Sixth Amendments and state law (*id.* at 24–25);

- Whether "substantial circumstantial evidence" supports Mr. Brown's contention that he never confessed (*id.* at 41);

- Whether Mr. Brown's confession was the primary basis for his conviction (*id.* at 22);

- Whether the Defendants' actions "constitute malicious prosecution" (*id.* at 42);

- Whether CPD practices "institutionalized denial of due process for the accused" (*id.* at 21).[4]

In short, Mr. Waller may not opine on the legal significance of the Defendants' actions because his role is "limited to describing sound professional standards and identifying departures from them." *West v. Waymire*, 114 F.3d 646, 652 (7th Cir.1997); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir.2005). On this point, Mr. Waller's testimony must remain focused on policing practices and not mere repetition to the jury of Mr. Brown's disputed allegations, which alone would do little to assist the jury to understand the evidence. *See United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014) (noting that expert testimony that "parrots" out-of-court statements fails to help the jury); *Goldberg v. 401 North Wabash Venture LLC*, 755 F.3d 456, 461 (7th Cir. 2014) (similar).

---

[3]     Plaintiff asserts that Mr. Waller will not testify on such matters to the jury (Pl.'s Waller Resp. [381] at 6 n.4), but it bears repeating: Mr. Waller is not a legal expert, and his opinions on the significance of Mr. Brown's Certificate of Innocence exceed the scope of his expertise. (*See* Waller Report at 15, 22.) Such testimony is barred.

[4]     Plaintiff assures the court that Mr. Waller will not opine on *Monell* issues, and the court agrees that such opinions are barred: Mr. Waller will not be permitted to offer testimony about CPD policies as presented on pages 28 through 41 of his report. Relatedly, consistent with Plaintiff's assurances, Mr. Waller will not testify regarding Defendant Whitehouse's conduct. (Pl.'s Waller Resp. at 14.)

Both parties point to *Andersen v. City of Chicago*, 454 F. Supp. 3d 808 (N.D. Ill. 2020), where Judge Kendall of this court permitted Mr. Waller to testify within appropriate limitations. *Andersen* is, indeed, instructive. In that case, Judge Kendall concluded that Waller was qualified by his extensive training and experience to opine on police practices generally. *Id.* at 813. So too here, Waller may opine on CPD policies and their conformity with nationally accepted police standards. (*See, e.g.*, Waller Report at 9 ("[N]ationally accepted standards of law enforcement practice were endorsed by the Chicago Police Department as reflected in its adoption of Rules and Regulations, the Law Enforcement Code of Ethics, basic and advanced training, and general orders.").) He may testify to the steps a reasonable investigator would have taken to solve the video store arson and resulting murders, as well as the information that a reasonable investigator would have taken into account as the investigation progressed. *See Jimenez*, 732 F.3d at 722. As in *Andersen*, however, there are many topics in Waller's report that he is not qualified to offer opinions on at trial, an exemplary sample of which is laid out above.

Additionally, while Mr. Waller may reference CPD policies in his testimony, the court notes that "[e]vidence of purely localized police procedure is less likely to be helpful than nationally or widely used policy." *United States v. Brown*, 871 F.3d 532, 538 (7th Cir. 2017). On this point, there is a notable difference between Mr. Waller's testimony here and the testimony he offered in *Andersen*. In *Andersen,* Waller compared the defendant officers' conduct to CPD policies, but did not testify that those policies reflected nationally accepted standards. Here, in contrast, Mr. Waller expressly grounds his opinions on national standards. *Cf. Andersen*, 454 F. Supp. 3d at 820 ("Waller does not explain whether this policy reflected widely accepted standards or the standards he used when training officers about interrogations."). If Defendants wish to challenge the extent to which CPD practices overlap with nationally accepted practices, they may explore that matter on cross-examination. Defendants are also free to cross-examine Mr. Waller concerning generally accepted practices for recording *Miranda* waivers. He has not, to date, shown that there is any widely-accepted written law enforcement standard concerning this issue

(Defs.' Waller Reply [390] at 5), and the court would not be inclined to admit his opinions on the issue unless he can do so.

This court concludes, as have other judges in this Circuit, that Mr. Waller may not offer legal conclusions, but may "testify about standard criminal investigation procedures from a law enforcement officer's perspective" and describe "how police develop cases against a person of interest including how they approach the issue of probable cause." *Blackmon v. City of Chicago*, No. 19 C 767, 2022 WL 3909182, at *2 (N.D. Ill. Aug. 30, 2022); *see also Estate of Robinson v. City of Madison, Wisconsin*, No. 15-CV-502-JDP, 2017 WL 564682, at *9 (W.D. Wis. Feb. 13, 2017); *Avery v. City of Milwaukee*, No. 11-C-408, 2015 WL 247991, at *1 (E.D. Wis. Jan. 20, 2015); *Ott v. City of Milwaukee*, No. 09-C-870, 2015 WL 1219587, at *11 (E.D. Wis. Mar. 17, 2015); *Wells v. City of Chicago*, No. 09 C 1198, 2012 WL 116040, at *9 (N.D. Ill. Jan. 16, 2012).

### 2. Failure to Record and Preserve

Defendants argue that Mr. Waller may not opine on the Detective Defendants' failure to preserve notes—testimony that might support a *Brady* claim—because such a claim will not be presented to the jury in this case. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that the prosecution's suppression of evidence from a criminal defendant violates due process "where the evidence is material either to guilt or to punishment"). In support of this argument, Defendants have cited cases holding that, where there is no evidence that exculpatory evidence existed, a witness may not speculate that such evidence was suppressed. (Defs.' Waller Br. at 8–9 (citing *Taylor v. City of Chicago*, No. 14 C 737, 2019 WL 4597383, at *9 (N.D. Ill. Sept. 23, 2019); *Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *4–5 (N.D. Ill. 2009)).)

Mr. Brown argues that Mr. Waller's testimony regarding investigation practices is relevant to his malicious prosecution and intentional infliction of emotional distress claims. Unlike a *Brady* claim, the jury will decide those state law claims, each of which require Mr. Brown to prove the Defendants' acted with intent. Evidence that the Detective Defendants deviated from investigatory standards that they knew or should have known existed, Mr. Brown contends, would

11

help the jury assess those state-law claims. Specifically, Mr. Waller opines that the Detective Defendants deviated from CPD policy and national norms by failing to record and/or preserve notes of the following occurrences (some of which are disputed): Mr. Brown's initial denial of involvement, his claim that he asked to speak with an attorney, the Detective Defendants' account of a confrontation between Michael Harper and Mr. Brown at Area 1, and any interactions between the officers and Mr. Brown while he was in custody but before he gave his statement. (Waller Report at 12–14.)

The court agrees with Mr. Brown on this point: because such testimony is relevant to the intent elements of Mr. Brown's state-law claims, Mr. Waller may opine that the Detective Defendants failed to record and preserve all relevant information during their investigation, as required by CPD policy, training, and generally accepted standards of practice, and Mr. Waller may opine that this lack of recordation violated generally accepted practices. *See Blackmon*, 2022 WL 3909182, at *5.

### 3. Motive Evidence and State-of-Mind Testimony

Defendants argue that Mr. Waller may not offer testimony that the Detective Defendants failed to comply with generally accepted police standards in that they did not follow up on Mr. Brown's alibi witnesses. The court agrees with Defendants that this testimony is inadmissible because there is no evidentiary foundation for it. Waller has not identified evidence that Mr. Brown, or anyone else, told Defendants about a potential alibi witness (Waller Report at 12), and Waller acknowledged at his deposition that a detective would not be required to investigate an alibi of which he was not informed. (Dep. of Dennis Waller ("Waller Dep."), Ex. 2 to Defs.' Waller Br. [367-2] at 116:11–21, 192:19–193:6.) Plaintiff has not addressed this aspect of Waller's testimony. Because such opinions about a purported failure to investigate Brown's alibi would not be supported by sufficient data or facts in the record, they would not help the jury. Consequently, Mr. Waller is barred from testifying on the matter.

12

### 4. Evidence Regarding Joyce "Honey" Owens

Defendants contend that Mr. Waller's opinions regarding the reports of Detectives Scheithauer and Micek, who are not parties to this case, are inadmissible. Those reports concern the non-party officers' interview with Joyce "Honey" Owens, who gave a statement the day following Mr. Brown's arrest (a statement that featured several inconsistencies). Owens reported that she and "some other people" were in the store "getting high on cocaine" on the night of the fire—and also that she was not inside, but instead stood outside the store while a drug transaction occurred within. She stated that four individuals ran out of the store—and then later stated that just one individual ran out of the store, while another person "handed her the packet of cocaine." And she stated that she and other individuals "began to consume the cocaine and discovered it was baking soda," for which "they all blamed Honey for making a switch." (*See* Ex. 9 to Defs.' Mot. *in Limine* [369-9].)

In a separate motion *in limine*, this court ruled that evidence regarding the non-party officers' interview with Ms. Owens is inadmissible. If used for the truth of Ms. Owen's statements, her statements are hearsay. If used to show what evidence the Defendants in this case had at their disposal when finding probable cause against Mr. Brown, the evidence is of limited probative value because the information became available after the Felony Review Unit had already approved charges against Mr. Brown. Notably, Mr. Brown's defense attorney was aware of the Owens interview in 2008 but chose not to call Owens as a witness and did not ask Detective Campbell if he was aware of the report.

Whatever its use, the court is concerned that the probative value of Ms. Owens's statements would be substantially outweighed by their prejudice to Defendants. Mr. Waller's opinion does not render these statements admissible. When remarking on the non-party officers' interview with Ms. Owens, Waller does not cite to any national standard of police practice that would require the Defendants in this case to take any further action in response to her statements. Mr. Waller's opinion that the detectives failed to pursue all investigative leads pursuant to CPD

policy also is not based on sufficient facts or data, because, for one, the interview took place after the close of the Detective Defendants' investigation of Mr. Brown. There is no evidence that the statement was provided to Detective Defendants during their investigation. Consistent with the court's ruling that reference to the interview of Ms. Owens is inadmissible, Mr. Waller may not offer his opinion that investigators should have taken further action in response to her statements.

### D.      Summary

In sum, Mr. Waller is barred from testifying as to Opinions C, D, E, and F of his expert opinion. He may testify to Opinions A and B in accordance with the limitations set forth above.

## III.      Plaintiff's Expert Dr. Richard Leo

### A.      Dr. Leo's Qualifications

Mr. Brown has retained Dr. Richard A. Leo as an expert on false confessions. Dr. Leo serves as the Hamill Family Professor of Law and Psychology at the University of San Francisco and as a fellow at the University of California, Berkeley School of Law's Institute for Legal Research. (Curriculum Vitae ("Leo CV"), Ex. A to Expert Report of Richard Leo ("Leo Report"), Ex. A to Defs.' Mot. to Bar Pl.'s Expert ("Defs.' Leo Br.") [368-1] at 1.) Dr. Leo holds a doctoral degree in jurisprudence and social policy and a law degree from the University of California, Berkeley; a Master of Sociology degree from the University of Chicago; and a Bachelor of Arts degree in sociology from the University of California, Berkeley. (*Id.* at 2.) For over 30 years, he has conducted research on police interrogation practices as they relate to the psychology of interrogation and confessions, including psychological coercion, police-induced false confessions, and erroneous convictions. (*See generally id.*) He has written several books and published numerous peer-reviewed articles on the topic of false and unreliable confessions. (*Id.* at 4–20.) His work is widely cited by scholars in various fields, and several courts across the country and in this district have found Dr. Leo's expert testimony on false confessions admissible. (*See* Expert Witness Testimony, Ex. B to Leo Report [368-1] at 1–5.) Defendants do not challenge Dr. Leo's qualifications to testify as a false-confession expert in general.

## B. Dr. Leo's Expert Opinion

Dr. Leo enumerates eight opinions in his expert report. First, he opines that Mr. Brown's description of what occurred during his interrogation is "consistent with empirical social science research" on practices "associated with, [that] increase the risk of, and are known to cause" false confessions. (Leo Report at 38 (Opinion 1).) Second, he states that the Detective Defendants' disputed factual account of their investigation and interrogation of Mr. Brown lack "face validity" and "fail to provide a reasonable or coherent explanation of how and why Mr. Brown would have falsely confessed to participating in a murder he did not commit." (*Id.* at 38 (Opinion 2).) Third, he opines that Mr. Brown's description of what occurred during his interrogation "indicates the use of interrogation techniques and practices that were guilt-presumptive, truth-presumptive, confirmatory and theory-driven." (*Id.* (Opinion 3).) Fourth, he states that Mr. Brown's account includes descriptions of "physically and psychologically coercive interrogation techniques" that "cause suspects to perceive that they have no meaningful choice but to comply with the demands and requests of their interrogators." (*Id.* at 39 (Opinion 4).) Fifth, he opines that Mr. Brown's account includes descriptions of risk factors that are associated with false confessions, such as "lengthy interrogation, premature rush to judgment and guilt-presumptive interrogation, false evidence ploys, threats and promises, and physical and psychological coercion." (*Id.* (Opinion 5).) Sixth, he notes that Mr. Brown's account includes descriptions of "risk factors" that can result in self-corroborating false statements. (*Id.* (Opinion 6).) Seventh, he finds that Mr. Brown's statement "bears the hallmarks, characteristics, and indicia of a false and unreliable confession" that can be classified as "coerced-compliant." (*Id.* (Opinion 7).) Finally, he opines that the techniques employed by the Detective Defendants during Mr. Brown's interrogation "violated universally accepted police investigation and interrogation national training standards, police protocols and best practices that existed in 1988." (*Id.* (Opinion 8).)

**C.      Admissibility**

Defendants do not contest that Dr. Leo is qualified to testify generally concerning false

confessions and the circumstances or situations that are more or less likely to result in a false

confession [368].  (Leo Report at 4–17; Defs.' Leo Br. at 1–2.)  Defendants argue Dr. Leo should

be barred, however, from offering the following opinions:

- Any opinions that the detectives in this case did not follow police investigation practices or nationally recognized police standards.

- Any credibility determinations of Brown, any witness, criminal co-defendants or Brown's confession.

- Any comment on the credibility or "reliability" of Brown's criminal co-defendants' confessions or certain pieces of evidence.

- Opining on the ultimate issues for the jury in this case—that Brown was physically or psychologically coerced and that his confession is false or fabricated.

- Opinions related to the "Error Insertion Trick."

(Defs.' Leo Br. at 2.)

**1.      Nationally Recognized Policing Standards**

Defendants first argue that the court should bar Dr. Leo from providing opinions related to

police practices because the topic goes beyond his expertise and would be duplicative of

Mr. Waller's testimony.   Plaintiff responds that Dr. Leo is "amply qualified by his education,

research, and experience to opine regarding police interrogation practices, including national

standards, training, and best practices, as they relate to the social science research on false

confessions."  (Pl.'s Leo Resp. [382] at 3.) [5]

---

[5]      Plaintiff states in his response brief that Dr. Leo's testimony will not be duplicative of Mr. Waller's.  Dr. Leo, he says, will offer opinions regarding "the empirical social science research on the types of interrogation techniques, methods, practices, and effects that are associated with, increase the risk of, and are known to cause false confessions, and that explain how and why innocent individuals are often moved to make and/or agree to false and unreliable confessions."  (Pl.'s Leo Resp. at 4–5 (quoting Leo Report at 2).)  Mr. Waller, on the other hand, "will offer opinions on nationally recognized police practices (not on the social science surrounding interrogation techniques)."  (Pl.'s Leo Resp. at 5.)  The court agrees that, so long as these experts speak only to their areas of expertise, their testimony will not be duplicative, but, as discussed

The court agrees with Defendants on this point. Dr. Leo is not an expert on national policing practices, yet Opinion 8 of Dr. Leo's report is titled "Violation of National Police Interrogation Training Standards, Protocols and Best Practices." (Leo Report at 34.) In that section, Dr. Leo makes several assertions about police officer training, such as "American police investigators are universally trained to absolutely avoid use of physical force and coercion in the interrogation room" (*id.*), "American police investigators are trained generally to avoid use of threats of harm . . . and promises of leniency . . ." (*id.* at 35), "American police are trained never to deprive a suspect of essential necessities . . ." (*id.*), "the detectives violated best practice standards with respect to police interrogation" (*id.*), and "American police interrogators are trained to avoid . . . disclosing non-public case facts to [a suspect] . . ." (*id.*).

These sorts of statements exceed Dr. Leo's expertise. *See Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016) (noting that the court "must look at each of the conclusions [an expert] draws to see if has the adequate education, skill, and training to reach them"). The court understands that Dr. Leo is well versed in a seminal text in criminal interrogations called the "Reid Manual," which recommends police should not interrogate suspects for longer than four hours absent "exceptional circumstances." (Pl.'s Leo Resp. at 3; Leo Report at 12, 35 (citing FRED INBAU AND JOHN REID, CRIMINAL INTERROGATION AND CONFESSIONS (3rd ed. 1986)).) Dr. Leo's curriculum vitae shows he taught four training sessions on interrogations from 2000 to 2003: two in Florida, one in Texas, and one in the Republic of Cyprus. (Leo CV at 58.) Dr. Leo also attended police interrogation training five times from 1990 to 1993, including four sessions in California and one in Georgia. (*Id.*) Those experiences could support a finding that Dr. Leo has knowledge and expertise concerning *best* practices for interrogation, but would not necessarily establish that he is an expert concerning *actual* national police practices in 1988. Dr. Leo is free to opine that lengthy interrogations pose a false-confession risk factor, but—because he does not qualify as

---

above, Dr. Leo's report is not, in fact, as limited in scope as Mr. Brown's description purports it to be.

an expert on policing practices more generally—he may not testify that national police practices support that opinion.

Defendants next take issue with Dr. Leo's opinion that the Detective Defendants made a "rush to judgment" in this case. Defendants argue that this testimony should be barred because Dr. Leo fails to cite any national police practices that would require the detectives "to conduct any follow-up investigation to test or attempt to corroborate the accuracy of their theory about Mr. Brown's involvement." (Defs.' Leo Br. at 4 (citing Leo Report at 24).) Defendants are correct that Dr. Leo may not testify to legal standards; that is, he may not assert that police had a legal obligation, constitutional or otherwise, to seek additional evidence that would corroborate Mr. Brown's involvement in the arson. The court also agrees with Defendants that Dr. Leo may not testify regarding the Detective Defendants' states of mind, and thus may not opine, for example, that the detectives conducted Brown's interrogation based on "their gut hunches and speculations." (Defs.' Leo Reply [392] at 4 (citing Leo Report at 25).) At most, the court will allow Dr. Leo to explain that the haste of the investigation (clearing a double homicide arson in one day) is consistent with a "rush to judgment," which he identifies as a factor that increases the risk of eliciting false compliance and a false confession. (*See* Leo Report at 24.)

Though he may not testify about national police practices, Dr. Leo's testimony about how certain practices are likely to produce false confessions may be helpful to jurors, many of whom may find the notion of a false confession counterintuitive. The Seventh Circuit has recognized that false confession expert testimony can be helpful to "let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fits the facts of the case being tried." *See United States v. Hall*, 93 F.3d 1337, 1345 (7th Cir. 1996). And several district courts have admitted false-confession expert testimony. *See, e.g., Andersen v. City of Chicago*, No. 16 C 1963, 2020 WL 1848081, at *2 (N.D. Ill. Apr. 13, 2020) (finding false-confession expert Dr. Saul M. Kassin qualified to speak on false confession risk factors, but not matters beyond that expertise, such as DNA results); *Harris*, 2017 WL 2436316, at *16 ("Dr. Leo's

expert testimony regarding false confessions will be helpful to explain why false confessions happen and how to recognize false confessions, thus allowing the jury to use this framework to apply to the facts of this case."); *Caine*, 2013 WL 1966381, at *3 ("Dr. Leo will be permitted to testify to various factors that can cause false confessions, and to their presence in this case."); *see also Hurt v. Vantlin*, No. 3:14-cv-00092-JMS-MPB, 2019 WL 8267074, at *4–5 (S.D. Ind. Sept. 26, 2019) (finding that a false-confessions expert may opine on "the circumstances under which police interrogation tactics are likely to produce false confessions").

### 2. Credibility Assessments and Reliability of Witness's Confessions

Defendants argue that Dr. Leo's report goes beyond assuming the veracity of disputed facts and instead seeks to persuade the jury that Mr. Brown's version of the facts is more credible. (Defs.' Leo Reply at 5.) In support, Defendants note remarks throughout Dr. Leo's report observing that Mr. Brown's evidence is "reliable" while Defendants' bear "indicia of unreliability." (*See* Leo Report at 2–3, 23–40, 33–36, 38–39.) Plaintiff insists, in response, that Dr. Leo's testimony is not so much an effort to discredit Defendants directly as an effort to use social science research literature to demonstrate that Defendants' factual account lacks "face validity." Specifically, he contends that their account does not "provide a reasonable or coherent explanation of how and why Mr. Brown would have falsely confessed to participating in a murder he did not commit." (Pl.'s Leo Resp. at 6 (citing Leo Report at 38 ¶ 2).)

The court agrees with Defendants: As explained above, Dr. Leo may testify regarding the hallmark features of false confessions and how to identify them, but he may not opine on the reliability of other witnesses (including Mr. Brown) or the deceased investigators' state of mind. This means Dr. Leo will not be permitted to testify to many of the statements he made in his report. For example, Dr. Leo may not offer testimony like this to the jury:

> The detectives' unwavering presumption of Mr. Brown's guilt and confession-driven interrogation led to investigative bias, behavioral confirmation bias and tunnel vision: They not only refused to accept Mr. Brown's protestations of innocence, but also saw his later interrogation-induced compliance and incriminating statements as corroboration of their belief in his guilt, as opposed to

the product of their own guilt-presumptive and physically and psychologically coercive interrogation techniques.

(Leo Report at 25.)

Plaintiff urges that Dr. Leo's use of the words "reliability" and "face validity" instead of "credibility" somehow immunizes his testimony from the charge that it improperly usurps the role of the jury. Not so. *See Davis v. Duran*, 277 F.R.D. 362, 370 (N.D. Ill. 2011) ("It is a fundamental premise of our trial system that 'determining the weight and credibility of witness testimony . . . belongs to the jury who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.'") (quoting *United States v. Scheffer*, 523 U.S. 303, 313 (1998)). Dr. Leo may not testify or opine about the reliability or unreliability of any of the confessions or other evidence, or about whether the parties' various versions of the events in this case are credible. This additionally means he may not testify as to how the confessions of Mr. Brown, or two persons also convicted of the arson (Michael Harper and Geronia Ford) compare with the other evidence of the crime. *See Caine*, 2013 WL 1966381, at *3.

### 3. Ultimate-Issue Determinations

Defendants next argue that Dr. Leo's report impermissibly tells the jury what conclusion it should reach on ultimate issues in this case: whether the Defendants coerced Mr. Brown and fabricated his inculpatory statement. Plaintiff again pushes back on this characterization, and contends that Dr. Leo's testimony is not an opinion that Mr. Brown is innocent, but rather an explanation that Mr. Brown's version of events has features that social science researchers have found to be associated with false confessions. This summary is not entirely accurate. The court concludes that several statements in Dr. Leo's report do appear to be statements about legal standards—matters on which the court will instruct the jury. Other statements are conclusions about the Defendants' mental states. Such opinions are inadmissible, including, for example, the following:

- "Because they presumed Arthur Brown's guilt from the start, the detectives developed a theory to fit Arthur Brown's involvement, [and] coerced him into signing a statement to fit their theory." (Leo Report at 24.)

- "In coercively pressuring and persuading Mr. Brown to sign the prosecutor-written and police-edited statement, the detectives sought not to objectively or independently investigate or test the truth, but rather to have Mr. Brown repeat back their preconceived belief about what they assumed and speculated must have led to the Magic Video store fire. The detectives were creating, not gathering, evidence against Mr. Brown." (*Id.* at 25.)

- "In my professional opinion, the lengthy interrogation described by Arthur Brown was psychologically coercive . . ." (*Id.* at 28.)

- "There is no reliable evidence linking Mr. Brown to the Magic Video Store fire other than the entirely prosecutor-written and police-edited statement that he signed after a lengthy interrogation that he describes as extremely physically and psychologically coercive." (*Id.* at 30.)

- "These features indicate that Mr. Brown's statement was more likely, if not certainly, the involuntary product of coercive and improper police interrogation methods and pressures than a reliable or trustworthy piece of evidence of criminal guilt." (*Id.*)

Dr. Leo's opinion about whether Mr. Brown's confession was, in fact, false and fabricated invades the province of the jury. Here, as was the case in *Andersen*, 2020 WL 1848081, at *3, "whether [Mr. Brown] is innocent is a dispute at the heart of this case and is one that must be left to the jury." Opinions like those listed above, which effectively usurp the jury's function, will not be admitted. *Good Shepherd Manor Found., Inc.*, 323 F.3d at 564 (citing *United States v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996)); *see also United States v. Neushwander*, No. 15 CR 542-1, 2017 WL 4572212, at *4 (N.D.Ill. Oct. 14, 2017) ("When an expert attempts to impinge on the role of the jury, the testimony should be barred.")

### 4. "Error Insertion Trick"

Defendants argue that Dr. Leo should be barred from presenting any opinions regarding the "Error Insertion Trick," which he describes as an "interrogation scripting technique . . . in which the interrogator writes out the suspect's confession statement, intentionally inserts minor factual or grammatical errors, and then has the suspect correct and initial these errors." (Leo Report at 16.) According to Dr. Leo, the purpose of the error insertion trick is two-fold. First, it "create[s]

the impression of validating a confession's voluntariness and accuracy," and, second, it appears to confirm the confessor's guilt by making the document look as though it demonstrates his personal knowledge of the facts of the crime. (*Id.* at 34.) Mr. Brown responds that Dr. Leo may opine on this technique because it is one example of the dangers inherent in police interrogation scripting.

The court disagrees. True, this testimony would satisfy the first Rule 702 factor: Dr. Leo has specialized knowledge that would help the jury understand that, if Detective Campbell deliberately introduced errors into a fabricated statement, Mr. Brown's edits would create the impression of validating the statement's voluntariness and accuracy. (Pl.'s Leo Resp. at 10.) The three remaining factors of Rule 702—that the testimony is based on sufficient acts or data, that it is the product of reliable principles and methods, and that the expert has reliably applied the principles and methods to the facts—are more problematic. To support his testimony that the error-insertion trick is an interrogation scripting technique, Dr. Leo cites to two pages of a book he has written. (Leo Report at 16 n. 26.) Dr. Leo does not say how prevalent use of this trick is on those pages, which discuss two anecdotal accounts of its use. RICHARD A. LEO, POLICE INTERROGATION AND AMERICAN JUSTICE (2008) at 175–76. He otherwise cites one page of another scholar's work, which includes a single anecdote in which a prosecutor explained how he learned of the strategic value of inserting incorrect information on minor points in statements. (Leo Report at 16 n. 26 (citing MARK GODSEY, BLIND JUSTICE: A FORMER PROSECUTOR EXPOSES THE PSYCHOLOGY AND POLITICS OF WRONGFUL CONVICTION (2017) at 144).) Dr. Leo provides no data in his report or deposition on how widespread or well known a practice the error-insertion trick was or is among police officers. He testified that he is unaware whether Campbell or Whitehouse ever received any training on the error-insertion trick. And he acknowledged that there is no factual basis to suggest that the technique was taught to any police officers in Chicago in 1988 or before. (Dep. of Richard Leo ("Leo Dep."), Ex. 2 to Defs.' Leo Br. [368-2] at 308:24–310:24.) There are no facts or data supporting an inference that the detectives in this case were aware of

the error-insertion trick; alone, the existence of corrected errors on the statement is not enough (errors could, after all, have been accidental rather than intentional). Consequently, assuming that Dr. Leo (or Dr. Kassin, whose scholarship Dr. Leo cites for support) has used reliable methodologies to assert the existence of the error-insertion trick, the court does not find that Dr. Leo has reliably applied those methodologies to the facts of this case, as required by Rule 702.

The court notes, further, that Rule 403 militates in favor of exclusion of this evidence: any probative value of Dr. Leo's testimony on the error-insertion trick is substantially outweighed by the risk that such testimony would confuse and mislead the jury into believing that, because there are corrected errors in the statement, those errors and corrections are more likely the result of deliberate insertion than earnest efforts to achieve accuracy. The fact that Detective Campbell is deceased and therefore unable to speak for himself in this proceeding renders this testimony all the more prejudicial. Dr. Leo's "error insertion" testimony will be barred.

### D. Summary

Dr. Leo is barred from testifying to Opinions 2, 3, 4 and 8. He may testify to his remaining opinions in accordance with the limitations set forth above.

## IV. Defense Expert Dr. Michael Welner

### A. Dr. Welner's Qualifications

Defendants have retained as an expert Dr. Michael Welner, a board-certified forensic psychiatrist with expertise in the study of disputed confessions. (Curriculum Vitae ("Welner CV"), Expert Report of Michael Welner ("Welner Report"), Ex. B to Pl.'s Mot. to Bar Defs.' Expert ("Pl.'s Welner Br.") [366-2] at 1.) Dr. Welner holds an undergraduate degree in biology and a medical degree from the University of Miami, and he completed postdoctoral training at the Beth Israel Medical Center in New York City and at the University of Pennsylvania. (Welner CV at 27; Dep. of Michael Welner ("Welner Dep."), Ex. C to Pl.'s Welner Br. [366-3] at 59:12–17.) He has interviewed and assessed hundreds of criminal defendants about their choice to confess, has taught and lectured on the assessment of disputed confessions, and has qualified as an expert

in courts across the country in cases relating to disputed confessions. (*See generally* Welner CV.) Welner estimated at his deposition that he had reviewed around 70 disputed-confession cases in the past 20 years. (Welner Dep. at 72:16–74:12.) Mr. Brown does not contend that Dr. Welner is not qualified to testify at all but argues that Dr. Welner's "core opinion demonstrates that his testimony falls outside of the bounds of Rule 702." (Pl.'s Welner Br. at 4.)

### B. Dr. Welner's Expert Opinions

Dr. Welner's report offers opinions on five broad issues: (1) how competing accounts of the circumstances surrounding Mr. Brown's self-incriminating statements relate to "what has been demonstrated and is known about false confessions"; (2) what empirical research "informs the understanding of false confessions"; (3) how Mr. Brown's account of the conduct of Detective Fine "speak[s] to interrogation techniques implicated in false confessions"; (4) what opinions of Dr. Leo have not been demonstrated with a valid methodology; and (5) what assertions made by Dr. Leo are factually incorrect or inconsistent with published research on false confessions. (Welner Report at 2–3.)

With respect to the first topic, Dr. Welner opines that, because there is a dispute over whether Mr. Brown is actually innocent, false-confession research "may be entirely irrelevant to this case." (*Id*. at 13.) If one accepts Mr. Brown's version of events, he observes, then Mr. Brown did not confess at all, so research regarding statements by an actually innocent person who says he is guilty is not relevant. Alternatively, if Defendants' account is correct, then Mr. Brown gave a truthful confession after being presented with evidence of his guilt. And Dr. Welner asserts that there is research showing that inmates cite perception of evidence against them as a common prompt for their confessions. (*Id*.)

On the issue of empirical research involving confessions, Dr. Welner discusses the work of Dr. Gisli H. Gudjonsson, a forensic psychologist and ex-police officer whose research includes inquiries into whether certain personal qualities (such as "suggestibility") may make a person more likely to falsely confess during an interrogation. (*Id*. at 16.) "Apart from what Dr. Gudjonsson

has studied," Dr. Welner states, "systematic research that informs false confessions with data that can validly apply to case assessment such as this is admittedly limited." (*Id*.) That portion of his report also includes the following bolded and underlined statement: "There is no research that informs or delineates the nature and impact of interrogation practices that lead to false confessions in major crimes for which suspects would face significant penalties." (*Id*. at 17.) He goes on to critique Dr. Leo's opinion as unsupported by any such research.

Dr. Welner's third opinion relates to interrogation techniques. Mr. Brown has testified that Detective Fine choked him to the point of unconsciousness and repeatedly slammed him into a wall. Dr. Welner appears to understand Plaintiff's position to be that such a physical assault is a "technique" designed to induce a confession; not surprisingly, Dr. Welner contends that physically abusive conduct would not constitute a "technique" and is in fact "the absence of technique." (*Id*. at 25.) Apart from his insistence that physical abuse is not an authorized practice, Dr. Weiner has not addressed the question whether unauthorized behavior of an officer who engages in such abuse or chokes a suspect might be likely to generate a false confession.

Dr. Welner's fourth and fifth opinions take aim at Dr. Leo's testimony: Dr. Welner asserts that the value of Dr. Leo's testimony is limited because no empirical research exists on what kinds of interrogation techniques, methods, practices, or effects are associated with, increase the risk of, and are known to cause false confessions. (*Id*. at 25–26.) He contends, further, that Dr. Leo's report includes statements that are "false, highly misleading, irrelevant to the case at hand, or otherwise beyond standards of practices in this area" (*id*. at 35) and goes on to list what he believes are several examples of methodological shortcomings in Dr. Leo's report.

### C. Admissibility

Plaintiff argues that all of Dr. Welner's opinions should be excluded because he has opined that there is no relevant specialized knowledge that could apply to Mr. Brown's case [366]. In the alternative, Plaintiff argues that Dr. Welner should be barred from testifying beyond the

scope of his expertise, and so should not be allowed to testify regarding police practices, legal proceedings, witness credibility, or any party's intent.

### 1. Sufficient Facts or Data

Plaintiff argues that the first three of Dr. Welner's opinions reject the application of false confession science or research to Mr. Brown's case and thus, by Dr. Welner's own admission, his opinions are not informed by sufficient facts or data. Defendants respond that Plaintiff distorts Dr. Welner's report: as they understand Dr. Welner, he has not said that false confession research does not exist, but instead that empirical research on the subject is limited. This limitation, Dr. Welner opines, is significant because research showing associations between risk factors and false confessions do not support the firm conclusions that one could draw from the results of robust empirical research. (Defs.' Welner Resp. [386] at 2–3; Welner Report at 15–20.)

That Dr. Welner is critical of Dr. Leo's methodology does not require the conclusion that his own opinion is inadmissible. Like Dr. Leo's opinions, many of Dr. Welner's opinions are informed by his professional experiences. Dr. Welner opines that, if the fact finder credits Mr. Brown's version of events, this case does not include a false confession (because Mr. Brown insists he never made a statement at all), so false confession research is of limited value. Dr. Welner's own experience and research could assist the jury in understanding the Defendants' version of disputed facts. Experts often disagree. The difference in the approaches adopted by Dr. Leo and Dr. Welner does not render either expert's testimony inadmissible; both sides are entitled to present their expert's perspective to the jury.

### 2. Reliability of Principles and Methods

Plaintiff next argues that Dr. Welner's opinions are not the product of reliable principles and methods, but rather amount to "speculative, abstract statements that are nothing more than bottom-line conclusions." (Pl.'s Welner Br. at 6–7.) Mr. Brown takes particular issue with two aspects of Dr. Welner's opinion: his statement that false confessions to murder in the context of police interrogations are rare, and his discussion of various pressures and incentives that motivate

a suspect to confess or to refuse to do so. (*Id.* at 7.) Because the court "must look at each of the conclusions [an expert] draws individually to see if he has the adequate education, skill, and training to reach them," the court addresses these points in turn. *Rivera v. Guevara*, No. 12 C 04428, 2018 WL 3093339, at *6 (N.D. Ill. June 22, 2018) (quoting *Hall*, 840 F.3d at 926).

Regarding the first matter, Mr. Brown argues that Dr. Welner is not qualified to offer his opinion that false confessions in murder and serious crimes are rare. Dr. Welner has not explained his methodology for reaching this conclusion, and he has not performed research on the prevalence of disputed confessions for serious crimes. Lack of research alone may not doom Dr. Welner's testimony; an expert may be qualified to testify based on experience—but only if the expert "explains how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Burgs v. Pearson*, No. 13 C 1988, 2014 WL 12775088, at *4 (N.D. Ill. Jan. 31, 2014); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, experience, training, or education.'"); *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) ("Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience."). In this case, the court will sustain an objection to Dr. Welner's testimony about the rarity of false confessions unless Defendants are able to lay the foundation for a conclusion that Dr. Welner's experience sufficiently qualifies him to hold such a view.[6]

As to the second matter, Mr. Brown contends that Dr. Welner is not qualified to opine on why guilty people are incentivized to confess, while innocent people are not. Dr. Welner opines

---

[6]    Just as Dr. Welner may not make naked assertions about the rarity of false confessions for serious crimes, Dr. Leo is not permitted to testify that the established number of false confessions to murder are the "tip of a much larger iceberg" of incidents and have been subject to a "dramatic undercount," unless he is able to identify the methodological basis for that claim. (Leo Report at 5.)

that, if one accepts Defendants' version of the facts, Mr. Brown's voluntary confession aligns with forensic psychology research because "[c]onfessions routinely follow when suspects are confronted with what they believe to be powerful evidence of their guilt." (Welner Report at 13.) He goes on to remark that in the research of truthful confessions—applicable here, in Defendants' view, because Mr. Brown was in fact guilty—inmates most often cite "perception of proof" as a prompt for admitting their guilt. (*Id.* (citing Gisli H. Gudjonsson & Jon F. Sigurdsson, *The Gudjonsson Confession Questionnaire-Revised (GCQ-R) factor structure and its relationship with personality,* 27 PERSONALITY AND INDIVIDUAL DIFFERENCES 5 (1999) at 953–68).) Because Dr. Welner has explained the principle underlying his opinion and applied it to the facts of this case, he may offer this testimony at trial.

Later in his report, however, Dr. Welner does not draw a clear line from his experience to the conclusions he draws. Take, for example, the following paragraph:

> There are numerous reasons why someone may conceal or even distort facts known only to those with guilty knowledge. In a crime for which there is already an arrested perpetrator (in this case there were Mr. Harper and Mr. Ford), less detail makes it easier to blame someone else as a prime mover in the crime. Under such circumstances, the confessing suspect is invested in revealing as little as possible, minimizing detail and convincing an interviewer that the debrief is complete. However, discrepancies with facts do not render that person innocent.

(*Id.* at 33.) Dr. Welner offers a theory for a person's decision to conceal or distort details of a confession, but he does not explain the methodology or principle that supports such a theory. Defendants argue that Dr. Welner's training and experience in interviewing inmates who have confessed qualifies him to offer such an opinion. While Defendants are correct that such experience may support the conclusion that Dr. Welner qualifies as an expert, that experience alone is insufficient to render his testimony admissible: he must also explain the methodologies that support the specific opinions he proffers. If there is a methodology behind Dr. Welner's conclusions, he has not clearly articulated it. It is unclear, for example, if Dr. Welner bases his opinion on interviews he conducted with inmates and, if so, whether those inmates told him that they had concealed or distorted details in the confessions to mitigate their culpability. He does

not say whether he compared statements given by arrestees with the evidence later introduced at trial; nor does he explain whether he looked in particular at statements given by persons who knew there were other suspects in custody. Without a more adequate foundation, Dr Welner he will not be permitted to offer an opinion like this at trial.

### 3. Rebuttal Testimony

Mr. Brown argues that the sole purpose of Dr. Welner's testimony is to dispute the admissibility of Dr. Leo's opinions. Such a purpose is improper, as the admissibility of Dr. Leo's opinions is for this court, not the jury, to decide. *See Daubert*, 509 U.S. at 595; *Kumho*, 526 U.S. at 147; *Masters v. Hesston Corp.*, 291 F.3d 985, 991 (7th Cir. 2002) ("[D]istrict judges play a 'gatekeeping' role in maintaining scientific expert testimony within proper bounds. *Daubert* requires judges to determine that scientific testimony under Federal Rule of Evidence 702 is both relevant and reliable."). In response to Questions 2, 4, and 5, Dr. Welner critiques the "empirical research foundation that informs the understanding of false confessions," specifically challenging the quality, sufficiency, and reliability of the data Dr. Leo relies on in this field. (Welner Report at 15–20 (Opinion 2), 25–35 (Opinion 4), 35–42 (Opinion 5).) For a few examples: Dr. Welner criticizes Dr. Leo for inflating the extent that experts have corroborated his research by using the word "researchers" instead of "I" when citing to his own work. (*Id.* at 29, 37.) Dr. Welner dismisses a citation in Dr. Leo's discussion of false evidence ploys as "a review article co-authored by Dr. Leo that cites further to polemics he has published advocating against what he terms false evidence ploys." (*Id.* at 26–27.) Dr. Welner contends that Dr. Leo has "comingle[d] aspirations he has about justice policy with what he asserts are 'scientific' understandings of what causes false confessions." (*Id.* at 27.) He criticizes Dr. Leo for "touting empirical research that does not exist and never happened." (*Id.* at 30.) And Dr. Welner ends his expert report with the following remark: "Dr. Leo uses the platform of his advocacy writing in psychological literature as a substitute for the scientific study of a boutique area that he long ago acknowledged was sorely in

29

need of proper methodological rigor in order to inform courts about the points he raises in the Brown case." (*Id.* at 42.)

Dr. Welner's rebuttal opinions in this case are similar to those he offered in *Chatman v. City of Chicago*, No. 14 C 2945, 2018 WL 11426158, at *4 (N.D. Ill. Oct. 30, 2018), and this court is inclined to adopt an approach similar to the one Judge Lee took there:  Dr. Welner may offer his critiques of Dr. Leo's methodology at trial based on his own professional experience as a forensic psychiatrist.  That means Dr. Welner may opine that Dr. Leo's research does not accord with what he has experienced in his own line of work—that is, that Dr. Leo's theory does not align with practice.  *See Angelopoulos v. Keystone Orthopedic Specialists, S.C.*, No. 12 CV 5836, 2017 WL 2178504, at *10 (N.D. Ill. May 16, 2017) (while an expert may not opine that an opposing expert's testimony "will not help the trier of fact to determine the facts at issue" under *Daubert*, an opposing expert "remains free to criticize [an opposing expert's] methodology, factual assumptions, and conclusions").  He may not, however, opine that Dr. Leo is a charlatan and his scholarship "hogwash."  *Chatman*, 2018 WL 11426158, at *4.  Dr. Welner's critiques must be informed by his experience as a forensic psychiatrist; to the extent his opinions of Dr. Leo are not supported by that experience, his critiques may be explored in defense counsel's cross-examination of Dr. Leo rather than in Dr. Welner's expert testimony.

### D. Scope of Testimony

As discussed above, Dr. Welner's testimony is only admissible to the extent that it falls within the scope of his expertise.  On this point, further remarks are necessary.

#### 1. Police Practices

Plaintiff argues that Dr. Welner is not qualified to opine on police practices and that his opinions related to police practices are "thinly veiled credibility assessments."  (Pl.'s Welner Br. at 10.)  Defendants respond that Dr. Welner does not opine on police practices generally, but rather points to facts (some of which are disputed) that he says Dr. Leo dismissed.  The court agrees with Plaintiff that discussing the motivations of law enforcement officials is beyond

Dr. Welner's expertise. Dr. Welner lacks training in law enforcement interrogation techniques and does not otherwise purport to have expertise on that subject. Accordingly, Dr. Welner is barred from testifying to the Detective Defendant' motivations for interrogating Mr. Brown. He may not, for example, offer the following testimony:

> There is, moreover, no history of animosity or conflict between Arthur Brown and any member of the Chicago Police Department to explain why any of the civil defendants, or anyone they answer to, would shoehorn Arthur Brown into their self-incriminating statements as an innocent man. The only reason police had interest in Arthur Brown was because of available evidence—his having been specifically identified as an accomplice by Michael Harper and Geronia Ford.

(Welner Report at 15.) Dr. Welner's qualifications do not provide him a foundation to opine on the motivations of the investigators in this case.

Other aspects of Dr. Welner's testimony concerning police interrogations is, however, admissible. To rebut Dr. Leo's opinion, Dr. Welner may testify as to his experience in interviewing individuals who have confessed to crimes and examining and studying the nature and content of their confessions, the manner in which those inmates inculpated themselves, and the motivations and pressures that led them to decide to confess. He may observe that the content of Mr. Brown's statement shifts primary responsibility to other actors and minimizes Mr. Brown's role in the crime. (Welner Report at 22.)

### 2. Legal Proceedings

Like the experts discussed above, Dr. Welner will be barred from offering opinion testimony about Mr. Brown's previous legal proceedings, including opinions about the strategic decisions made by prosecutors during Mr. Brown's trials and the significance of various judicial findings. For the sake of clarity, the court offers the following examples of his opinions concerning the procedural circumstances of Mr. Brown's conviction and exoneration—opinions that appear to exceed the scope of his expertise :

- In 2017, a judge granted a new trial on the basis of his attorneys' ineffective assistance and improper prosecutor argument at his 2008 retrial, as opposed to evidence of a coerced or false confession, or of Mr. Brown's innocence. The state elected not to retry him in 2017, but decision-makers such as ASA Eric

Sussman have since testified that decision was based on an unwillingness to allocate the human and financial resources of an overtaxed Chicago State's Attorney's Office to a new trial of a defendant who had already served nearly thirty years for murder. (Welner Report at 11.)

- Prosecutors have no plan to charge Mr. Bell, and to this day believe his claims to be non-credible. Mr. Brown testified in 2020 that he did not know Mr. Bell, let alone buy any drugs from him or anyone. And while his attorneys testified that they would never have presented testimony they knew to have been false, Mr. Brown, who knew it [to be] false, expressed indifference to the specter of his using a false claim to attempt to overturn his conviction. (*Id.* at 12.)

- Notwithstanding that the court's 2017 decision to vacate the conviction was not about the merits of Mr. Bell's claim, Mr. Brown's attorney, Jamal Muhammad, wrote to Mr. Bell, "In large part because of you, Mr. Brown has been freed." Indeed, the 2008 retrial would not have happened were Bell not to have presented himself as solely responsible for the arson murders. (*Id.*)

Such statements fall beyond Dr. Welner's expertise and are likely to "confuse or distract the jury." *See Sinclair*, 74 F.3d at 757. Accordingly, they are inadmissible at trial.

### 3. Credibility and Intent

All parties recognize that determining the weight and credibility of witness testimony is the exclusive province of the jury. *See Andersen*, 454 F. Supp. at 816 (quoting *Goodwin v. MTD Prod., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000)). Experts are not permitted to offer opinions as to the believability or truthfulness of that testimony. *Jordan v. City of Chicago*, No. 08 C 6902, 2012 WL 88158, at *4 (N.D. Ill. Jan. 11, 2012) (quoting *United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999); *Goodwin*, 232 F.3d at 609 ("credibility questions are within the province of the trier of fact"). Expert testimony regarding a person's intent or state of mind is similarly off limits: "An expert's assertions about another person's intent are neither helpful nor admissible under Rule 702." *United States v. Schultz*, No. 14-CR-467-3, 2016 WL 7409911, at *3 (N.D. Ill. Dec. 22, 2016) (collecting authority).

On this issue, the following directions are exemplary and not exhaustive. Dr. Welner may testify that "[s]tandard practice in forensic mental health is to assign greater value to accounts chronologically closest to the event." (Welner Report at 22, 22 n.15.) He may testify that forensic psychiatrists have posited multiple explanations for how an invested litigant's account evolves

overtime. (*Id.* at 15.) He may testify that, if one accepts Defendants' version of the facts, the detectives presented Mr. Brown with an opportunity to issue a statement mitigating his culpability following Harper and Ford's statements. (*Id.*) He can remark that, in his opinion, the statement Mr. Brown signed minimized his culpability as compared to Harper's. (*Id.*) He may note that nothing in Mr. Brown's statement speaks to his relationship with the landlord of the strip mall. (*Id.* at 23.)

But, as noted above, in light of Dr. Welner's lack of expertise in interrogation techniques and police training, he may not testify that Mr. Brown's testimony contradicts any such training. (*Id.* at 22.) He also may not testify that "Mr. Brown's criminal history would understandably have led him to consider that the criminal justice system would treat him leniently." (*Id.* at 23.)

Significantly, Dr. Welner also may not testify to the credibility of James Bell. On page 12 of his report, Dr. Welner discusses how Mr. Bell played a role in Mr. Brown's release from prison by testifying at Mr. Brown's 2003 post-conviction hearing and retrial in 2008. In his report, Dr. Welner goes on to recount Mr. Bell's phone calls from prison. Yet it is not at all clear how the facts surrounding Bell's conduct support Dr. Welner's opinion, as a forensic psychiatrist, about Mr. Brown's disputed confession (which long predated Bell's involvement). Instead, Dr. Welner's testimony regarding Mr. Bell amounts to little more than inadmissible parroting of Defendants' case. *Brownlee*, 744 F.3d at 482; *Goldberg*, 755 F.3d at 461. Defendants claim that Dr. Welner can discuss Bell's statements as evidence that Dr. Leo should have considered in his analysis (Defs.' Welner Resp. at 12); Defendants' position in this regard may be explored during Dr. Leo's cross-examination, but it is not an appropriate subject of Dr. Welner's own expert testimony.

What the court has discussed here are relevant examples. The general principle is clear: Dr. Welner may only offer his expert opinion when those opinions specifically relate to his expertise in forensic psychiatry. This will require that he refrain from offering opinions on credibility of witnesses or their mental state—which may prove difficult for him. So long as he

complies with these limitations, his testimony will be admissible at trial, where it can be subject to vigorous cross-examination. *See Daubert*, 509 U.S. at 596; *Chatman*, 2018 WL 11426158, at *3.

### E. Summary

Dr. Welner is barred from testifying to substantial portions of each of his opinions, as detailed above. He may offer his opinion on the general markers of false or true confessions in so far as those opinions are based on his experience and expertise as a forensic psychiatrist. While his discussion of how perceptions of proof can incentivize an individual to confess may help the jury, his inflammatory remarks about Dr. Leo and his colleagues will not. Should Dr. Welner stray from basing his opinion on his professional expertise—as is often the case in his written report—the court will sustain objections to his testimony at trial.

## CONCLUSION

In accordance with the discussion above, Defendants' motions to bar or limit the testimony of Dr. Kavanaugh, Mr. Waller, and Dr. Leo are granted in part and denied in part. Plaintiff's motion to bar or limit the testimony of Dr. Welner is denied in part and granted in part.

ENTER:

Dated: March 17, 2023

_____
REBECCA R. PALLMEYER
United States District Judge

34