## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ARTHUR BROWN,

      Plaintiff,

      v.

CITY OF CHICAGO, et al.,

      Defendants.

Case No. 18 CV 7064

Hon. Rebecca R. Pallmeyer

Magistrate Judge Maria Valdez

## ARTHUR BROWN'S MOTION TO CLARIFY
## THE SIGNIFICANCE OF EYEWITNESS REPORTS

This Court has heard much about Joyce "Honey" Owens in various motions in this case. But, largely due to failing of the undersigned, the Court has not had the full context in which to evaluate the significance of the information that Ms. Owens provided to the police. For example, we have not heretofore explained to the Court that Joyce Owens named another eyewitness, Bobbie Johnson, whom the police then interviewed, and who corroborated the account that this fire took place in and around drug deals conducted by Michael Harper in his video store—a completely different scenario than laid out in Mr. Brown's coerced and fabricated confession. As this Court stated in its most recent ruling, the undersigned also has not made clear to the Court the purpose for which this evidence is offered. (Dkt. 411 at 17-18.) This filing attempts to provide that missing context and information.

## BACKGROUND

As this Court is well aware, this case began with a fire that occurred at approximately 5:00 a.m. on May 28, 1988. The investigative files of this arson/murder recount interviews of three

eyewitnesses: Sid Malone, Joyce "Honey" Owens, and Bobbie Johnson. Sid Malone was the only eyewitness to testify at Mr. Brown's 1990 criminal trial.

Mr. Malone testified that shortly before the fire, he saw two men walk toward the Magic video store, and one of them carried a gas can. (April 18, 1990 Trial Tr., at 58:11-58:21, attached hereto as Ex. 1.) He did not recognize either of those individuals. This happened somewhere around 5:00 a.m. (*Id.* at 61:17-22.) Mr. Malone was interviewed on the scene by CPD beat patrol officers. (PX-1, at p.4, attached hereto as Ex. 2.) Nonetheless, Defendant Detectives Fine and Kutz, the lead homicide detectives on the case, later contacted Mr. Malone and interviewed him at Area 1. (*Id.* at p.8.)

Joyce "Honey" Owens was interviewed by Detectives Micek and Scheithauer on May 29, 1988. The General Progress Report (or "GPR," a CPD form used to take contemporaneous notes of interviews) of Ms. Owens's interview is PX-7, attached hereto as Ex. 3. A typed account of that interview addressed to Sgt. Sykes and Defendant Detective Campbell, the lead investigator of the arson, is PX-6, and attached as Exhibit 4.[1]

Ms. Owens stated that in the early morning hours of May 28, 1988, she was with Bobbie Johnson, Lonnie Wallace, Daryl LNU, and some other people in Mr. Johnson's store a few doors

---

[1] This typed report was entered into the investigative file on May 31, 1988, weeks before Mr. Brown was indicted. (PX-30 (a copy of the Bomb & Arson Investigative File Inventory) attached hereto as Ex. 5; Micek Dep. at 141:8-14, attached hereto as Ex. 6 (indicating that the line reference on the inventory corresponds with the typewritten report summarizing Ms. Owens's interview).). Detective Micek testified that the intended audience for this report were the investigating detectives, who were Campbell, Fine and Kutz. (Micek Dep. at 139:9-11 (a hard copy of the Owens memo "would be put in Joe Campbell's mailbox and Sergeant Sykes' mailbox"); *id.* at 139:22-24, 140:1-4 (confirming that the memo was "submitted for inclusion in the bomb and arson investigative file so it would be available to *everybody*, the prosecutors and the criminal defense attorneys who would be able to utilize it however they wanted to in the criminal proceedings"); *id.* at 123:9-13 (Q: Let me ask you this: did you write down the details that you thought *were most important for the detectives assigned to the case*, primarily assigned to this case, to know about what Miss Owens said? A: Yes.).)

down from Magic Video. (Ex. 4, PX-6.) She said that they were using cocaine and that Mr. Johnson beeped Michael Harper to purchase cocaine from Harper. (*Id.*) Bobbie Johnson, Lonnie Wallace ("Boo"), and Daryl went into the video store while Ms. Owens stayed outside. Approximately 15 minutes later, all four men came out of the store and ran in different directions. (*Id.*) Ms. Owens stated that she was willing to take a polygraph examination to confirm the truthfulness of her account. She provided the police with her contact information and told them when best to contact her. (*Id.*) The typed report states that Ms. Owens "has given good information on previous occasions." (*Id.*)

Importantly, police officers (though not Defendant Detectives) did follow up on information provided by Ms. Owens, which led them to a second eyewitness: Bobbie Johnson. The police interviewed Mr. Johnson on May 29, 1988. (PX-5, attached hereto as Ex. 7). The Violent Crimes investigative file contains three reports related to Mr. Johnson: a GPR that describes the initial contacts with Mr. Johnson (*id.*); a GPR providing notes of the officers' interview of Mr. Johnson (PX-4, attached hereto as Ex. 8); and a typed report of Mr. Johnson's interview (PX-3, attached hereto as Ex. 9). The initial GPR indicates that the officers contacted Mr. Johnson based on information provided by Joyce Owens. (Ex. 7, PX-5 at CITY-AB-001502). When contacted at approximately 9:00 a.m. on May 29, Mr. Johnson denied having any pertinent information. (Ex. 9, PX-3 at p.2; Ex. 7, PX-5 at CITY-AB-001502). At approximately 5:00 p.m. on May 29, 1988, Mr. Johnson called the police officer with whom he had spoken to say he was willing to tell the truth. (*Id.*) The police picked him up and interviewed him. (Ex. 9, PX-3 at p. 2).

Mr. Johnson confirms Ms. Owens' testimony that drug activity preceded the fire during the precise time that Mr. Brown was supposed to be setting this fire. Mr. Johnson said that he was

at his store a few doors down from Magic Video store in the early morning hours of May 28, 1988. He said that at approximately 4:00 a.m., someone came to the door and asked where he could get cocaine. Mr. Johnson went to the video store and called Michael Harper who was "cleaning out the store." (*Id.*) According to Mr. Johnson, Michael Harper provided cocaine in exchange for fifty dollars. There is no mention of anyone else being at the store. (*Id.*) The customer returned again about 25-30 minutes later, and Mr. Johnson returned to the store and "went through the same routine." Michael Harper was still cleaning out the store. Later, Mr. Johnson saw Michael Harper and his cousin carry gas cans into the store. (*Id.*) Mr. Johnson said that the customer came a third time for more cocaine, and Mr. Johnson again called Michael Harper but got no response even though he could see Harper was still in the store. (*Id.*) Later, Mr. Johnson saw Michael Harper park a Blue/White Blazer in the back of the store. Michael Harper then got into another van with a male black approximately 17 years old. The van had other occupants. (*Id.*) Mr. Johnson went to buy a pack of cigarettes and when he returned, the video store was on fire. (*Id.* at p. 3.) He saw Michael Harper "walking/hopping as though something was wrong with his leg." (*Id.*) Michael Harper asked if Mr. Johnson had seen a black male who was tall and skinny running with a gas can because someone told him that is who set the place on fire. (*Id.*) Mr. Johnson also said that Michael Harper's mother offered him money not to talk to the police. (*Id.*) Mr. Johnson said that he would not testify in court because he feared for his life. Mr. Johnson repeated his account to Assistant States Attorney Burnett. (*Id.*)

The investigative file reveals that the Defendant Detectives did nothing to follow any of the many leads provided by Ms. Owens and Mr. Johnson.

## **ARGUMENT**

**I.** **THE REPORTS DOCUMENTING THE EYEWITNESS ACCOUNTS OF JOYCE OWENS AND BOBBY JOHNSON SHOULD BE ADMITTED INTO EVIDENCE.**

4

A. **The Owens and Johnson Eyewitness Reports Are Highly Relevant to the Defendant Detectives' Malice in Commencing and Continuing the Underlying Criminal Proceeding.**

The Illinois state law claim of malicious prosecution requires Mr. Brown to prove that defendants acted with malice. Malice, in this context, is acting for any reason other than to bring the responsible party to justice:

> Malice, as an element of malicious prosecution, has been defined as the initiation of a prosecution for an improper motive. An improper motive for a prosecution is any reason other than to bring the responsible party to justice. The element of malice may be inferred from a lack of probable cause when the circumstances are inconsistent with good faith by the prosecutorial team and lack of probable cause has been clearly proved.

*Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 141 (citations omitted).

Plaintiff must also prove that the Defendants caused a criminal proceeding to be commenced or continued against him. Evidence related to the law enforcement investigation is relevant here where it tends to show "that defendants engaged in a bad-faith investigation that immediately focused on [plaintiff] as the primary suspect, which deliberately limited the scope of the inquiry and disregarded or discounted other suspects and plausible motivations for the crime," such that they "opted not to pursue other avenues of investigation." *Id.*, ¶ 90; *see also id.*, ¶ 79 ("liability for malicious prosecution 'extends to all persons who played a significant role in causing the prosecution of the plaintiff'"). The Illinois Supreme Court has emphasized that where "an investigative team conducts a bad-faith and incomplete investigation—designed to implicate a particular individual regardless of the evidence—the prosecutor is effectively prevented from fully exercising [his/her] independent judgment," such that an indictment does not break the "causal chain." *Id.*, ¶ 84 (citing *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)).

The Detective Defendants' failure to follow leads provided by these eyewitnesses is central to Mr. Brown's case. Aside from the testimony of Mr. Brown, there is no direct evidence of

Defendants' malice. This is almost always the case; malice—like intent, discussed below—is established by circumstantial evidence. With regard to police officers, the most pertinent circumstantial evidence of intent is the investigation they conducted. The Illinois Supreme Court has recognized the powerful probative force of evidence related to police investigations to prove malice. If Mr. Brown is not permitted to inform the jury that the Detective Defendants had these important leads but did not follow them, he will be denied the most probative evidence of malice.

## B. The Reports are Relevant to the Detective Defendants' Intent to Violate Mr. Brown's Constitutional Rights.

For other claims, Mr. Brown has to prove that Defendants fabricated a confession and intentionally violated his constitutional rights. Defendants' intent cannot be proved directly; no one will admit to such conduct. Circumstantial evidence, therefore, is critical proof of intent. *See Jimenez v. City of Chicago*, 732 F.3d 710, 722 (7th Cir. 2013) (evidence of a defendant officer's deviations from investigatory standards can "support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights.") The failure to investigate where investigation would have been required by national standards or reason is powerful evidence of Defendant Detectives' intent. *Id.* at 721–22; *United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) ("We have before recognized that evidence of departmental policies can be relevant to show intent . . ."). Plaintiff contends that the Detective Defendants *could not* follow many obvious leads because the evidence would prove that they coerced Arthur Brown to sign a fabricated confession. (That is, of course, not the only conclusion a jury could draw, but it is one.) There is no more powerful evidence of that intent than the failure to follow leads provided by two eyewitnesses to the crime.

The issue before the Court is whether the jury should be prevented from knowing that these eyewitnesses *existed* and that the Detective Defendants ignored them. The issue is not, as framed

by the Defendants at times, whether Ms. Owens or Mr. Johnson was a witness who the State would call at a trial.[2] The salient question is whether an officer in search of the real perpetrator of the offense would have done *anything* to follow the leads that Ms. Owens and Mr. Johnson provided to determine if their accounts could be corroborated or disproved. Put another way, should a jury be allowed to consider whether a detective in search of the true perpetrator of the crime would have ignored information provided by two eyewitnesses to the arson/murder, including the identities of additional eyewitnesses?

Both Ms. Owens and Mr. Johnson provide information that inculpates Michael Harper and/or Geronia Ford. A jury could reasonably conclude that detectives who were in charge of this investigation and interested in finding the true perpetrator of the offense would follow up on that information. Both Mr. Johnson and Ms. Owens identify at least one additional witness—Lonnie "Boo" Wallace—whom no investigating detective interviewed.[3] Mr. Johnson also alleged that Michael Harper's mother engaged in witness tampering. These leads would be followed by detectives interested in bringing the true perpetrators to justice.

In addition to inculpating Michael Harper and Geronia Ford, the information provided by Ms. Owens and Mr. Johnson casts doubt on the information that Harper and Ford supposedly provided to the defendants about Mr. Brown's involvement in the case. According to the

---

[2] Because the relevance of this evidence is Detective Defendants' failure to follow leads contained in these written reports while the investigation was in its most active phase, alleged inconsistencies in interviews with a public defender decades later—or at a deposition, yet another decade later—are irrelevant.

[3] The Joyce Owens report states that "The 3rd District Tact team had already released Bobby Johnson and Lonnie Wallace (Boo) when we arrived. They denied everything to the tact team and we didn't see any need to go and interview them at this time." (Ex. 4, PX-6.) As stated above, Mr. Johnson ultimately provided information to the police regarding what he witnessed in the early morning hours of May 28. (Ex. 9, PX-3, at p. 2.) There is no evidence that any investigating detective ever reached out to Lonnie Wallace to have any follow up conversation with him regarding what he witnessed.

7

Defendants, Michael Harper and Geronia Ford described a scenario where a 37-year-old contractor—who had never committed a crime—helped a veritable stranger commit an arson for no reason. Michael Harper and Geronia Ford claim that their own motivation was to collect insurance proceeds that did not exist. Joyce Owens and Bobby Johnson described an alternative scenario. They provided information that the fire took place during a drug deal and that the individuals involved in the drug deal—not Arthur Brown—were at the scene of the fire.[4] Both of these witnesses describe drug deals taking place inside the video store at the same time that Mr. Brown was supposedly soaking a mattress with gas and lighting it on fire. This Court need not decide which scenario is more likely—although the choice is not hard. The question at hand is whether the jury should be allowed to hear this competing theory, and critically, that the Detective Defendants did nothing to investigate that theory and prove or disprove it. From this evidence, a jury could infer that the Detective Defendants did not pursue this lead because they were not interested in bringing the responsible party to justice. *Beaman,* 2021 IL 125617, at ¶ 149 ("[A] rational juror could find that defendants intentionally ignored, shaped, interpreted, or created evidence to support their conclusion that [the plaintiff] was guilty.").

This evidence is critical because it is undisputed that detectives are required to follow all leads. (CPD procedures require that of detectives; those procedures are not being allowed into evidence with the understanding that no one will dispute the proposition.) (*See* PX-400, at § 8.3 (G), (I), attached hereto as Exhibit 10.)

---

[4] Neither Joyce Owens nor Bobbie Johnson say explicitly that Arthur Brown was not present. As discussed below, they were not shown any lineups that would establish that fact. But the scenario they describe is diametrically opposed to the scenario that Michael Harper and Geronia Ford describe.

Once the jury understands that the Detective Defendants, experienced law enforcement officers, did not follow national standards to pursue all leads—especially those offered by eyewitnesses—the question becomes: Why did the Detective Defendants deviate from this standard?[5] One logical reason why the Detective Defendants did not follow these leads is because it would develop evidence that would prove they coerced Mr. Brown into signing a fabricated narrative. If this was a fire that was related to a series of drug deals, and with a number of people present who were involved in those drug deals, it completely contradicts the account of the crime that Defendant Whitehouse wrote and Defendant Campbell edited for Mr. Brown. Evidence that this fire took place in the midst of a drug deal with drug dealers and customers present would show that the confession given by Mr. Brown was false and coerced. Why else would Detective Defendants do nothing to pursue leads that would inculpate Michael Harper? Why else would Detective Defendants not pursue evidence of a more logical scenario for this fire than that it was done to collect non-existent insurance money?

The Court need look no further to conclude this evidence is admissible, but there is an additional reason. Plaintiff's police practices expert Dennis Waller opined that the failure to follow the leads created by the Joyce Owens and Bobbie Johnson interviews violated generally accepted police practices. (Waller Rep. at 10-11, attached hereto as Ex. 11.) Mr. Waller indisputably is an expert in police practices. He will testify, if permitted, that the failure to follow the leads created by the Owens and Johnson interviews violates the national standard for detectives to follow all leads. Importantly, Defendants' police practices expert agrees that the detectives have an obligation to interview anybody who was at the scene who comes to their attention as a potential

---

[5] This issue is not whether these statements made it impossible for anyone else to have set the fire. The issue is not whether these statements, if believed, completely exonerate Mr. Brown, although they do. The issue is: Why didn't the Detective Defendant follow these leads?

witness. (Andreu Dep., 149:25-150:6, attached hereto as Ex. 12.)  Mr. Andreu admitted that he would have interviewed Lonnie "Boo" Wallace.  (*Id.* at 150:17-22.)  He agreed that he would have shown Joyce Owens a lineup (not including Michael Harper, who she knew).  (*Id.* at 157:5-11.) He would have shown Bobbie Johnson a lineup, as well, assuming he would attend, although it would not have been a "mandatory" part of his investigation[6]. (*Id.* 157:12-158:15.)  Defendants' expert would have pursued leads presented by Joyce Owens and Bobbie Johnson.  How can the jury be deprived of this evidence based on a theory that they were too unreliable, or high, or any other factor?

It is well-settled that police officers acting contrary to training or policies is relevant to willfulness and intent.  *See, e.g., Proano*, 912 F.3d at 439 (holding that the fact that an officer broke from department policy is relevant to a determination of willfulness).  The same logic would apply to violations of national standards for detectives.

## II. THE ARGUMENTS AGAINST ADMISSION OF THIS HIGHLY RELEVANT EVIDENCE ARE WITHOUT MERIT

### A.  The Investigation Was Not Over

Among the arguments against admission of this evidence is the idea that Michael Harper, Geronia Ford, and Arthur Brown had been arrested and the case marked "closed" before Joyce Owens and Bobbie Johnson were interviewed.  That implies the investigation was over.  It was not.  The closing of a case does not end an investigation.  Indeed, Detective Kutz interviewed witnesses the day after Ms. Owens and Mr. Johnson were interviewed.  (*See, e.g.,* PX-40, attached

---

[6] That Mr. Johnson said he did not want to cooperate further with the investigation does not absolve the Detective Defendants from investigating further.  Mr. Johnson admitted to conducting a number of drug transactions with Michael Harper. There are many legitimate ways to overcome a witness's reluctance to cooperate in investigations. Few witnesses are enthusiastic about participating in a murder investigation, especially those who are admitting to criminal activities.  That does not stop law enforcement from engaging with those witnesses.

hereto as Ex. 13.) Detective Kutz testified that an investigation does not end until the conclusion of the trial. (April 19, 1990 Trial Tr., at 127:11-128:23, attached hereto as Ex. 14.) Mr. Brown was not even indicted until July 1, 1988, over a month after Ms. Owens and Mr. Johnson were interviewed.

### B. Bobbie Johnson and Joyce Owens' Information Was Credible Enough to be Worthy of Follow-up Investigation

Both Joyce Owens and Bobbie Johnson were disinterested witnesses.[7] But it is really more than that. True, they had nothing to gain from coming forward. But they had much to lose. Both admitted crimes in the course of their statements to the police. Bobbie Johnson admitted participating in several drug transactions. (Ex. 9, PX-3 at p. 2–3.) Joyce Owens admitted to getting high on cocaine and taking cocaine from Bobbie Johnson. (Ex. 4, PX-6.) Thus, their statements carry some of the indicia of reliability as a statement against penal interest.

Moreover, Defendants' police practices expert admits that Joyce Owens was credible "to some extent." ("Q. Okay. And we know that Joyce Owens was credible, right? A. To some extent, yes." (Ex. 12, Andreu Dep. at 135:25-136:2.)

The fact is Joyce Owens's information was not ignored by the police; it was ignored by the Detective Defendants—the persons who were in charge of the investigation and who were required to follow all leads. Other detectives interviewed Bobbie Johnson on the strength of Joyce Owens's assertion that he too was an eyewitness. When they conducted the interview of Mr. Johnson, they discovered that he was, *as Joyce Owens said*, an eyewitness.

There are two statements in the report of Ms. Owens's interview that can be viewed as contradictions. First, Joyce Owens told the police that Michael Harper came running out of the

---

[7] Defendants' police practices expert acknowledged that Joyce Owens was disinterested. (Ex. 12, Andreu Dep. at 164:9-10.)

store with the other people and a bag full of tapes. (Ex. 4, PX-6.) In that same interview, she corrected herself and said that Michael Harper first came out with a bag of tapes and walked in the direction of his mother's house. (*Id.*) He later returned to the store and ran out with the others involved in the drug deal when the fire was lit. (*Id.*) That is hardly a disqualifying "contradiction."

The other statement in question is that she did not recognize anyone in custody from the news coverage. (*Id.*) But she made it clear throughout the interview that she knew who Michael Harper was; indeed, she knew how he allegedly conducted his drug deals. (*Id.*) There are at least two possible explanations for the statement that she did not recognize anyone in custody. First, the police report is not a text of what Joyce Owens said. It is quite possible that Joyce Owens said she did not know the other people in custody. Again, there is no doubt she knew Michael Harper. The other possible explanation is that she did not see Michael Harper in whatever television coverage she viewed. As the below still shot from PX-601D shows, media footage shows that when escorted in front of the press on May 28, 1988, Michael Harper covered his head with his jacket so that his face could not be seen.



Nor does Joyce Owens's use of cocaine disqualify her as a source of information that the Defendant Detectives should have pursued. Once again, the inquiry is not whether Ms. Owens would be an ideal witness. The question is: Would any detective interested in bringing the true perpetrator of the crime to justice have ignored her information? If Defendants want to argue to

12

the jury that Ms. Owens being on drugs was a basis for ignoring her information, they are free to do so.  It does not follow that Ms. Owens's statements should be kept entirely from the jury.

None of the issues about Ms. Owens mean that the leads she provided should have been ignored by detectives charged to follow all leads.  Again, Defendants' police practices expert admits that had he been investigating the case, he would have shown Joyce Owens a lineup and interviewed Lonnie Wallace. (Ex. 12, Andreu Dep. at 150:17-22, 157:17-158:1).  If Ms. Owens were completely incredible, those investigative steps highlighted by Defendants' own expert would have been futile.

The force of this evidence is that the Detective Defendants did not follow up on these leads, even while they were actively investigating the case in the days following the crime.  It is relevant to their malice and intent. For that reason, any subsequent contradictions, unknown to the Detective Defendants, are irrelevant.  Defendants point to fragmentary notes of a Cook County Public Defender investigator taken in 2008 and her deposition in 2021.  The Detective Defendants had no knowledge of either.  They are irrelevant.

**C. Defendants' Unavailability Prejudices Plaintiff, Not Defendants**

That the Detective Defendants cannot be subjected to cross-examination on this issue severely prejudices Plaintiff's case.  If Plaintiff's counsel were able to confront the Detective Defendants with the litany of steps any detective who was interested in bringing the true perpetrator to justice would have taken, it would have far greater impact than the cold paper exhibits this pleading seeks to admit.  Indeed, defense counsel will be able to argue any number of potential reasons for these leads being followed without being bound by the story their clients might tell.  Further, their police practices expert will testify about why, in his opinion, these leads need not have been followed in order to have a thorough investigation.

**D. Defendants Were Aware of These Reports**

The interviews of Joyce Owens are in the Arson investigative file. Those notes refer to Bobbie Johnson, Lonnie "Boo" Wallace, and others as eyewitnesses. The interviews of Bobbie Johnson are contained in the Violent Crimes investigative file. Those interview summaries refer to Joyce Owens (as the source of Mr. Johnson's identity, address, and statement that Mr. Johnson was on scene when the arson occurred) as well as others.

CPD Special Order 86-3 governs Investigative Files. It provides that the investigative file

> is a criminal case file pertaining to an investigation which contains official Department reports, notes, memoranda, and miscellaneous documents generated or received by a Division member during the course of the investigation. The Investigative File is designed to provide all parties engaged in a criminal proceeding, including…**the assigned Department members,** with the available written documentation pertaining to the criminal investigation in question.

(PX-403, § III.A., attached hereto as Ex. 15) (emphasis supplied). The assigned Department members in this case are the Detective Defendants. The Special Order requires the Detectives assigned to the case to "record and preserve relevant information as fully and accurately as possible during the course of their investigation," and translate handwritten GPR's into Supplementary Reports, among other responsibilities.[8] It would be impossible for the lead detectives to execute these responsibilities without reviewing the entire file. In addition, CPD Detective Division Standard Operating Procedures, Chapter 18, govern investigative files. (Ex. 10, PX-400, § 8.) Those procedures incorporate Special Order 86-3. Consistent with Kutz's testimony that an

---

[8] This is but one example of why the Special Orders and the Standard Operating Procedures are relevant and essential evidence. Without that evidence, the Court, and ultimately the jury, would not appreciate why the Defendant Detectives would know what was in the investigative files. The relevance of this particular Standard Operating Procedure and General Order are that Defendant Detectives **complied** with them. Thus, there could be no juror confusion with violations of Constitutional rights.

14

investigation is not over until trial is complete, all investigative files are to be maintained through at least trial, and some permanently. (Ex. 15, PX-403, § V.A.)

Consistent with these orders and procedures, Detective Micek, who authored the typed Joyce Owens interview memorandum, testified that he was not the assigned detective on this investigation and that he submitted his notes and report for review and action by the assigned detectives, who were Detectives Fine, Kutz and Campbell. *(See supra.* at fn. 1.)

### E. This Evidence Is Not Rule 404 Evidence

The evidence regarding Detective Defendants failure to investigate these leads is not offered as a bad act or to prove their propensity to commit bad acts. Rather, it is closely related to the central conduct of this case: Defendants' fabrication of a confession. Even if this conduct did fall under Rule 404, it would be admissible as evidence of intent and motive under Rule 404(b).

### F. The Court's *in Limine* Rulings Are Expressly Not Binding

Defendants have said that this Court has addressed the Joyce Owens report, and it has. The undersigned apologizes for not providing the Court with a more complete context to gauge the relevance of the eyewitness reports of Ms. Owens and Mr. Johnson. By definition, and as this Court has stated, *in limine* rulings are made with limited background and then, when appropriate, revisited when more information is available.

### III. THESE REPORTS SHOULD BE ADMITTED INTO EVIDENCE AND THE PARTIES SHOULD BE ALLOWED TO REFERENCE THEM IN OPENING STATEMENTS.

All of the foundation for these exhibits already exists. The parties agree that the reports are authentic and are contained in the investigative files. That is all the foundation necessary.

### CONCLUSION

Plaintiff requests that the reports related to Joyce Owens (Exs. 3-4, PX-6, 7) and Bobby Johnson (Ex. 7-9, PX-3, 4, 5) be admitted into evidence.

Dated: March 23, 2023                    Respectfully submitted,

                                         /s/ *Ronald S. Safer*
                                         Ronald S. Safer
                                         Joseph O'Hara
                                         Abigail L. Peluso
                                         Allison N. Siebeneck
                                         Lauren Jaffe
                                         Andrew Patton
                                         RILEY SAFER HOLMES & CANCILA LLP
                                         70 W. Madison Street, Suite 2900
                                         Chicago, Illinois 60602
                                         (312) 471-8700 (tel)
                                         (312) 471-8701 (fax)
                                         rsafer@rshc-law.com
                                         johara@rshc-law.com
                                         apeluso@rshc-law.com
                                         asiebeneck@rshc-law.com
                                         ljaffe@rshc-law.com
                                         apatton@rshc-law.com

                                         Maegan B. McAdam (admitted *pro hac vice*)
                                         RILEY SAFER HOLMES & CANCILA LLP
                                         136 Madison Avenue, 6th Floor
                                         New York, NY 10016
                                         (212) 660-1000 (tel)
                                         (212) 660-1001 (fax)
                                         mmcadam@rshc-law.com

                                         *Attorneys for Plaintiff Arthur Brown*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 23, 2023, I caused the foregoing document to be electronically filed used the CM/ECF system, which will send notice of this filing to all counsel of record.

*/s/ Ronald S. Safer*
                                                             

4889-5819-9641, v. 3